# Exhibit 6

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| JOHN DOE,<br><br>                    Plaintiff,<br><br>       v.<br><br>JOSHUA BERNSTEIN<br>                    Defendant. | 10 CIV 9658 (NRB) ECF<br><br>**AFFIDAVIT** |

STATE OF NEW YORK    )
                                   ) ss.:
COUNTY OF NEW YORK   )

Joshua Bernstein being duly sworn, deposes and says that:

1. This affidavit is based on personal knowledge, unless stated otherwise, and it is provided voluntarily in connection with a settlement of the claims against me in the action captioned: *John Doe v. Bernstein*, Index No. 10 Civ. 09658 (S.D.N.Y.).

2. I was employed by Bayrock Group LLC ("Bayrock" or the "Company"), a real estate development company, from November 2006 to September 2008.

3. During my employment at Bayrock, John Doe instructed me to maintain a back-up copy of all Bayrock files from the servers. Mr. Doe instructed me to purchase whatever equipment was necessary, including an external hard drive, and to back up all Bayrock files, including emails, on the backup drive.

4. I purchased an external hard drive with my personal funds and began to periodically back up Bayrock's email server onto the external hard drive (the "backup hard drive"). I then copied all the data from the back-up hard drive onto multiple DVDs and maintained hard copies of some of the data. Subsequently, the original hard drive I

had purchased broke and I disposed of it prior to the *John Doe v. Bernstein* action. However, I still possessed multiple DVDs containing data from the hard drive and hard copies of some of the data (hereinafter, also referred to as the "back-up hard drive").

5. Unbeknownst to me until after my employment Bayrock's corporate email system and - by extension the back-up hard drive – contained documents concerning the federal criminal prosecution of Mr. Doe ("Doe's Documents"), including:

   a) A Cooperation Agreement, dated December 10, 1998;

   b) A United States Department of Justice Financial Statement, dated December 10, 1998;

   c) A Pre-Sentence Investigation Report, dated June 18, 2004;

   d) A proffer agreement, dated October 2, 1998; and

(the foregoing documents being defined as the "Confidential Doe Documents").

6. The back-up hard drive also contained communications between Doe and his counsel, and communications between Bayrock and its counsel.

7. In or about September, 2008, I ceased working for the Company.

8. After my employment ended, Bayrock sent me a letter requesting that I return "[my] blackberry and all other company property in [my] possession or control, including the hard drives which were removed from the computer in [my] office." *See* Exhibit ("Ex.") 1. Similarly, in an email dated in or about October 3, 2008, John Doe wrote, "Josh you had downloaded all emails on to a hard drive I ask you to get I would like to get that please." [sic] *See* Ex. 2. Although Bayrock and John Doe asked me to return the back-up hard drive, I kept it anyway. I believed I was entitled to do so because Bayrock and John Doe had failed after numerous requests to reimburse all of my

outstanding business expenses, including my personal expense of purchasing the back-up hard drive.

9. In or about February 2009, I sued Bayrock in New York State Supreme Court, Westchester County, for, among other things, unpaid wages, bonuses, and reimbursements, including for the back-up hard drive (the "Westchester Action"). I learned that Jody Kriss, my former colleague at Bayrock who was primarily responsibly for the finances of the firm, was also suing Bayrock in an action in Delaware (the "Delaware Action"). Frederick Oberlander, Esq. was the attorney representing him in the Delaware Action.

10. After my employment with Bayrock ended, I informed Mr. Kriss that I possessed Bayrock's backup hard drive. I also showed Mr. Kriss the letter that Bayrock had sent me requesting that I return Bayrock's property. *See* Ex. 1.

11. Mr. Kriss told me that if I cooperated with him and helped him in the pursuit of his claims against Bayrock and other related parties, he would give me a piece of whatever he recovered from them. I understood this to mean that he wanted me to share the data on the back-up hard drive, or any other information I possessed, with him to assist him.

12. Mr. Kriss told me that his lawyer was Frederick Oberlander. When Mr. Oberlander and I spoke, we discussed the facts and circumstances of my case and his client's case.

13. At a later date, Mr. Oberlander and I discussed the fact that I possessed the back-up hard drive. Initially, I had assumed that Mr. Kriss had already informed Mr. Oberlander that I had obtained the back-up hard drive as part of my duties as an

employee at Bayrock. Mr. Oberlander assured me that the documents on the hard drive were not stolen and that as a legal matter I had every right to possess the back-up hard drive. He further sent me emails containing legal authority indicating that, even if the documents were stolen, they could still be used in court. *See* Ex. 3

14. Mr. Oberlander told me that he would like to review the back-up hard drive, along with other related evidence for my case against Bayrock, because he had reason to believe that bad things happened at Bayrock. Mr. Oberlander also told me that Mr. Kriss and I may have a common interest against Bayrock.

15. After apprising me of our common interest, Mr. Oberlander then volunteered to represent me in the Westchester Action for free. He also convinced me that, because of his representation of Mr. Kriss and Eugene Borokovich, an associate of Tevfik Arif, one of Bayrock's principals at the time, he had extensive knowledge of all the events that had taken place at Bayrock and was familiar with all of the key individuals at Bayrock, including John Doe.

16. Mr. Oberlander provided me a retainer agreement, dated February 28, 2010 (the "Retainer Agreement"), in which he attempted to explain the nature of the "Common Interest Privilege." *See* Ex. 4, Retainer Agreement. The Retainer Agreement was a 7-page document, much of which I did not understand. Mr. Oberlander also attempted to orally explain the privilege to me.

17. According to the Retainer Agreement, "Jody [and I] share a common interest in enforcing rights to money due each of [us] pursuant to contractual or equity or similar interests in Bayrock companies..." *Id.*, at pg. 2, ¶ 4, and that "a fundamental purpose for this common interest agreement is the pooling and free use of such

information without resort to compelled disclosure or production or resistance or hostility." *Id.* at pg. 3, ¶ 2.

18. Furthermore, based on the Retainer Agreement, I believed that Mr. Oberlander acknowledged that Mr. Kriss already knew that I possessed the back-up hard drive with the documents on them. Specifically, he wrote:

> So for example, none of the disk with Bayrock server files, its existence, its contents, and your knowledge or possession thereof are privileged, or for that matter confidential with respect to Jody, **who obviously knows all about it, as we have already discussed**, and all are subject to Mr. Kriss's and others' subpoena, use, and production, and you may not assume, and have no reasonable expectation of, confidentiality or privilege as to the disk and your possession or knowledge of it and its contents.

*Id.* at pg. 3, ¶ 1 (emphasis added).

He also wrote:

> We have agreed that the disk and files are not confidential. Therefore, whatever's on [the hard drive] Jody gets to know and vice versa.

*Id.* at pg. 5, ¶ 8.

19. On or about February 28, 2010, I signed the Retainer Agreement. I did so because I believed that Mr. Oberlander's extensive knowledge of Bayrock and its principals and could assist me in my claims against Bayrock. Specifically, Mr. Oberlander had told me that he could favorably settle the Westchester Action on my behalf and he was to depose Bayrock's General Counsel, Julius Schwartz, Esq. Mr. Oberlander signed the Retainer Agreement "on behalf of Jody Kriss by his attorney, who may as set forth herein above also be at some immediately future time the special, limited attorney of Josh Bernstein". *Id.* at pg. 7.

20. I did not pay Mr. Oberlander any legal fees for his representation of me. Mr. Oberlander told me he was volunteering his services for free because Mr. Kriss and I had a "common interest" against similar defendants.

21. Accordingly, after I signed the Retainer Agreement, I provided Mr. Oberlander with unfettered access to the information from the back-up hard drive. One night in late February 2010, Mr. Oberlander came over to my apartment in New York City to review the evidence on the hard drive. Mr. Oberlander and I were the only ones in the room, and he sat at my desk and used the search function on my computer to search for relevant documents that originated from the back-up hard drive. He searched for several hours. He printed documents and emailed files, which I believe may have gone directly to his personal email address. At one point, Mr. Oberlander asked me if I had a "keystroke logger," which tracks what someone types on a keyboard. I told him I did not have such a program.

22. I was unaware of all the search terms Mr. Oberlander used to retrieve documents. However, I recall some search terms he used, including at least one law firm "Roberts & Holland" (which was counsel to Bayrock); "Elizabeth Theiriot;" the "FL Group;" and "Alex Salomon" (whose accounting firm represents Bayrock). As he was doing these searches, he would ask if I heard of these names and what I knew about them. On other occasions, names such as Duval & Stachenfeld, Nixon Peabody and other law firms representing Bayrock were also brought up.

23. Oberlander told me that, with his knowledge of the actors in the case, he could settle the Westchester Action for me on very favorable terms. Mr. Oberlander said that he could either obtain the documents as he was doing, or via subpoena. Mr.

Oberlander again explained to me that the documents from the hard drive were not privileged and confidential. He later said they were exempt because of the "crime fraud exception". He also told me that, as a member of Bayrock, Mr. Kriss was entitled to all the documents on the back-up hard drive.

24. I now realize that, by giving Mr. Oberlander access to the back-up hard drive, I provided him access to Doe's Confidential Documents. However, at the time, I was not aware of, nor did I believe, that these documents were privileged or confidential, or that there could be any limitation or restrictions to me disseminating them to my legal counsel. I believed that, because Mr. Oberlander was an attorney, he was complying with the law.

25. Subsequently, on or about March 5, 2010 and March 9, 2010, Mr. Oberlander deposed Julius Schwarz in the Westchester Action.

26. To date, I have not paid Mr. Oberlander for any legal work that he performed for me, nor do I owe him any money.

27. Five months later, in or about August 2010, Mr. Oberlander and Mr. Richard Lerner, his counsel, asked me to provide them with a Declaration, stating that the court needed one.

28. I complied with their request and assisted in preparing the Declaration, which essentially stated the facts and circumstances of how Mr. Oberlander came to represent me and how Mr. Oberlander came to possess Doe's Confidential Documents,, which were contained on the hard drive . See Ex. 5.

29. After listening to Mr. Oberlander's deposition of Mr. Schwartz, it occurred to me that many of his questions did not seem directly related to the

Westchester Action for which I had retained him but may have related to the lawsuit that Mr. Kriss had against Bayrock.

30. Aside from the deposition he took in the Westchester action, Mr. Oberlander has not provided me any other legal representation.

*Joshua Bernstein*

Sworn to Before me
This 19th Day of September, 2011

Notary Public

DAVID C. WROBEL
NOTARY PUBLIC, State of New York
No. 02WR6086511
Qualified in Westchester County
Commission Expires January 21, 2015