SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK

-------------------------------------------------------- x

SALVATORE LAURIA,

               Plaintiff,

    -against-

JODY KRISS,

               Defendant.

-------------------------------------------------------- x

Index No. _____

Purchased: March 16, 2014

**SUMMONS**

Plaintiff designates New York County as the place of trial

The basis of venue is Defendant's residence in New York, New York

TO THE ABOVE-NAMED DEFENDANT:

     PLEASE TAKE NOTICE THAT YOU ARE HEREBY SUMMONED to answer the complaint in this action and to serve a copy of your answer, or, if the complaint is not served with this summons, to serve a notice of appearance on the Plaintiff at the address set forth below within twenty (20) days after the service of this summons, exclusive of the day of service, or within thirty (30) days after service is complete if this summons is not delivered personally to you within the State of New York.

     YOU ARE HEREBY NOTIFIED THAT should you fail to answer or appear, a judgment will be entered against you by default for the relief demanded in the complaint.

Dated:  New York, New York

March 16, 2014

BEYS STEIN MOBARGHA & BERLAND LLP

By:  _____

Nader Mobargha
Michael P. Beys

The Chrysler Building
405 Lexington Avenue, 7th Floor
New York, New York 10174
Telephone: (646) 755-3603
          (646) 755-3600
Facsimile: (646) 755-3599
Email:  nmobargha@beysstein.com
        mbeys@beysstein.com

*Attorney for Plaintiff Salvatore Lauria*

**Defendant's Addresses:**

Jody Kriss
205 West 76th Street. Unit 1101
New York, New York 10023

East River Partners, LLC
915 Broadway, Suite 1001
New York, New York 10010

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK

------------------------------------------------x

SALVATORE LAURIA,

          Plaintiff,

   -against-

JODY KRISS,

          Defendant.

------------------------------------------------x

Index No. _____

**COMPLAINT**

Plaintiff Salvatore Lauria ("Lauria") by and through his attorneys, Beys Stein Mobargha & Berland LLP, for his Complaint against Defendant Jody Kriss, alleges as follows:

### PRELIMINARY STATEMENT

1.      This case is about a billion-dollar shakedown by real estate developer Jody Kriss ("Kriss"), who made millions of dollars as consigliere for the Russian mob.  Like Tom Hagen in "The Godfather," Kriss and his father, attorney Ronald Kriss, were the "front men" for the Bayrock Group ("Bayrock"), a real estate development company, owned and run by people Kriss himself claims were mobsters.  Kriss was the Chief Financial Officer ("CFO") of Bayrock and his father was the outside general counsel for what Kriss claims was a mob outfit.  In fact, his co-workers nicknamed Kriss "VOR-TON," a word play on "Wharton," the school he attended, and the Russian "vor-in-law" ("thief-in-law," as Russian mobsters are known), because – as he used to brag – Kriss could steal more using his Wharton degree than 100 gangsters combined.  Yet ultimately, because Kriss was unsatisfied with the millions he made as Bayrock's front man, he

turned on his alleged gangster friends, suing them, Bayrock, prominent law firms, Plaintiff Lauria, and numerous others in a relentless, extortionate billion-dollar shakedown.

2.       Currently a founder and principal of East River Partners, Kriss now moonlights as a professional plaintiff who uses his veneer of power and prestige, and the court system, to repeatedly sue and extort innocent defendants. He has sued the Trumps. He has sued the Sapirs. He has sued prestigious law firms, including Nixon Peabody LLP, Satterlee Stephens Burke & Burke LLP, Duval & Stachenfeld LLP, and Roberts & Holland. He has sued small law firms. He has sued individual lawyers. He has sued the insurance carriers for these law firms. He has sued accounting firms. He has sued individuals with little or no assets, like Plaintiff Lauria. He even sued his father's former firm, Akerman Senterfitt LLP ("Akerman"), which acted as Bayrock's outside general counsel and where his father Ronald Kriss was the chief liaison to Bayrock. After the lawsuit was filed naming Akerman as a defendant, Ronald Kriss left the firm, and ultimately landed, remarkably, as a managing partner at Stroock & Stroock & Lavan ("Stroock"). Most absurdly, however, Kriss sued a current federal prosecutor in Brooklyn, New York for his role in legally protecting the identity of confidential government witnesses. He has attempted to extort all of these various parties by filing no less than four frivolous, sensational lawsuits over the last five years.

3.       Kriss accuses all of these defendants – without any basis – of operating a massive civil RICO conspiracy together. That the claims asserted in the litigations are meritless – or more accurately, absurd – is of no concern to him. Equally of no concern to him is the indisputable fact that the actions he accuses the defendants of are actions that Kriss, and his father, the outside general counsel of Bayrock, themselves committed and are responsible for.

For Kriss, litigation is a useful nuisance tool that can reap handsome financial rewards and cover his own tracks at the same time.

4.  Indeed, Kriss himself was the "front" for Plaintiff Lauria and other Bayrock employees, to cover up their past criminal convictions. Formerly a low-level analyst, Kriss was elevated to the position of CFO at Bayrock precisely for this reason. The scheme has its roots back in the early 2000s when Kriss and his father, Ronald Kriss, an ivy-league educated partner at Akerman, masterminded a plan to take over Bayrock. First, Kriss hired Ronald Kriss's law firm as Bayrock's outside general counsel, tasking him to "solve" the problem of Bayrock employees' criminal histories, as Bayrock tried to raise money from outside investors and to finance their projects with major U.S. banks. In turn, Ronald Kriss advised Bayrock that it needed a squeaky-clean, pedigreed executive as the face of the company and suggested his own son. Kriss was the perfect "front man," a graduate of the University of Pennsylvania's prestigious Wharton School, with no criminal past. In his new position, Kriss proceeded to raise money from investors and banks, negotiated deals on behalf of Bayrock, and signed all key regulatory filings, all as the name and face of Bayrock. As Bayrock's attorney, Ronald Kriss devised and legally blessed this scheme. Together at the helm, Jody and Ronald Kriss paid themselves millions of dollars in commissions and legal fees for several years posing as the figureheads of Bayrock.

5.  Yet, despite the millions that Kriss and his father's firm made, their real plan was to eventually turn on the very criminals they were covering up for, and to extort them for hundreds of times the money they made in fees as the CFO and general counsel of Bayrock. Kriss used mobster tactics to build his case against Bayrock and other defendants, including Lauria. These tactics included (i) "wiring up," using a hidden recording device to record

privileged and confidential conversations he had with Bayrock's principal, Tevfik Arif, and in-house general counsel, Julius Schwarz; (ii) lying and destroying evidence, that is, reentering Bayrock's offices under false pretenses to "wipe down" his computer and delete potentially incriminating electronic files; and (iii) bribing the ex-tech analyst at Bayrock to give him access to the company's hard drive, which the analyst himself had duplicated, taken, and kept without permission.   On the stolen hard drive, Kriss and his attorneys found a treasure trove of judicially-sealed, attorney-client privileged and confidential documents, including documents concerning the government cooperation of Lauria and another Bayrock employee against dangerous mob associates and criminals.   Kriss also found privileged communications between Bayrock executives and the company's attorneys about highly sensitive legal and tax matters and pending litigations.

6.      After illegally recording his colleagues and stealing Bayrock's privileged communications and other documents, Kriss began his legal extortion campaign, which involved filing multiple civil RICO actions against numerous defendants.   Each of the lawsuits filed by Kriss were designed to fail as meritorious actions, but succeed as tools of extortion.   As a pressure tactic to score a quick settlement from defendants in those actions, including Plaintiff Lauria, Kriss and his attorneys disclosed and attached judicially-sealed documents and attorney-client privileged communications in a publicly filed complaint.   These documents contained sensitive details about Lauria and another Bayrock employee's past cooperation with the federal government.   The public disclosure and circulation of this information could sound the death knell for Plaintiff Lauria and his family – a possibility confirmed by the government and multiple federal judges.

7.     Kriss and his attorneys did not care.  In fact, they actively sought to disclose this life-threatening information to the press, and orchestrated the publication of numerous articles about it.  For Kriss, the more press time his frivolous lawsuits and sensational, judicially-sealed information garnered, the more money the defendants – especially the prominent laws firms and their insurance carriers – would pay to settle the "dispute" and make it go away.  Kriss and his attorneys made no secret of their extortionate plan, even admitting it to their opposing counsel.

8.     Pushing their disclosure campaign even beyond the press, Kriss and his attorneys also disclosed sealed information to a very well known lawyer who represented the very organized crime figures whom Plaintiff Lauria cooperated against.  The result was a violent one for Lauria.  In July 2012, one of these mob associates viciously assaulted Lauria in broad daylight, accusing him of being "a rat" and telling him, "you're dead."  Despite this violent consequence, Kriss forged ahead filing additional lawsuits and continuously exposing sensitive and sealed information about Lauria and others to expose them to danger and further his extortion campaign.

9.     That is because Kriss is a predator with a veneer of legitimacy, a wolf masquerading as a shepherd, a Tom Hagen.  His use and abuse of the judicial system to steal, pressure, and extort Lauria and other defendants show that mobsters and extortionists do not always pack a gun, carry a bat, or threaten physical violence.  Sometimes they wear suits and have fancy degrees from Ivy-league schools like Wharton.

## PARTIES

10.     Plaintiff Salvatore Lauria is an individual who resides in Connecticut.

11.     Defendant Jody Kriss is an individual who resides in New York, New York.

## JURISDICTION AND VENUE

12.     This Court has jurisdiction over the subject matter of this action pursuant to

Section 7 of Article VI of the Constitution of the State of New York and pursuant to Judiciary

Law § 140-b because this is a civil action for, *inter alia*, monetary damages (exclusive of interest

and costs) in excess of the jurisdictional maximum of the Civil Court.

13.     Venue is proper in this County pursuant to C.P.L.R. §§ 503(a) and 509.

## FACTUAL BACKGROUND

### *Kriss and Lauria work at Bayrock together*

14.     The story begins at Bayrock, where Lauria and Kriss were both employed.

Bayrock is a real estate investment and development firm specializing in luxury, residential,

commercial and mixed-use condominiums, and has developed real estate throughout the United

States.  Jody Kriss was Bayrock's CFO, Chief Operating Officer ("COO"), and Director of

Finance from 2003 to 2008.  On his current company's website, East River Partners, he even

claims to have been the founder of Bayrock.  Between 2006 and 2007, Lauria was a consultant

with the company whose primary responsibility was to find investors for real estate deals both in

the United States and internationally.

15.     While a valuable and lucrative asset to the company, Lauria had a criminal past.

In 1998, Lauria pleaded guilty to securities fraud in the Eastern District of New York.  If

disclosed, his past would bring bad publicity to Bayrock's real estate projects throughout the

country, scare off its investors and banks, and hamper its fund-raising abilities.  This was one of

the reasons Kriss was made the name and face of Bayrock, to "front" for people like Lauria.

16.     Kriss was intrigued by Lauria's criminal history.  While sharing an office with

Lauria at Bayrock, Kriss would routinely ask to see Lauria's court-mandated ankle monitor and

referred to it as "federal jewelry." Kriss would boast to Lauria that Lauria could have stolen a lot more money had he received a business school degree from Wharton. Kriss bragged that with the stroke of a pen, he could steal more money than 100 mobsters with guns combined. Among his co-workers at Bayrock, especially those he now claims are Russian mobsters, Kriss became known as "VOR-TON" which literally means thief of tons in Russian. Specifically, it is a play on words on both Kriss's alma mater, the Wharton School of the University of Pennsylvania, and the Russian "vor-in-law," as Russian mobsters are known. In other words, "the gangster from Wharton." Ultimately, he would live up to this name and reputation.

### *Kriss is the front man for convicted criminals at Bayrock*

17.     Despite the natural connection Kriss, a.k.a. "VOR-TON," drew between legitimate business and organized crime, Kriss knew he had to hide his brand of business from Bayrock's investors. First, he brought in and teamed up with his father, Ronald Kriss, Bayrock's outside general counsel and a well-respected law partner at the Akerman, who has both an undergraduate and law degree from the University of Pennsylvania, the same school his son Jody Kriss attended. Once together, this father-son duo orchestrated a scheme to keep Lauria and others with criminal ties involved in Bayrock's day-to-day operations, while hiding their criminal pasts from Bayrock's investors and banks.

18.     Under Ronald Kriss's expert legal direction, the Bayrock enterprise would operate as follows. Kriss would act as the front man – i.e., the figurehead and face – for these convicted criminals, who would continue to work at Bayrock and make Kriss substantial amounts of money. Kriss's sterling educational background, Wharton degree, and crime-free history were the perfect cover for these alleged mobsters. To investors, it was Kriss who was in charge, not the former convicted criminals, who actually operated and managed the company. Kriss's role

-7-

as the front for alleged Russian and Italian mobsters culminated with his signature on Bayrock's condominium documents – his certifications and legal representations to the New State Attorney General's Office and the public at large.

19.     With themselves at the helm of Bayrock, Ronald Kriss, as the outside general counsel of Bayrock, and Kriss, as CFO and Director of Finance at Bayrock, paid themselves millions of dollars in commissions and legal fees for several years, while hiding the truth about the criminal history that plagued Bayrock.

### *Kriss's ties to Russian organized crime go beyond Bayrock*

20.     Kriss's ties to convicted criminals went beyond Bayrock.  During his tenure at Bayrock, Kriss traveled to Russia to meet with high-ranking members of Russian organized crime and discuss the investment of their "profits" in the New York real estate market. Witnesses attended these meetings, where it was clear that Kriss was fully aware of the origins of the money he was soliciting.

21.     Kriss and his father, Ronald Kriss, also traveled to Turkey aboard a privately leased 707 jet with the alleged criminals they were fronting for.  Once in Turkey, the Krisses hobnobbed with Russian "dignitaries," a euphemism for members of organized crime.  This event was photographed.

22.     Like the convicted criminals Kriss was fronting for, the sources of the funds of these Russian and Turkish investors did not bother or deter Kriss from doing business with them. To the contrary, these types of investors, with their colorful backgrounds, were a routine part of Kriss's business plan and dealings.  Without him, there would have been no use for Kriss and his Wharton degree.

### *Kriss's relationship with Lauria goes sour and he seeks recovery of a commission fee*

22.     Despite Kriss's success in combining the foreign criminal underworld with the U.S. real estate business, he ultimately turned sour on the convicted felons at Bayrock for which he was fronting.  The seeds of his resentment against Lauria – and ultimate revenge –were planted in 2007 when Lauria brought the FL Group, an Icelandic company, to invest $85 million into Bayrock.  Kriss advised on the deal.  As a result of bringing in the business, Lauria earned a $2.5 million commission, a percentage of the total investment, which had been pre-negotiated by Kriss.  Kriss was incensed that a convicted criminal like Lauria was to receive such a large commission, while he, the self-proclaimed founder, front, and high-level executive of Bayrock with an Ivy League degree, was only to receive his relatively modest salary.

23.     So Kriss embarked on a crusade to extort an additional bonus from Bayrock for the transaction.  This extortion included threats to publicly disclose the criminal history and federal cooperation of Lauria and other employees.  Never mind that Kriss and his father Ronald Kriss devised the cover-up of these criminal histories.  Kriss knew that disclosing this information could place these former criminals – and their families - in grave danger of potential retaliation from the very criminal informants whom Lauria had cooperated against.  Kriss did not care – his only concern was to subject Bayrock to an old-fashioned shakedown so that he could receive a huge payout.  Bayrock's owner had no choice but to authorize a $500,000 extortion payout to Kriss.

24.     Yet, Kriss was not satisfied with his $500,000 bonus.  The disparity between Kriss's $500,000 payment and Lauria's $2.5 million commission was something Kriss still could not tolerate.  Kriss believed that he was entitled to $1.5 of Lauria's $2.5 million commission, so he demanded more money.  However, Bayrock ownership did not agree and refused to cave to

Kriss's histrionics.  So Kriss took matters into his own hands.  Using his position as CFO to control the purse, Kriss cheated Lauria out of $1 million by only paying Lauria $1.5 million of the $2.5 million owed to him.  Lauria drafted a complaint and was prepared to file a lawsuit to collect the rightful amount of his commission.  Ultimately, however, Lauria had no choice and settled the case, only receiving $200,000, a fraction of the remaining $1 million he was entitled to.

### Kriss files his First Frivolous Action

25.     Despite successfully cheating Lauria out of his rightful commission, Kriss was still seeking a larger payout for himself, whether from Bayrock or Lauria.  Before Kriss could obtain his payout from Bayrock or Lauria, however, Bayrock fired Kriss.  Kriss then took to the courts for his extortion.  In November 2008, Kriss filed his first lawsuit against Bayrock and numerous other defendants in Delaware Chancery court ("First Frivolous Action").  In early 2010, Kriss's case was summarily dismissed.

26.     However, a short time later, a low-level former Bayrock analyst – and close friend of Kriss – handed Kriss and his attorney Bayrock's stolen hard drive, which contained highly sensitive judicially-sealed documents belonging to another Bayrock employee, and privileged communications between Bayrock and its attorneys.  This gave Kriss the leverage he needed to wage his billion-dollar extortion campaign against Bayrock and other defendants.

### Kriss uses illegal means to gather evidence and extort Bayrock

27.     The history of how this analyst obtained this hard drive and what he chose to do with it is laced with illegal, surreptitious, and unethical conduct.  In 2006, Bayrock hired this analyst, who was tasked to assist the company with information technology support.  During his tenure at Bayrock, the analyst became extremely close with Kriss, with the two spending

inordinate amounts of time together. The relationship had afforded Kriss the opportunity to delete files from Bayrock's hard drive so that any trace of his culpability would be gone. Ultimately, on or about September 2008, Bayrock fired the analyst.

28.     However, prior to his termination, the analyst obtained a copy of Bayrock's entire corporate hard drive and email system and copied its contents to a back-up hard drive. Bayrock's corporate hard drive contained government-sealed and confidential documents belonging to the other Bayrock employee with a criminal past, and Bayrock's attorney-client communications. Once Bayrock realized that the analyst possessed this sensitive material they asked him to return it. The analyst refused.

29.     With the hard drive unlawfully in his possession, this disgruntled former Bayrock hired Kriss's own attorney to sue Bayrock. They agreed to work together to sue Bayrock in separate lawsuits.

30.     In fact, Kriss and his attorney duped the analyst to give him unfettered access Bayrock's stolen hard drive, first by offering him a "piece of the action" from Kriss's lawsuits against Bayrock, and second, by offering the attorney's legal services for free. This was an offer the analyst could not refuse.

31.     With Kriss's blessing, the attorney pillaged Bayrock's hard drive, discovering a treasure trove of judicially-sealed documents and Bayrock's attorney-client, privileged communications. These confidential documents would ultimately prove to be instrumental in Kriss's extortion campaign against Bayrock, Lauria and the various other defendants that he would ultimately name in his next barrage of frivolous lawsuits.

### *Kriss Files his Second Frivolous Action*

32.     On May 10, 2010, following the dismissal of their First Frivolous Action in Delaware Chancery Court, Kriss and his attorney filed their second frivolous action. He brought the lawsuit in the Southern District of New York, captioned *Jody Kriss et al. v. Bayrock Group et al.,* 10 Civ. 3959 ("the Second Frivolous Action"). The Second Frivolous Action essentially accuses a group of Bayrock employees and principals (including Lauria), accountants, four prominent law firms, and other individuals and corporate entities of a massive civil RICO conspiracy and demands $100 million. The allegations in the complaint are nonsensical, and the list of defendants equally bizarre, particularly the law firms and an insurance carrier. The list of defendants includes: (i) Bayrock and its related entities; (ii) Tevfik Arif; (iii) Julius Schwarz (an attorney); (iv) Lauria; (v) Felix Sater; (vi) Alex Salomon (an accounting firm); (vii) Jerry Weinrich; (viii) Salomon & Company PC; (ix) Akerman Senterfitt LLP (a law firm); (x) Martin Domb (a lawyer); (xi) Craig Brown; (xii) Duval & Stachenfeld LLP (a law firm); (xiii) Bruce Stachenfeld (a lawyer); (xiv) David Granin; (xv) Nixon Peabody LLP (a law firm); (xvi) Adam Gilbert (a lawyer); (xvii) Roberts & Holland (a law firm); (xvi) Elliot Pisem; (xvii) Michael Samuel; (xviii) Mel Dogan (a lawyer); (xix) National Union Fire Insurance Co. of Pittsburgh, PA (an insurance carrier).   Most, if not all, of these defendants are professionals with sterling reputations. Kriss knew therefore that he could exponentially multiply the price of his lawsuit by naming prestigious, white shoe law firms, their lawyers individually – and more importantly, their insurance carriers – as defendants. He figured that, to protect their reputation, these defendants would stroke a quick check just to disassociate themselves from Bayrock's convicted criminals and their sensational pasts. Kriss and his attorneys made no secret that this was their plan, even admitting it to opposing counsel and in writing to others.

33.     However, most egregiously, <u>Kriss included both attorney-client communications and judicially-sealed information in his publicly filed complaint – information he illegally obtained from Bayrock's stolen hard drive</u>.  The disclosure of the government-sealed information was illegal in itself.  Worse yet, the public exposure of this information placed Lauria and another Bayrock employee – and their families – in grave danger.  Three different federal courts confirmed the possibility of this danger.  Again, that did not matter to Kriss, and in fact, that danger was integral to his plan.  Kriss's attorney made no secret that the threat of public disclosure of this sensitive and sealed information was nothing more than an extortion, stating:

> I recommend you forward this to Julius [Bayrock's general counsel] with the comment from me that there are three alternatives:
>
> (a)  I file publicly today
>
> (b)  I file under seal today
>
> (c)  He arrange a tolling agreement with EVERY defendant but Nixon
>
>        Peabody
>
> I don't care how many people he has to get on the phone and how fast he has to work.  He had years to give back the money and now it's over.  He can get Brian Halberg [Bayrock's associate general counsel] to help him.  I believe it's possible to get this in under seal if Bayrock joins in a joint motion in part 1 to seal the complaint pending a redaction agreement with the assigned judge but there are never any guarantees.

In short, there was no doubt that both Kriss and his attorney knew what they were doing was illegal, and that the public disclosure of sealed information could put Lauria and others in grave danger.  However, Kriss publicly disclosed the information anyway.

34.     Interestingly, even with the plethora of privileged communications and judicially-sealed information contained on the hard-drive – which Kriss illegally obtained and illegally disclosed to the public – the complaint in the Second Frivolous Action lacked merit, as it did the First Frivolous Action.  For instance, Lauria's name was mentioned only twice in the 765-

-13-

paragraph, 165-page complaint, and in both instances only fleetingly.  The first mention of Lauria's name was merely to state that he and others were involved with, and pleaded guilty to, a Russian and Italian stock brokerage "pump and dump" scheme prior to joining Bayrock, a now 20-year old crime to which Lauria already had pleaded guilty.  The second mention of Lauria's name was the spurious allegation that he may or may not have received kickbacks in connection with Mafia investments at Bayrock.  That is it.  Nevertheless, Kriss named him as a defendant in the $100 million RICO action.  The real purpose of naming Lauria was to identify Lauria as an informant for the federal government, to dredge up his past and expose him to danger, so that the prestigious law firms and deep-pocketed defendants would pay to get out of the case.  It was also payback for the $1.5 million commission Lauria received in 2007.

35.     Thus, by illegally gathering and illegally disseminating sealed confidential information, Kriss had set in motion what would prove to be a persistent pattern of conduct, aimed at emotionally, mentally, physically, and financially harming Lauria.

### *The Second Frivolous Action concerns crimes which Kriss and Ronald Kriss are guilty of*

36.     Yet, the real irony in the Second Frivolous complaint is that Kriss accuses Lauria and others of crimes that Jody Kriss and his father Ronald Kriss, the outside general counsel of Bayrock, are themselves guilty of committing.  The Second Frivolous Action epitomizes the age-old adage of the pot calling the kettle black.

37.     First, the complaint alleges, among other things, that "Bayrock is substantially and covertly mob owned and operated …."  Kriss accuses Bayrock of covering up the past of its convicted employees, and asserts that no investor would partner with Bayrock for any venture if this information were revealed.  However, simply by virtue of his positions as CFO, COO, Director of Finance, and self-proclaimed co-founder of Bayrock, Kriss was the very name and

-14-

face of Bayrock. He was the front for Lauria and other Bayrock employees, hiding their criminal histories and ties to organized crime from Bayrock's unsuspecting investors and banks. And his father, Ronald Kriss, Bayrock's counsel, hatched, legally blessed, and employed this hide-and-seek scheme. Indeed, both Kriss and his father were well aware of what was transpiring in the halls of Bayrock's offices and the aisles of the private jets they used to travel to Turkey and Russia to expand their network of wealthy criminals. They knew exactly who worked at Bayrock. That was why they were there in the first place.

38.      Second, in the complaint, Kriss accuses Bayrock of filing "false condominium offering documents." However, it was Kriss who signed these documents as CFO on behalf of Bayrock. Kriss conveniently omits this crucial fact from his complaint.

39.      Third, Kriss claims in the complaint that one employee took from Bayrock $8,000,000; another took $4,000,000, and yet another took $15,000,000. Without any explanation, he claims that the money simultaneously came from "crime" and from Bayrock. Again, conspicuously absent from the complaint is that he was the Director of Finance and the CFO of Bayrock. As such, he was in charge of the money that entered and left Bayrock's coffers. Consequently, it was Kriss who was most familiar with Bayrock's alleged "criminal" financial sources, if any. And it was Kriss who would have approved, or at least played a part in, any improper distribution of revenues to Bayrock's employees.

40.      Fourth, Kriss claims that Bayrock – a company he claims he founded and financially managed – paid one of its employees a "million dollars a year in unreported income" and "intentionally understated [its] partnership taxable income, by at least $50,000,000 to as much as $100,000,000." Once again, if that was the case, it was Kriss – the Director of Finance and the CFO – who created and approved the transaction and examined Bayrock's tax returns

before they were filed.  If any tax crimes occurred at Bayrock, Kriss himself was in on it.

Perhaps that is why he knows so much about the intimate details concerning these transactions,

including the exact dollar amounts of the distributions.[1]

41.     Never is Kriss's hypocrisy and greed more apparent than when he names as a

defendant the Akerman law firm where his father Ronald Kriss was a partner and which acted as

outside general counsel to Bayrock.   Indeed, the very reason Akerman was Bayrock's counsel in

the first place was because Ronald Kriss, his father, worked as a partner there.  However, this did

not stop Kriss from suing the firm, calling them "RICO attorneys…who agreed to knowingly

facilitate the racketeering."  He even copied and pasted an email addressed to his own father

Ronald Kriss at rk@akerman.com, placing the full text of his email in the complaint.  Curiously,

however, although Kriss names the Akerman firm as a defendant in the Second Frivolous Action,

and again in a later action, he failed to name his father, the chief contact at Akerman for all

Bayrock-related work, as a defendant.  This further demonstrates Ronald Kriss's integral role in

the father-son takeover and shakedown scheme.

42.     Kriss had planted the seeds of his shakedown plan long before he filed his

frivolous actions, or stole documents from Bayrock's stolen hard drive.  First, Kriss leaked

government-sealed information about Bayrock and the history of its employees to the press.  He

was giving them – and his future defendants – a taste of what was to come.  Second, Jody Kriss,

a.k.a. "VOR-TON," admits to wearing a wire and secretly recording the attorney-client

communications of Bayrock's principal and general counsel – a fact that he admitted in his

Second Frivolous Complaint.  Specifically, Kriss admits that, like a mafia turncoat, "in May

---

[1] Regarding tax improprieties, upon information and belief, Kriss claimed to have resided in Florida
while he was working at Bayrock in New York.  In fact, upon information and belief, Bayrock's
accountants refused to prepare and file KRiss's personal tax returns for him for this reason.  The
accountants are now defendants in Kriss's various frivolous actions.

2008" he "recorded Julius Schwarz" discussing a loan that Bayrock was giving to another employee. Wearing a wire to record conversations of colleagues and then using those recordings to blackmail colleagues in future lawsuits is not something learned in the classrooms or hallways of Wharton; rather it is a tactic learned from the mafia school of hard knocks and the wiseguys Kriss apparently fraternized with.

43.    Moreover, even if something illegal was transpiring at Bayrock – which it was not – Kriss did not speak out when these events actually happened; he did not speak out when ran Bayrock; he discussed them only after Bayrock fired him and he started his frivolous shakedown campaign. These are not the actions of a whistleblower, as Kriss tries to portray himself. Rather, these are the actions of a shakedown artist.

### *The Second Frivolous Action is delayed due to Jody Kriss and his rogue lawyers' illegal public disclosures of judicially-sealed information*

44.    Because of Kriss's illegal public disclosure of attorney-client communications and confidential, judicially-sealed information, the Second Frivolous Action has been delayed for years. To date, an operative complaint still has not been publicly filed. Four different federal courts, including two in Brooklyn, one in Manhattan, and the United States Court of Appeals for the Second Circuit enjoined Kriss and his attorneys from further disclosing the judicially-sealed information that they had initially included in their complaint. As these courts have found, Kriss and his attorneys' disclosure of this judicially-sealed information could place Bayrock's former employees, who had a history of cooperation with the federal government, in grave danger. Yet, in the face of these Court orders and findings, Kriss and his rogue lawyers defiantly continued to publicly disclose this judicially-sealed information and even orchestrated the publication of news articles about it, to circulate the life-endangering information even further. Again, the motive was obvious: to force the white-shoe defendants to the settlement table to avoid association with

Bayrock's convicted criminals and the sensational details of their federal cooperation contained in the government-sealed documents.

45.     Due to Kriss and his attorneys' willful disobedience of unambiguous court orders, the Court of Appeals was forced to appoint a separate judge in the Brooklyn federal court to police Kriss and his attorneys to ensure that they comply with court orders, an almost unprecedented move by a court, especially an appellate court.  The Court of Appeals also found Kriss and his attorneys' vexatious, scorched-earth litigation tactics troublesome.  In one particularly harsh ruling, the Court of Appeals "warned [Kriss's lawyers] that the Court's patience has been exhausted by his filing six separate notices of appeal regarding the same principal legal dispute…and that any further attempts to re-litigate the issued decided by this order, or other future filings of a frivolous nature, may result in sanctions, including the imposition of leave-to-file restrictions, requirements of notice to other federal courts, and monetary penalties."

46.     Amazingly, Kriss and his attorneys were undaunted and remain undeterred.  They have continued to improperly disclose sealed and confidential information to the public and press (Apparently, Kriss its not just a shakedown artist and thief; he is a cheater too).  Ultimately, the federal judge in Brooklyn referred Jody Kriss's attorneys for criminal prosecution.  Again, the criminal investigation of Kriss's lawyers did not deter Kriss or his attorneys.  Together, they have continued to file frivolous lawsuits, cheating their way through the court system.

***Kriss and his attorneys intentionally put Lauria's life in danger***

47.     At one point in the midst of their frivolous litigation campaign, Kriss and his rogue lawyers decided to bypass the courts and the press and went straight to the court of organized crime.  They did the unthinkable:  they disclosed the judicially-sealed information to a

-18-

famous criminal lawyer who had represented the very members of the mafia that Lauria had cooperated against.

48.     The result of this disclosure was a violent one for Lauria.  In or about July 2012, one of the members of the mafia tracked down Lauria in a restaurant in Bay Ridge, Brooklyn, where Lauria was having lunch with his current business colleagues.  Undaunted by the public scene, the mafia member beat Lauria in broad daylight, menacingly telling Lauria, "you're dead – I am going to kill you and the fucking Russians.  You're a rat.  I did two years because of you." Lauria knew how serious the threat was.  He had heard that the very same family of this mafia member has a long history of murder and violence.  Consequently, immediately after the encounter, Lauria sought the protection of the FBI.

49.     Events such as this – spawned by Kriss's merciless quest for a payday – show that the actual merits of Kriss's claims are beside the point.  Kriss's only goal is to extort money from Lauria, whether through litigation or fear of death.  Or better yet, his goal is to allow Lauria and the other Bayrock employee to be murdered, thereby raising the settlement price the white-shoe defendants in the Second Frivolous Action would be willing to pay to put this sensational, legal-turned-violent fiasco behind them.

### *Kriss files his Third Frivolous Action, this time using deceased Holocaust survivors as figureheads*

50.     Months after the assault, on March 18, 2013, with the First Frivolous Action dismissed and the Second Frivolous Action still in limbo, Kriss and his attorneys filed a third frivolous action in the Southern District of New York, the *Estate of Ernest Gottdiener, et al. v. Felix Sater and Salvatore Lauria*, 13 Civ. 1824 (the "Third Frivolous Action").  In this action, they again allege a civil RICO claim against Lauria and another former Bayrock employee. Kriss and his lawyers knew that Kriss could not be the plaintiff in every action filed against

Lauria, Bayrock, or the other former Bayrock employee with a criminal past.  So they

shamelessly trolled and found nominee plaintiffs, the Gottdieners, dead Holocaust survivors, and

brought a frivolous civil RICO claim on behalf of their estates.

51.     Again, like the First and Second Frivolous Actions, the Third Frivolous Action

was designed to fail as a meritorious lawsuit, but succeed as another tool of extortion and a

vehicle for re-airing alleged crimes committed over 20 years ago, far beyond the 4-year statute of

limitations for their civil RICO claim.  Furthermore, neither Lauria nor the other Bayrock

employee with a criminal past ever knew the Gottdieners, nor did they sell them securities or

anything else.  The action was just another excuse to publicly attach Lauria's dated criminal

record, publicize his cooperation against dangerous organized crime figures, and humiliate him

into paying Jody Kriss the $1.5 million commission from their Bayrock days.  Aside from

Lauria's previous criminal record, there are no relevant allegations asserted against Lauria

connecting him to any of the plaintiffs.  The lack of meritorious claims did not stop Kriss and his

attorneys from seeking a whopping $100 million in damages.

### Kriss files his Fourth Frivolous Action

52.     Two months after filing the Third Frivolous Action, Kriss took another step in his

ongoing campaign to harass and injure Lauria through public exposure.  This time they raised the

stakes and filed the fourth frivolous action in New York State Supreme Court, captioned *Kriss,*

*et. al. v. Bayrock Group LLC, et al.*, 651715/2013 (the "Fourth Frivolous Action").  This time

they are seeking one billion dollars in damages.

53.     A review of the four-page, single-spaced summary of the case contained in the

Summons and Notice shows that the Fourth Frivolous Action is nothing more than a replica of

the Second Frivolous Action, except this time Jody Kriss filed the action in state court.  To quote

the Summons and Complaint, the "over-arching theme" is that Bayrock fraudulently concealed the "substantial degree" to which it was run by convicted felons with ties to organized crime, and that the concealment of these individuals' convictions defrauded investors, "many of them senior citizens, including Holocaust survivors," of millions of dollars.

54.     The Fourth Frivolous Action names the same defendants as in the Second Frivolous Action, except this time he adds a little sensationalism to his caption by naming the Trumps, the Sapirs, and an Assistant United States Attorney.  The Defendants include (i) the Bayrock entities; (ii) Tevfik Arif; (iii) Julius Schwarz; (iv) Felix Sater; (v) Brian Halberg (a lawyer); (vi) Lauria; (vii) Alex Salomon (an accounting firm); (viii) Jerry Weinrich; (ix) Salomon & Co. PC (an accounting firm); (x) Akerman Senterfitt LLP (a law firm); (xi) Martin Domb (a lawyer); (xii) Craig Brown; (xiii) Duval Stachenfeld LLP (a law firm); (xiv) Bruce Stachenfeld (a lawyer); (xv) David Granin; (xvi) Nixon Peabody LLP (a law firm); (xvii) Adam Gilbert (a lawyer); (xviii) Robert & Holland LLP (a law firm); (xix) Elliot Pisem; (xx) Michael Samuel; (xxi) Mel Dogan (a lawyer); (xxii) Tamir Sapir; (xxiii) Alex Sapir; (xxiv) Walter Saurack (a lawyer); Satterlee Stephens Burke & Burke LLP (a law firm; (xxv) Kelly Moore (a lawyer); (xxvi) Morgan Lewis & Bockius LLP (a law firm); (xxvii) Nader Mobargha (the undersigned counsel in this case); (xxviii) Michael Beys (also the undersigned counsel in this case); (xxvix) Beys Stein & Mobargha LLP (the predecessor to the undersigned law firm); (xxx) Todd Kaminsky (a federal prosecutor in the Eastern District of New York); (xxxi) CIM Group; (xxxii) Istar Financial; (xxxii) Donald Trump; (xxxiii) Ivanka Trump; (xxxiv) National Union Insurance Company of Pittsburgh.

55.     Not surprisingly, the four-page Summons and Notice in the Third Frivolous Action does not mention Lauria's name and does not even hint at how a former low-level

Bayrock employee like Lauria could have any possible role in hiding the criminal backgrounds of Bayrock employees from Bayrock's investors, especially when Lauria is the former convicted criminal himself.  The Fourth Frivolous Action is nothing more than yet another dishonest attempt by Kriss to extort from Lauria the $1.5 Million that he believes he is owed from the FL transaction.  If these three frivolous actions destroy Lauria's reputation after the years of cooperation in which he rehabilitated himself and repaid his debt to society, so be it.  Kriss does not care, as long there is a multi-million payout to him.

56.     Kriss's reckless approach to litigation is never more evident than how he frivolously named a federal prosecutor and the Trumps as defendants, then suddenly discontinued the actions against them – without so much as a formal settlement or an explanation – because it suited him procedurally, and his father economically.  First, to keep the Fourth Frivolous Action in state court, Kriss dismissed the Assistant United States Attorney when the government sought to remove the case to federal court.  Kriss also dropped Donald and Ivanka Trump as defendants in the lawsuit when he discovered that they were his father Ronald Kriss's, clients at his new law firm, Stroock, where he is the managing partner of their Florida office. Ironically, Ronald Kriss had to leave his previous firm, Akerman, when Kriss named that firm as a defendant in the Second Frivolous Action.  Kriss feared the same consequences for his father if he kept the Trumps as defendants in the Fourth Frivolous Action.  Consequently, he casually discontinued the Fourth Frivolous Action against the Trumps - without a formal settlement and before serving a complaint on them – showing the lack of seriousness in his claims.  The claims against the Trumps were simply designed as another good old-fashioned shakedown of some famous wealthy people who might have something to lose if they were associated with former criminals.  Kriss was not concerned, however, since he and his father Ronald Kriss would be

profiting from the Trumps in another way:  As clients.  Whether a person is a defendant, client, former colleague or victim does not matter; all that matters to Kriss is that Kriss is profiting from them.

### *The Four Frivolous Actions showcase the Kriss's use and abuse of the judicial system*

57.     For Kriss, filing lawsuits is just an endless game, like putting quarter after quarter in a slot machine in Las Vegas, hoping to hit the jackpot and strike it rich.  Kriss has become a professional plaintiff abusing the judicial system, while simultaneously endangering the lives of former federal cooperators.   Kriss's action in funneling sensitive, judicially-sealed documents and information to the press and others, combined with filing several public complaints to further disseminate sensitive information about Lauria, has resulted in an ongoing campaign targeting Lauria and exposing him to grave danger.  Kriss's hope and intent is to cause Lauria mental anguish and physical harm, and to coerce Lauria into paying Kriss money to which he is not entitled.

### *Kriss's actions take an emotional and mental toll on Lauria and his family*

58.     Kriss's hard-nosed litigation tactics, which include publicly disclosing life-endangering information to the press and mob associates, have caused Lauria and his family to live in extreme fear and emotional distress.  Before his July 2012 violent encounter with the mobster he cooperated against, Lauria was already fearful for his life.  After the incident, however, his fear for his life – and the lives of his wife and two children – grew exponentially.  He has been unable to sleep  and regularly falls into deep depression.  His wife and children are now afflicted with greater fear and anxiety than anything they had experienced before.  In addition to fearing for their lives, Lauria's family now has to relive the humiliation of the past.

59.     The July 2012 encounter has also taken a toll on Lauria's relationship with his business colleagues, several of whom witnessed the violent encounter.  Not surprisingly, the encounter has had a detrimental effect on his work and his future prospects at his company.

60.     Lauria regrets his past actions and his involvement in securities fraud, which took place almost 20 years ago.  But he has paid his debt to society and served the federal government as part of the repayment of that debt.  He was hoping that his criminal past – and his cooperation against dangerous criminals – could eventually fade, with his starting a new life, as he has a right to do.  Kriss has now made that impossible.  Worse yet, he has intentionally exposed Lauria to grave danger and retaliation by dangerous criminals.

61.     It is time to hold Jody Kriss, a.k.a., "VOR-TON," accountable.

## FIRST CAUSE OF ACTION
### (Intentional Infliction of Emotional Distress)

62.     Plaintiff Lauria repeats and realleges the allegations contained in the paragraphs above as if fully set forth therein.

63.     Defendant Kriss and his attorneys purposely disclosed judicially-sealed information to the press, and orchestrated the publication of numerous articles about the information and Lauria's cooperation against dangerous mob associated.

64.     Defendants and his attorneys also purposely disclosed judicially-sealed information to an attorney who represented the very mob-related criminals that Plaintiff and another Bayrock employee cooperated against.

65.     The judicially-sealed information contained details of Plaintiff's cooperation, or connected the dots of Plaintiff's cooperation, against members and associates of organized crime.

-24-

66.     Defendant's public disclosure of this judicially-sealed information, especially to the attorney for the mob-related criminals that Plaintiff cooperated against, put Plaintiff's life in imminent, grave danger, a fact confirmed by the government.

67.     As a result of Defendant's disclosures, a mob associate whom Lauria cooperated against beat Lauria in broad daylight, menacingly threatening, "You're dead.  I am going to kill you and the fucking Russians.  You're a rat.  I did two years because of you."

68.     The very purpose of Defendant's disclosure of this sensitive information was to not only put Plaintiff's life in actual danger, but also to cause Plaintiff's severe emotional distress for fear that his life, and his family, were in danger.

69.     Defendant also compounded the emotional distress it had already caused Plaintiff, by consistently suing him and illegally disclosing judicially-sealed information in the lawsuits and various legal proceedings.

70.     Defendant's conduct was solely motivated by his malevolent desire to cause Plaintiff harm and to extort money from Plaintiff.

71.     Defendant's conduct and its intended effect were extreme and outrageous, as it was illegal and put Plaintiff and his family in grave danger.

72.     As a direct and proximate result of Defendant's outrageous conduct, Plaintiff suffered emotional distress, mental anguish and fear of bodily harm from the immediate and potentially harmful effects of Defendant's public disclosures.

73.     As a direct and proximate result of Defendant's outrageous conduct, Plaintiff's family also suffered emotional distress, mental anguish and fear of bodily harm from immediate and potentially harmful effects of Defendant's public disclosures.

74.     As a direct and proximate result of Defendant's outrageous conduct, Plaintiff's relationship with his wife and children suffered and was irreparably damaged.  This caused Plaintiff even further emotional distress.

75.     As a direct and proximate result of Defendant's willful, wanton and gross conduct, Plaintiff seeks damages in the amount of $ 5 million, plus punitive damages and attorney's fees and costs.

## SECOND CAUSE OF ACTION
### (Prima Facie Tort)

76.     Plaintiff repeats and realleges the allegations in the paragraphs above as if fully set forth therein.

77.     Defendant and his attorneys intentionally inflicted harm on Plaintiff when they devised and pursued a scheme to obtain and publicize judicially-sealed information to the press and to the attorney of the mob-related criminals whom Plaintiff cooperated against.

78.     The disclosure of this judicially-sealed information was solely motivated by malice or disinterested malevolence to place Plaintiff, and his family by extension, in imminent grave danger.

79.     There was no excuse or justification for this disclosure to the mob attorney since Defendant was already legally represented by two attorneys and did not need a criminal attorney.

80.     This disclosure resulted in special damages, which were incurred as a direct and proximate result of Defendant's disclosures to the attorneys representing the professional criminals responsible for attacking, injuring and threatening Plaintiff.

81.     Additionally, Defendant and his attorneys knowingly filed multiple meritless actions against Plaintiff with the sole, malicious motive of causing Plaintiff harm by funneling

the judicially-sealed information to third parties through s publicly-filed complaints in an attempt to extort money from Plaintiff.

82.     The filing of these actions was solely motivated by malice or disinterested malevolence and was done without excuse or justification.

83.     Defendant had no excuse or justification for filing any of these Frivolous Lawsuits, especially given that Plaintiff and his father are legally and practically responsible for.

84.     Plaintiff suffered special damages in the amount of his attorney's fees expended in defending these actions and being forced to prosecute his action to stop Defendant's harassment via his frivolous litigation campaign.   Plaintiff suffered damages in the amount of his and his family's medical expenditures associated with the treatment of traumatic for the fear of retaliation by various mob associates.  Plaintiff has suffered other special damages as well, which can be further quantified during discovery.

85.     As a direct and proximate result of Defendant's willful, wanton and gross conduct, Plaintiff seeks compensatory damages in the amount of $ 5 million, plus punitive damages and attorney's fees and costs.

## THIRD CAUSE OF ACTION
### (Abuse of Process)

86.     Plaintiff repeats and realleges the allegations in the paragraphs above as if fully set forth therein.

87.     Defendant intentionally or recklessly used the courts on multiple occasions for an illegitimate purpose.  He knowingly and maliciously filed baseless actions, which minimally implicate Plaintiff, and failed to draw any connection between Plaintiff's actions and alleged claims.

88.     The sole purpose for filing the Frivolous Actions was to harass Plaintiff and extort an unmerited settlement from him.

89.     Defendant has abused the court system by filing multiple lawsuits, one of which was predicated on the same facts as the two previous ones, one of which involved an attempt at filing a lawsuit solely to publicly disseminate records to harm and scare Plaintiff and coerce Plaintiff into a settlement.

90.     Defendant has engaged in this conduct for the specific collateral purpose of harassing, threatening and attempting to extort money from Plaintiff, as well as other individuals. Defendant has no legitimate purpose or legal end in mind for any of the lawsuits he has filed, and which implicated Plaintiff.  Defendant's illegitimate purpose in pursuing any of the Frivolous Actions is clearly demonstrated by the facts alleged above, as Defendant and his father are both guilty of the very acts complained of in Defendant's lawsuit.

91.     Defendant's abuse of the legal process is further evidenced by his complete and utter disregard for the judicial authority as he has repeatedly ignored and violated court orders issued in the legal proceedings he initiated, specifically put in place to maintain the sanctity of the judicially-sealed documents and information, the disclosure of which could put Lauria and his family in grave danger.

92.     Defendant's abuse of the legal process was so egregious that it prompted the Second Circuit Court of Appeals to issue a stern warning to Defendant to stop their frivolous litigation and to threaten Defendant with sanctions.  Furthermore, the Second Circuit Court of Appeals appointed a separate district judge to police Kriss and his lawyers' conduct to ensure that they comply with court orders.

93.     Yet, Defendant continued his illegal conduct, and continued to file frivolous lawsuits, often repeating the same allegations with no purpose other than to harass and extort Plaintiff and other defendants.

94.     Defendant committed all of these acts without excuse or justification.

95.     Defendant has been using and abusing the judicial system in a perverted manner to obtain the collateral objective of putting Lauria in grave danger and extorting money from him.

96.     As a direct and proximate result of Defendant's abuse, Plaintiff has been harmed and suffered damages through the disclosure of sensitive, confidential information.  Plaintiff has also suffered economic harm as he has been forced to engage counsel to defend the Frivolous Actions.

97.     As a direct and proximate result of Defendant's willful, wanton, and gross conduct, Plaintiff seeks damages in the amount of attorney's fees and costs in defending the Frivolous Actions and for bringing the current action, plus punitive damages.

## FOURTH CAUSE OF ACTION
### (Negligent Infliction of Emotional Distress)

98.     Plaintiff repeats and realleges the allegations in the above paragraph as if fully set forth herein.

99.     Defendant and his attorneys also negligently disclosed judicially-sealed information to an attorney who represented the very mob-related criminals that Plaintiff and another Bayrock employee cooperated against.

100.    Defendant illegally obtained and caused public dissemination of the judicially-sealed information despite his duty not to do so, both as a former officer of Bayrock pursuant to court orders specifically put in place to prohibit these actions.

101.    The judicially-sealed information contained details, or connected the dots, of Plaintiff's cooperation against mob-related criminals. Public disclosure of this judicially-sealed information, especially to the attorney for the mob-related criminals that Plaintiff cooperated against, put Plaintiff's life in grave danger, a fact confirmed by the government.

102.    Nevertheless, Defendant and his attorneys negligently disclosed this information, putting Lauria's and his family's lives in grave danger. They disclosed the information so that Lauria's fear for his life would cause him to settle in response to Defendant's multiple lawsuits and pay Defendant an unjustified sum of money.

103.    Furthermore, Defendant and his attorneys negligently disregarded the substantial probability that their disclosure would cause Plaintiff severe emotional distress. Indeed, it was this very emotional distress that provided Defendant the leverage against Plaintiff that he was seeking.

104.    This disclosure, in fact, resulted in damage including severe emotional distress and physical injury as one of the mob-related criminals attacked Plaintiff in broad daylight and threatened to kill him.

105.    As a direct and proximate result of Defendant's disclosure of judicially-sealed information, Plaintiff, as well as his family by extension, has been damaged and suffered severe emotional distress, mental anguish, physical injury and financial loss.

106.    As a direct and proximate result of Defendant's willful, wanton, and gross conduct, Plaintiff seeks compensatory damages in the amount of no less than $ 5 million, plus punitive damages and attorney's fees and costs.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff respectfully requests that judgment be entered in his favor against Defendant as follows:

A.   Punitive damages from Defendant;

B.   Damages for the severe emotional distress that Lauria and his family have suffered after their lives were put in grave danger;

C.   Attorneys' fees and costs that Lauria has incurred for defending the Three Frivolous Actions;

D.   Attorneys' fees and costs that Lauria has incurred for being forced to bring this action;

E.   An injunction against Kriss preventing him from filing any further actions against Lauria without court approval; and

F.   Any such additional and further relief, including equitable relief, the Court deems just and proper.

Dated: March 16, 2014
       New York, New York

Beys Stein Mobargha & Berland LLP

By: _____
        Nader Mobargha
        Michael Beys
The Chrysler Building
405 Lexington Avenue, 7th Floor
New York, New York 10174
Telephone: (646) 755-3603
             (646) 755-3600
Facsimile: (646) 755-5229
Email: nmobargha@beysstein.com
        mbeys@beysstein.com

*Attorneys for Plaintiff Salvatore Lauria*

-31-

Index No. _____

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK

SALVATORE LAURIA,

Plaintiff,

-against-

JODY KRISS

Defendant.

## SUMMONS AND COMPLAINT

Beys Stein Mobargha & Berland LLP
The Chrysler Building
405 Lexington Avenue, 7th Floor
New York, New York 10174

T: (646) 755-3600
F: (646) 755-3699

Service a copy within _____ is hereby admitted.

Dated, _____

_____
Attorney(s) for