ENTERED   Bayrock

## EMPLOYMENT AGREEMENT

THIS EMPLOYMENT AGREEMENT ("Agreement") dated ~~September~~ November 10th, 2005 but effective as of February 1, 2003 (the "Effective Date") is entered into by and between Bayrock Group, LLC, a New York limited liability company (the "Company"), Tevfik Arif solely for purposes of Section 4 hereof, and Jody Kriss ("Executive").

### Recitals

The Company desires to retain the services of Executive, and Executive desires to be retained by the Company, on the terms and conditions set forth in this Agreement.

### Agreement

For and in consideration of the foregoing and the mutual covenants of the parties herein contained, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties agree as follows:

1.     ENGAGEMENT.  The Company hereby engages Executive to serve in the capacities described herein, and Executive hereby accepts such engagement and agrees to perform the services described herein upon the terms and conditions hereinafter set forth (collectively, the "Services").

2.     TERM.  The term of Executive's Services pursuant to this Agreement shall commence on the Effective Date and shall terminate at the close of business on December 31, 2008, subject to earlier termination in accordance with the other terms and conditions set forth herein.

3.     DUTIES; LOYALTY.  Executive shall be Director of Finance of the Company, and shall accordingly be responsible for supervising all transactions on behalf of and as required by the Company.  Executive agrees to devote his full working time, skill and attention and use his best efforts to advance the business and welfare of the Company.  During the term of employment, Executive shall not engage in any other employment activities for any direct or indirect remuneration, including, without limitation, serving as a member of any board of directors of any other entity; provided that, Executive shall not be precluded from investing personal and/or family assets so long as such other activities do not impair Executive's devotion of substantially all his full business time to the affairs of the Company, and do not compete against any Company Investments (as defined in Paragraph 5).

4.     MEMBERSHIP INTEREST.  For purposes of this Section and the remainder of this Agreement, the following capitalized terms shall have the following respective meanings:

    A.     "Assumed Tax Rate" means the sum of the maximum federal and state tax rates applicable to each class of income earned during the period in question without giving effect to deductions for state taxes which may be available at the federal level. The federal tax rates shall be determined by rates applicable to individuals who are residents of the United States applied to the particular class of income to which the federal tax rate is being applied.  The maximum state tax rate shall be determined by reference to the tax rates of the State of New York with respect to

{M2248368;3}

the particular class of income to which the Assumed Tax Rate is being applied; accordingly, the Assumed Tax Rate is the same for all Members, irrespective of their actual tax situation.

B.    "Capital Proceeds" means proceeds received by the Company or any Company Entity by reason of the occurrence of any of the following-described events, less in each instance the total of all expenses incurred in connection with the receipt or collection of such proceeds and less all amounts applied to the reduction of the Company Entities' indebtedness (other than indebtedness from a Company Member) and/or toward repayment of Principal Capital: (i) any sale of Company or any Company Entity property; (ii) any refinancing of any permanent loan with respect to Company or any Company Entity property; (iii) any insurance payment or damage recovery with respect to Company or any Company Entity property to the extent that such proceeds are not required to repair or restore such property; and (iv) any condemnation, or sale in lieu of condemnation, of any Company or any Company Entity property.

C.    "Company Entities" means the Company and/or the affiliates, subsidiaries and related entities of the Company and/or Tevfik Arif doing business under the 'Bayrock' name.

D.    "Company Members" means the members, officers, directors, employees and/or representatives and/or agents of the Company, and/or their respective affiliates, related entities, successors and/or assigns.

E.    "Company Proceeds" shall mean, at any relevant time, the cash, securities, cash equivalents and other proceeds of the Company and all Company Entities, collectively, including Capital Proceeds, reduced by (i) payment of the Company Entities' debts and obligations as they become due, exclusive of loans made to the Company or any Company Entity by the Principal or any other Company Member, (ii) the Total Principal Company Contribution, (iii) without duplication of amounts reduced under clauses (i) and/or (ii) above, amounts disbursed in payment of incurred out-of-pocket operating expenses of the Company and/or the Company Entities, exclusive of any fees, salaries or other remunerative amounts paid to the Principal or any other Company Member, but specifically including the non-equity salaries and benefits paid to Company administrative personnel and professionals, and (iv) amounts reasonably designated by the Principal as cash reserves to pay for Company overhead for a period not to exceed six (6) months.

F.    "Cumulative Tax Amount" means a cumulative amount separately calculated with respect to each Member as follows: (i) first, for all fiscal years and other periods of the Company which have ended (including fractional periods), the total amount of each different class of separately stated income (but not loss) of the Company allocated to the Members for federal income tax purposes, including ordinary income, shall be multiplied by the Assumed Tax Rates applicable with respect to such class of income earned during said period; (ii) second, for all fiscal years and other periods of the Company which have ended (including fractional periods), the

total amount of each different class of separately stated loss or expense (but not income) of the Company allocated to the Members for federal income tax purposes, including ordinary losses, shall be multiplied by the Assumed Tax Rates applicable with respect to such class of loss or expense incurred during said period assuming that such item were an item of gain or income instead of loss or expense; and (iii) third, the Cumulative Tax Amount is equal to the remainder of the sum of the products described in clause (i) above minus the sum of the products described in clause (ii) above. The Cumulative Tax Amount shall be recalculated and determined as of every date on which distributions are made, immediately prior to the making of such distributions.

G.    "Executive's Membership Interest" means a non-dilutable 10% non-voting membership interest in the Company and each of the Company Entities, pursuant to which, following Principal having first received a 10% return of his Total Principal Company Contribution, and subject to the provisions of this Section 4 and Section 5, Executive shall be entitled to 10% of all Company Proceeds, reduced, however, by the Executive Advance Amount (as hereinafter defined) previously paid to Executive as of such time, and subject, further, to the Vesting Schedule (as hereinafter defined), which Company Proceeds shall be paid to Executive as and when Company Proceeds are available for distribution to the Members.   Executive shall under no circumstances be responsible for the debt or obligations of the Company as a result of Executive's Membership Interest, nor shall Executive ever be required to contribute capital to the Company.

H.    "Members" means the members of the Company and the members of each Company Entity.

I.    "Principal" means Tevfik Arif, an individual.

J.    "Principal Capital" means the principal (but not interest) of any loans to the Company and/or the Company Entities made by the Principal to the extent such loans were necessary to finance the day-to-day operations of the Company and/or the Company Entities in lieu of capital contributions to the Company and/or the Company Entities.

K.    "Total Principal Company Contribution" means the total capital contributions made to the Company and/or the Company Entities by the Principal, together with Principal Capital, exclusive of any fees, salaries or other remunerative amounts paid to the Principal or any other Company Member.

(a)    Subject to the provisions of this Section 4 and Section 5, the Company and the Company Entities agree that, in consideration for Executive's Services, Executive shall receive Executive's Membership Interest. Executive shall have the right, no more than once per year, to audit the books and records of the Company Entities. Such audit rights for any particular Company Investment shall expire following one hundred eighty (180) days after the final distribution of Company Proceeds with respect to such Company Investment. Such audit shall further be paid for by the Company in the event that the results of such audit reveal the existence

of Company Proceeds in excess of $5,000 to which Executive was entitled pursuant to the provisions of this Section, but which failed to be distributed to Executive.

(b)     The Company shall advance to Executive from time to time up to an amount not to exceed $10,000 per month, funds reasonably required to pay for the personal living expenses of Executive and his immediate family members (the "Executive Advance Amount"). The Executive Advance Amount shall be deducted from Executive's portion of Company Proceeds to which Executive is entitled under the provisions of Section 4(a).

(c)     Notwithstanding anything in the Company's and the Company Entities' Operating Agreements (collectively, the "Operating Agreements") to the contrary, the Company's and the Company Entities' Managing Members shall make a distribution (a "Special Tax Distribution") to the Members, Pro Rata in accordance with the relative amount by which the positive Cumulative Tax Amount of each Member exceeds the cumulative distributions which have been made to such Member pursuant to the Operating Agreements as modified by this Agreement, until the cumulative amount distributed to the Members equals the positive Cumulative Tax Amounts of the Members. Without limiting other provisions of this Agreement, Special Tax Distributions (i) shall be distributed to the Members regardless of a Member's individual tax situation and regardless of when a Member became a Member of the Company, (ii) shall be considered to be in anticipation of, and shall be offset against and reduce as quickly as possible, all amounts otherwise distributable to such Member, other than amounts which represent the repayment of loans or interest thereon, and (iii) shall be debited against the Capital Accounts of the Members to the same extent as the distributions against which the Special Tax Distributions are offset. The Company's and the Company Entities' Managing Members shall use best efforts to make the Special Tax Distributions prior to the dates for making estimated tax payments for each year (the 15th of April, June, September and January).

(d)     The Operating Agreements are hereby deemed amended and modified to incorporate the provisions of this Section. Tevfik Arif, the direct and/or indirect majority member of the Company and each Company Entity, hereby executes this Agreement in order to acknowledge and to confirm his agreement to the foregoing. By signing this Agreement individually, Tevfik Arif shall sign solely in his capacity as managing member and/or majority member of the Company and each Company Entity, and shall incur no personal liability under this Agreement as a result of said execution, provided, however, that the foregoing limitation of liability shall apply only so long as Tevfik Arif retains direct or indirect control and majority ownership of the Company and each Company Entity.

5.     VESTING SCHEDULE. Notwithstanding the provisions of Section 4 above to the contrary, until such time as the Principal has received a return of 100% of his Total Principal Company Contribution plus a 10% return thereon (at which time Executive shall be deemed fully vested with respect to such Company Investments), with respect to any particular Company Investment (as hereinafter defined), Executive's Membership Interest will vest on the basis of the earlier of (i) one-thirty-sixth (1/36th) per month from and after the later of (y) the Company Investment Date (as hereinafter defined) or (z) the Effective Date, or (ii) the date upon which the Principal receives Company Proceeds from a Company Investment (as hereinafter defined). For purposes of this Agreement, (y) "Company Investments" means investments by the Company or any Company Entity, including, without limitation, the Company investments listed on Annex B

{M2248368;3}                                  4

hereto; it being understood that in the event the Company and/or any Company Entity participate in a Company Investment, such Company Investment shall be treated as a single Company Investment for all purposes of this Agreement; and (z) "Company Investment Date" means the date on which either an agreement has been executed or an investment has been made by a Company Entity with respect to a Company Investment.

6.      FRINGE BENEFITS.

(a)      Generally.  Executive shall be eligible for fringe benefits pursuant to any pension, retirement, profit sharing or other employee fringe benefit plan that the Company makes available to employees of the Company and/or its subsidiaries and for which Executive will qualify according to his eligibility under the provisions thereof.

(b)      Insurance.  The Company shall pay for the cost of the health, dental, life, and disability insurance plans maintained by the Company for its professional/senior staff for Executive.  The Company shall maintain directors and officers insurance for its executives.

(c)      Vacation, Holidays and Illness.  During the term of this Agreement, Executive shall be entitled to days off for vacation (not less than (and no greater than without Company approval) four (4) weeks per year), holidays, illness or other appropriate purposes, which vacation shall be scheduled at times reasonably convenient to the Company.

(d)      Company Cars and Residences.  During the term of this Agreement, Executive shall be entitled to use for himself and his immediate family members Company automobiles, Company apartment and condominium units and Company homes, in each case solely to the extent retained and maintained by the Company for the nonexclusive use of one or more of the Company Members, excluding, however, property and assets retained by Principal for his own personal use.

7.      EXPENSES.  Executive shall be promptly reimbursed for all reasonable expenses incurred on behalf of the Company.

8.      TERMINATION.  The term of Executive's engagement under this Agreement may be terminated by the Company prior to expiration of the term provided in Section 2 hereof only in accordance with the following sections.

(a)      For Cause.  This Agreement may be immediately terminated by the Company for Cause (as herein defined).  For purposes of this Agreement, the term "Cause" shall mean the existence or occurrence of one or more of the following conditions or events:

(i)      a willful and continual breach by Executive of any provision of this Agreement, provided that if such act is capable of cure, Executive shall be given written notice and such act shall not be deemed a basis for Cause if cured within 5 business days after such written notice is received by Executive specifying the alleged failure in reasonable detail (in the event of any disagreement between Executive and the Company as to whether Executive has, in fact, willfully and continually breached a provision of this Agreement, such disagreement shall be resolved by arbitration under the provisions of Section 15 hereof);

(ii)     performance by Executive of any act of fraud or material misrepresentation or a material act of misappropriation, or a felony conviction resulting from any such act; or

(iii)    the entry of a judgment or order enjoining or preventing Executive from such activities as are material or essential for Executive to perform the Services as required by this Agreement.

(b)     Mutual.   Executive's engagement under this Agreement may be terminated upon mutual written agreement of the Company and Executive.

(c)     Death.   In the event of the death of Executive, this Agreement shall terminate immediately.

(d)     Disability.   If, during Executive's engagement under this Agreement, Executive shall become permanently disabled and unable to perform his duties as required herein ("Disability") for a total of sixty (60) consecutive days in any twelve (12) month period then the Company may, upon thirty (30) days written notice to Executive, terminate Executive's engagement under this Agreement.

9.     DEATH AND DISABILITY.   In the event of the termination of Executive's engagement under this Agreement by reason of Executive's death or Disability, (i) the Company shall pay Executive (or his heirs and/or personal representatives) all compensation and benefits for a period of one (1) year after the date of death or one (1) year after the date of termination for Disability as if Executive had not been so terminated; and (ii) Executive's Membership Interest shall automatically be fully vested and payable as provided under Section 4 hereof.

10.    SEVERANCE.   In the event of the termination of Executive's engagement under this Agreement for any reason other than Executive's death or Disability, the Company shall provide the payments and benefits to Executive as indicated below:

(a)     With Cause or Voluntary Termination by Executive.   If Executive is terminated for Cause, or if Executive voluntarily terminates his engagement with the Company (other than by reason of a Change of Control, as hereinafter defined, or the relocation of the Company outside of New York City), (i) the Company shall be obligated only to reimburse Executive for any expenses to which Executive is due reimbursement by the Company under Sections 6 and 7; and (ii) Executive's Membership Interest shall be limited to the amount by which it has vested as of the date of said termination in accordance with the provisions of Section 5, and Executive shall further not be entitled to any Company Proceeds attributable to any Company Investments for which the respective Company Investment Date occurs subsequent to the date of said termination. In addition, Company shall pay vested benefits, if any, owed to Executive under any plan provided for Executive under Section 6 hereof in accordance with the terms of such plan as in effect on the date of termination of engagement under this Section.

(b)     Without Cause.   In the event that the Company shall terminate Executive without Cause or Executive voluntarily terminates his engagement with the Company as a result of a Change of Control or the relocation of the Company outside of New York City, (i) the

Company shall be obligated to pay all compensation and benefits to Executive for a period of nine (9) months after the date of termination as if Executive had not been so terminated; and (ii) Executive's Membership Interest shall automatically be fully vested and payable as provided under Section 4 hereof.  For purposes hereof, a "Change of Control shall be deemed to have occurred if any person or group of persons (within the meaning of Section 13 or 14 of the Securities Exchange Act of 1934, as amended), other than the Principal or any person directly or indirectly controlled by the Principal, obtains the ability to control, directly or indirectly, the policies or management of the Company.

11.     PROTECTION OF CONFIDENTIAL INFORMATION; NON-SOLICITATION AND NON-COMPETITION.

        (a)     Executive acknowledges that in the course of his employment by the Company that the Company will bring Executive into close contact with the "Confidential Information" of the Company, including, without limitation: costs, profits, marketing strategies, sales information, products, operational methods and solicitation strategies, plans for future development, client identification and specifications, project specifications and agreements, and any other business information which is not available to the public and provided to the Executive solely in connection with his duties hereunder (defined herein as the "Confidential Information"), and that the foregoing Confidential Information is of a special, unique, proprietary nature.  Executive further acknowledges that the Company's business is international in scope, that the Company will compete with other real estate development companies that could be located anywhere in the world and the nature of Executive's services to the Company including Executive's expertise are such that Executive may compete from any location in the world.  In recognition of the foregoing, Executive agrees:

        (i)     That Executive will not use the Confidential Information for his own benefit or for the benefit of any party other than the Company, or intentionally disclose the Confidential Information to any person or entity outside of the Company either during or after the term of this Agreement or any subsequent term, except if such disclosure is in furtherance of the interests of the Company or if Executive obtains the Company's express prior written consent; provided, however, that (i) Executive shall have no such obligation to the extent such matters are or become publicly known other than as a result of Executive's breach of his obligations hereunder; (ii) Executive, after giving prior notice to the Company to the extent practicable under the circumstances, may disclose such matters to the extent required by applicable laws or governmental regulation or judicial or regulatory process; or reasonably deemed necessary by Executive in the course of regular business operation or (iii) Executive may disclose the terms of this Agreement to his attorney, accountant and/or financial advisor; and

        (ii)    Executive will deliver promptly to the Company (and erase from memory on his/her computer or any other electronic memory device) upon termination of employment or at any other time the Company may so request, all names, addresses, phone numbers, memoranda, notes, records, reports, policy information and other documents (and all copies thereof) in any form whatsoever (including information contained in computer memory or on any computer disks) relating to the Company's business, including without limitation the Confidential Information, which Executive obtained while employed by, or otherwise serving or

acting on behalf of, the Company and which Executive may then possess or have under his/her control;

(iii)    That for a period of two (2) years after Executive's termination of employment, for any reason, Executive shall not, without the prior written consent of the Company, directly or indirectly, for his/her own account or for the account of any other person or entity, employ or solicit the employment of, or assist or encourage any entity of which Executive is an affiliate, to employ or solicit the employment of any person who was an employee of the Company or any of its affiliated companies;

(iv)    That for a period of two (2) years after Executive's termination of employment, for any reason, Executive shall not, without the prior written consent of the Company, directly or indirectly, for his/her own account or for the account of any other person or entity:  solicit, entice or attempt to solicit or entice, any business association or relationship (not preexisting with Executive) during the term of this agreement of the Company to cease doing business with the Company; and

(v)    That Executive agrees that so long as he is employed by the Company, he will conduct the real estate development business only on behalf of the Company except for Executive's family – oriented businesses and that he will not, in any capacity, render services to any other entity including but not limited to his own enterprise, unless he obtains prior written approval from the Company.

(b)    In addition to such other rights and remedies as the Company may have at equity or in law with respect to any breach of this Agreement, if Executive commits a breach of any of the provisions of this Section, the Company shall have the right and remedy to have such provisions specifically enforced by any court having jurisdiction, including without limitation both a temporary and permanent injunction, it being acknowledged and agreed that any such breach or threatened breach will cause irreparable injury to the Company and that money damages may not provide an adequate remedy.

12.    NOTICES.  Any notice required or permitted to be given under this Agreement shall be sufficient if in writing and if sent by registered mail, personally or by overnight delivery service to the addresses below or to such other address as either party shall designate by written notice to the other:

If to Executive:  To the address set forth below his signature on the signature page hereof.

If to the Company:

725 Fifth Avenue, 24th Floor
New York, New York 10022
Attention: Tevfik Arif

13.    INDEMNIFICATION.  The parties agree to the indemnification provisions set forth in Annex A attached hereto and made a part hereof.

14.   REPRESENTATIONS AND WARRANTIES.  Each party represents and warrants to the other that (a) this Agreement has been duly executed and delivered and constitutes the legal, valid and binding obligation of such party, enforceable against such party in accordance with its terms, and (b) the execution, delivery and performance by such party of this Agreement do not and will not require any consent, approval or filing or violate or conflict with any provision of the charter documents, certificate of organization, operating agreement, by-laws or similar documents of such party and do not and will not violate any law, rule or regulation, or any order, judgment or decree of any court or other governmental or regulatory authority, nor violate or result in a breach of or constitute (with due notice or lapse of time or both) a default under any contract, lease, loan or other agreement or instrument to which such party is a party or by which it or any of its assets are subject nor will result in the creation or imposition of any lien, charge or encumbrance of any kind whatsoever. The foregoing representations and warranties contained in this Section shall survive the cancellation and/or termination of this Agreement.

15.   ARBITRATION.  All claims and disputes (a "Dispute") between the parties arising out of or relating to this Agreement or the breach thereof, shall be resolved using the following procedures:

(a)   A meeting shall be held promptly, and in any event, not later than five (5) business days after a party requests such a meeting, attended by individuals with decision-making authority regarding the dispute, to attempt in good faith to negotiate a resolution of the Dispute.

(b)   If the parties cannot negotiate a resolution of the Dispute within seven (7) calendar days after the meeting (the "Negotiation Period"), the Parties shall submit the Dispute to binding arbitration in accordance with the applicable rules of the American Arbitration Association ("AAA") currently in effect, unless the parties mutually agree otherwise.  The following procedures shall apply:

(i)   Demand for arbitration shall be filed in writing with the other parties and with the AAA.  A demand for arbitration shall be made within a reasonable time.  In no event shall the demand for arbitration be made after the date when institution of legal or equitable proceedings based on such claim, dispute or other matter in question would be barred by the applicable statute of limitations.

(ii)   No arbitration arising out of or relating to this Agreement shall include, by consolidation, joinder or any other manner, an additional person or entity not a party to this Agreement, except by written consent containing a specific reference to this Agreement signed by the parties and any other person or entity sought to be joined.  Consent to arbitration involving an additional person or entity shall not constitute consent to arbitration of any claim, dispute or other matter in question not described in the written consent or with a person or entity not named or described therein.  The foregoing agreement to arbitrate and other agreements to arbitrate with an additional person or entity duly consented by the parties to this Agreement shall be specifically enforceable in accordance with applicable law and any court having jurisdiction thereof.

{M2248368;3}                                                   9

(iii)     The award rendered by the arbitrator or arbitrators shall be final and judgment may be entered upon it in accordance with applicable law in any court having jurisdiction thereof.

(iv)     All filing fees and AAA costs associated with the arbitration itself shall be paid for by the prevailing party. The prevailing party also shall recover from the non-prevailing party all attorneys' fees and costs, including fees and costs for legal assistants and expert witnesses, and including all fees and costs incurred relative to any challenge or appeal of the arbitration award or confirmation by a court of law. For purposes of this Agreement, the "prevailing party" shall be deemed to be that party who obtains substantially the result sought, whether by settlement, mediation or otherwise, or judgment. For purposes of this Agreement, the term "attorneys' fees" shall include, without limitation, the actual attorneys' fees incurred in retaining counsel for advice, negotiations, suit, appeal, or any other legal proceeding, including mediation and arbitration.

(v)     The parties to the arbitration shall mutually designate an arbitrator who shall be the sole arbitrator from and after said appointment or, if the parties fail to agree on a mutually acceptable arbitrator within five (5) calendar days following the expiration of the Negotiation Period, each party to the arbitration shall appoint one arbitrator within such five (5) calendar day period, and the two arbitrators so appointed shall appoint a third arbitrator within five (5) calendar days of the last of their appointments, and such third arbitrator shall be the sole arbitrator from and after said appointment. In the event either party fails to appoint its respective arbitrator within the five (5) calendar day period provided above, the arbitrator appointed by the other party within such period shall be the sole arbitrator for purposes of this Section 15, and in the event the two arbitrators fail to appoint a third arbitrator within the five (5) calendar day period provided above, either part may request an arbitrator be appointed by the AAA, in which event said arbitrator shall be the sole arbitrator for purposes of this Section 15. Once the sole arbitrator is designated pursuant to the provisions of this clause (v), arbitration shall be done on an expedited basis and shall be decided within thirty (30) days of the designation of the sole arbitrator.

(vi)     Time shall be of the essence with respect to the provisions of this Section 15.

16.   ENTIRE AGREEMENT; MODIFICATION.

(a)     This Agreement contains the entire agreement of the Company, the Principal and Executive, and the Company, the Principal and Executive hereby acknowledge and agree that this Agreement supersedes any prior statements, writings, promises, understandings or commitments between the parties hereof.

(b)     No future oral statements, promises or commitments with respect to the subject matter hereof, or other purported modification hereof, shall be binding upon the parties hereto unless the same is reduced to writing and signed by each party hereto.

17.   ASSIGNMENT. The rights and obligations of the parties under this Agreement shall inure to the benefit of and shall be binding upon the successors and permitted assigns of the



parties. Notwithstanding anything contained herein to the contrary, neither party may assign his or its rights or obligations under this Agreement without the prior written consent of the other party; provided, however, that Executive shall be allowed to assign Executive's Membership Interest rights in connection with his estate planning to one or more of his immediate family members and/or to a trust, the beneficiaries of which include one or more of his immediate family members.

18.     GOVERNING LAW.  This Agreement shall be governed by and construed in accordance with the domestic laws of the State of New York  without giving effect to any choice or conflict of law provision or rule (whether of the State of New York or any other jurisdiction) that would cause the application of the laws of any jurisdiction other than the State of New York.

19.     MISCELLANEOUS.

(a)     The section headings contained herein are for reference purposes only and shall not in any way affect the meaning or the interpretation of this Agreement.

(b)     The failure of any party to enforce any provision of this Agreement shall in no manner affect the right to enforce the same, and the waiver by any party of any breach of any provision of this Agreement shall not be construed to be a waiver by such party of any succeeding breach of such provision or a waiver by such party of any breach of any other provision.

(c)     All written notices required in this Agreement shall be sent postage prepaid by certified or registered mail, return receipt requested or by overnight delivery service against receipt or by overnight delivery service against receipt.

(d)     In the event any one or more of the provisions of this Agreement shall for any reason be held invalid, illegal or unenforceable, the remaining provisions of this Agreement shall be unimpaired, and the invalid, illegal or unenforceable provision shall be replaced by a mutually acceptable valid, and enforceable provision which comes closest to the intent of the parties.

(e)     In any action or proceeding arising out of or relating to this Agreement, the prevailing party shall be entitled to recover reasonable attorneys' fees and costs from the other party to the action or proceeding.

(f)     This Agreement may be executed in any number of counterparts, each of which shall constitute an original and all of which together shall constitute one and the same instrument.

(g)     The Company and Tevfik Arif individually hereby acknowledge and confirm that they have been represented by counsel, Mel Dogan, in connection with the negotiation and execution of this Agreement, and that said counsel has explained and translated in Turkish for the Company and Mr. Arif individually the provisions hereof.

(h)     This Agreement supercedes the terms and provisions of that certain Employment agreement entered into between Executive and the Company dated June 29, 2004.

{M2248368;3}                    11

[Signature page follows]

12

IN WITNESS WHEREOF, the parties have executed this Engagement Agreement as of the day and year first above written.

BAYROCK GROUP, LLC

WITNESSES:                              By: _____
                                             Tevfit Arif, its sole Member

Print Name: DANIEL RIDLOFF

Print Name: MARTA SZOSTKOWOLSKI

JODY KRISS

_____
7 E 75ᵗʰ ST, #4C
New York, NY 10021

Print Name: DANIEL RIDLOFF

Print Name: MARTA SZOSTKOWOLSKI

TEVFIK ARIF HEREBY EXECUTES
THIS AGREEMENT TO ACKNOWLEDGE
AND TO CONFIRM HIS AGREEMENT
TO THE PROVISIONS OF SECTION 4
HEREOF:

_____
Tevfik Arif

Print Name: DANIEL RIDLOFF

Print Name: MARTA SZOSTKOWOLSKI

{M2248368;3}                    13

STATE OF _New York_ )
                      ) ss.
COUNTY OF _New York_ )

    On the ___ day of _November_ in the year 2005 before me, the undersigned, a notary public in and for said state, personally appeared /Tevfik Arif_____, personally known to me or proved to me on the basis of satisfactory evidence to be the individual whose name is subscribed to the within instrument and acknowledged to me that he/she/they executed the same in his/her/their capacity, and that by his/her/their signature on the instrument, the individual, or the person upon behalf of which the individual acted, executed the instrument.

                          Notary Public

                                  MELIH DOGAN
                         Notary Public, State of New York
                              No. 02-4593196
                          Qualified in New York County
[Notary Seal]       My commission expires: Commission Expires June 30, 1989

STATE OF _New York_ )
                      ) ss.
COUNTY OF _New York_ )

    On the ___ day of _November_ in the year 2005 before me, the undersigned, a notary public in and for said state, personally appeared / Tevfik Arif_____, personally known to me or proved to me on the basis of satisfactory evidence to be the individual whose name is subscribed to the within instrument and acknowledged to me that he/she/they executed the same in his/her/their capacity, and that by his/her/their signature on the instrument, the individual, or the person upon behalf of which the individual acted, executed the instrument.

                          Notary Public

                                    MELIH DOGAN
                              Notary Public, State of New York
                              No. 02-4593196
                          Qualified in New York County
[Notary Seal]       My commission expires: Commission Expires June 30, 1989

{M2348368;3}                  14

STATE OF _New York_ )
                     ) ss.
COUNTY OF _New York_ )

    On the _14_ day of _November_ in the year 2005 before me, the undersigned, a notary public in and for said state, personally appeared _Jody Ferriss_, personally known to me or proved to me on the basis of satisfactory evidence to be the individual whose name is subscribed to the within instrument and acknowledged to me that he/she/they executed the same in his/her/their capacity, and that by his/her/their signature on the instrument, the individual, or the person upon behalf of which the individual acted, executed the instrument.

                           _____
                           Notary Public

                                      **JULIUS RANDOLPH SCHWARZ**
                                      Notary Public, State of New York
                                      No. 02SC8127581
                                      Qualified in New York County
                                      Commission Expires May 23, 2009

[Notary Seal]             My commission expires: _____

## ANNEX A

The Company agrees to indemnify and hold harmless Executive and his affiliates, employees, independent contractors, advisors, partners, members, managers and each of their respective successors and/or assigns (all of the foregoing are referred to as an "Indemnified Party"), from any and all losses, claims, damages or liabilities, joint or several, as they are incurred (including, without limitation, any legal or any other expenses incurred by any Indemnified Party in connection with the investigation of any claim or the preparation for or defense of any action, claim or proceeding, whether or not resulting in any liability, or otherwise incurred at trial and/or any appellate levels) to which such Indemnified Party may become subject under any statute, common law or otherwise, relating to or arising out of this Agreement, or any transactions referred to herein or any transactions arising out of the transactions contemplated herein; provided, however, that the Company shall not be liable to an Indemnified Party in any such case to the extent that any such loss, claim, damage or liability is found, in a final judgment by a court of competent jurisdiction, to have resulted from said Indemnified Party's willful misconduct or gross negligence.

Promptly after receipt by an Indemnified Party of notice of the commencement of any action or proceeding in respect of which indemnity may be sought against the Company, such Indemnified Party will notify the Company in writing of the receipt of commencement thereof, and the Company shall assume the defense of such action or proceeding (including the employment of counsel reasonably satisfactory to the Indemnified Party and the payment of the fees and expenses of such counsel). After assumption of the defense of any action by the Company, the Company shall not be liable for any further costs of defense by counsel for the Indemnified Party. Notwithstanding the preceding sentence, the Indemnified Party will be entitled to employ its own counsel in such action if the Indemnified Party reasonably determines that a conflict of interest exists which makes representation by counsel chosen by the Company inappropriate. In such event, the fees and disbursements of such separate counsel will be paid by the Company.

If for any reason the foregoing indemnity, hold harmless and reimbursement provisions, rights, remedies and protections are unavailable to any Indemnified Party, or insufficient to hold any Indemnified Party harmless, then the Company shall contribute to the amount paid or payable by such Indemnified Party as a result of such losses, claims, damages, liabilities or expenses in such proportion as is appropriate to reflect the relative benefits received (or anticipated to be received) by the Company on the one hand and the Indemnified Party on the other hand, and also the relative fault of the Company on the one hand and the Indemnified Party on the other hand, as well as any relevant equitable considerations. It is hereby further agreed that the relative fault of the Company on the one hand and an Indemnified Party on the other hand with respect to the transactions shall be determined by reference to, among other things, whether any untrue or alleged untrue statement of a material fact or incorrect opinion or conclusion or the omission or alleged omission to state a material fact relates to information supplied by the Company on the one hand or by the Indemnified Party on the other hand, as well as the parties' relative intent, knowledge, access to information and opportunity to correct or prevent such statement, opinion, conclusion or omission. No Indemnified Party shall have any liability to the Company or any other person in connection with this Agreement except for any liability for losses, claims, damages or liabilities finally judicially determined to have resulted

solely from actions taken or omitted to be taken as a direct result of such Indemnified Party's gross negligence or willful misconduct.

The indemnity, contribution and expense reimbursement obligations set forth herein shall be in addition to any other rights, remedies or indemnification which any Indemnified Party may be entitled to at common law or otherwise, and shall remain in full force and effect regardless of any investigation made by or on behalf of any Indemnified Party. In no event shall the Company have any liability for any settlement affected without the written consent of the Company (which consent shall not be unreasonably withheld); provided that, the Company will not agree to any settlement requiring anything other than the payment of money damages without the consent of Executive, which consent may be withheld in his sole and absolute discretion.

{M2248368;3}

17

**ANNEX B**

**Existing Company Investments**

Midtown Miami

Banyan Bay

Trump Ft Lauderdale Beach Club

Trump Ft Lauderdale Hotel & Tower

Trump Camelback in Phoenix

Sixth Street in Whitestone, Queens

246 Spring Street, New York New York

1770 Sherman Street, Denver, Colorado

Arizona Center, Phoenix Arizona

Woodmont Country Club, Tamarac, Florida

2308 and 2300 N. Ocean Drive, Hollywood, Florida

# EXHIBIT B

## LIMITED LIABILITY COMPANY AGREEMENT
## OF
## BAYROCK/ZAR SPRING LLC

This Limited Liability Company Agreement (together with the schedules attached hereto, this "Agreement") of Bayrock/ZAR Spring LLC (the "Company"), is entered into by 246 Spring Street Holdings II, LLC, as the sole equity member (the "Member"), and James Young as the Independent Manager (as defined on Schedule A hereto). Capitalized terms used and not otherwise defined herein have the meanings set forth on Schedule A hereto.

The Member, by execution of this Agreement, hereby forms the Company as a limited liability company pursuant to and in accordance with the Delaware Limited Liability Company Act (6 Del. C. § 18-101 et seq. ), as amended from time to time (the "Act"), and this Agreement, and the Member and James Young hereby agree as follows:

Section 1.       Name.

The name of the limited liability company formed hereby is Bayrock/ZAR Spring LLC.

Section 2.       Principal Business Office.

The principal business office of the Company shall be located at c/o Bayrock Group L.L.C., Trump Tower, 725 Fifth Avenue, 24th Floor, New York New York 10022 or such other location as may hereafter be determined by the Member.

Section 3.       Registered Office.

The address of the registered office of the Company in the State of Delaware is c/o National Registered Agents, Inc., 160 Greentree Drive, Suite 101, Dover, Delaware, 19904.

Section 4.       Registered Agent.

The name and address of the registered agent of the Company for service of process on the Company in the State of Delaware is 160 Greentree Drive, Suite 101, Dover, Delaware 19904.

Section 5.       Members.

(a)       The mailing address of the Member is set forth on Schedule B attached hereto. The Member was admitted to the Company as a member of the Company upon its execution of a counterpart signature page to this Agreement.

(b)       Subject to Section 9(c), the Member may act by written consent.

(c)       Upon the occurrence of any event that causes the Member to cease to be a member of the Company (other than (i) upon an assignment by the Member of all of its limited liability company interest in the Company and the admission of the transferee pursuant to Sections 21 and 23, or (ii) the resignation of the Member and the admission of an additional

(i)    to acquire, own, hold, manage, operate, develop, construct, maintain, market, lease or otherwise deal with the property located at 246 Spring Street, New York, New York (the "Property");

(ii)    to sell, transfer, exchange, mortgage, pledge, assign, dispose of, finance or refinance the Property; and

(iii)    to engage in any lawful act or activity and to exercise any powers permitted to limited liability companies organized under the laws of the State of Delaware that are related or incidental to and necessary, convenient or advisable for the accomplishment of the above-mentioned purposes.

(b)    The Company, and the Member or any Manager on behalf of the Company, may enter into, execute, deliver and perform under the Basic Documents and all documents, agreements, certificates, or financing statements contemplated thereby or related thereto, all without any further act, vote or approval of any Member, manager, or other Person notwithstanding any other provision of this Agreement, the Act or applicable law, rule or regulation.  The foregoing authorization shall not be deemed a restriction on the powers of the Member or any Manager to enter into other agreements on behalf of the Company.

Section 8.    Powers.

Subject to Section 9(c), the Company, and the Manager on behalf of the Company, (i) shall have and exercise all powers necessary, convenient or incidental to accomplish its purposes as set forth in Section 7 and (ii) shall have and exercise all of the powers and rights conferred upon limited liability companies formed pursuant to the Act.  Subject to Section 7, the Manager has the authority to bind the Company.

Section 9.    Management.

(a)    Manager.  Subject to Section 9(c), the business and affairs of the Company shall be managed by or under the discretion of the Manager.  The initial Manager shall be the Member.  The Manager does not need to be a Member.  The Manager shall be, and is hereby designated as a "manager" within the meaning of Section 18-101(10) of the Act.

(b)    Manager as Agent.  To the extent of its powers set forth in this Agreement and subject to Section 9(c), the Manager is an agent of the Company for the purposes of the Company's business, and the actions of the Manager taken in accordance with such powers set forth in this Agreement shall bind the Company.  Notwithstanding the last sentence of Section 18-402 of the Act, except as provided in this Agreement or in a resolution of the Manager, the Manager may not bind the Company.

(c)    Limitations on the Company's Activities.

(i)    This Section 9(c) is being adopted in order to comply with certain provisions required in order to qualify the Company as a "special purpose" entity.

other Person, the costs incurred in so doing shall be fairly allocated to or among such entities for whose benefit the goods and services are provided, and each such entity shall bear its fair share of such costs; and all material transactions between (or among) any Affiliate shall be conducted on substantially the same terms as would be conducted with third parties.

(d)    to the extent that the Company and any Affiliate have offices in the same location, there shall be a fair and appropriate allocation of overhead costs among them, and each such entity shall bear its fair share of such expenses.

(e)    conduct its affairs strictly in accordance with its organizational documents, and observe all necessary, appropriate and customary limited liability company formalities including, but not limited to, obtaining any and all members' consents necessary to authorize actions taken or to be taken, and maintaining accurate and separate books, records and accounts, including, without limitation, payroll and inter-company transaction accounts.

(f)    maintain books and records separate from those of any other Person.

(g)    maintain its assets in such a manner that it is not more costly or difficult to segregate, identify or ascertain such assets.

(h)    hold regular meetings of its members, and observe all other limited liability company formalities.

(i)    hold itself out to creditors and the public as a legal entity separate and distinct from any other entity.

(j)    prepare separate tax returns and financial statements, or if part of a consolidated group, then it will be shown as a separate member of such group.

(k)    transact all business with its Affiliates on an arm's-length basis and pursuant to enforceable agreements.

(l)    conduct business in its name and use separate stationery, invoices and checks.

(m)    not commingle its assets or funds with those of any other Person.

(n)    not assume, guarantee or pay the debts or obligations of any other Person.

Failure of the Company, or a Member or Manager on behalf of the Company, to comply with any of the foregoing covenants or any other



Section 14.    Additional Contributions.

The Member is not required to make any additional capital contribution to the Company. However, the Member may make additional capital contributions to the Company at any time upon the written consent of such Member. To the extent that the Member makes an additional capital contribution to the Company, the Member shall revise Schedule B of this Agreement. The provisions of this Agreement, including this Section 14, are intended to benefit the Member and the Special Member and, to the fullest extent permitted by law, shall not be construed as conferring any benefit upon any creditor of the Company (and no such creditor of the Company shall be a third-party beneficiary of this Agreement) and the Member and the Special Member shall not have any duty or obligation to any creditor of the Company to make any contribution to the Company or to issue any call for capital pursuant to this Agreement.

Section 15.    Allocation of Profits and Losses.

The Company's profits and losses shall be allocated to the Member.

Section 16.    Distributions.

Distributions shall be made to the Member at the times and in the aggregate amounts determined by the Manager. Notwithstanding any provision to the contrary contained in this Agreement, the Company shall not make a distribution to the Member on account of its interest in the Company if such distribution would violate the Act or any other applicable law or any Basic Document.

Section 17.    Books and Records.

The Manager shall keep or cause to be kept complete and accurate books of account and records with respect to the Company's business. The books of the Company shall at all times be maintained by the Manager. The Member and its duly authorized representatives shall have the right to examine the Company books, records and documents during normal business hours. The Company, and the Manager on behalf of the Company, shall not have the right to keep confidential from the Member any information that the Manager would otherwise be permitted to keep confidential from the Member pursuant to Section 18-305(c) of the Act. The Company's books of account shall be kept using the method of accounting determined by the Member. The Company's independent auditor, if any, shall be an independent public accounting firm selected by the Member.

Section 18.    Reports.

(a)    Within 60 days after the end of each fiscal quarter, the Manager shall cause to be prepared an unaudited report setting forth as of the end of such fiscal quarter:

(i)    unless such quarter is the last fiscal quarter, a balance sheet of the Company; and

(ii)    unless such quarter is the last fiscal quarter, an income statement of the Company for such fiscal quarter.

instrument signifying its agreement to be bound by the terms and conditions of this Agreement, which instrument may be a counterpart signature page to this Agreement. Such admission shall be deemed effective immediately prior to the resignation and, immediately following such admission, the resigning Member shall cease to be a member of the Company.

Section 23.    Admission of Additional Members.

One or more additional Members of the Company may be admitted to the Company with the written consent of the Member.

Section 24.    Dissolution.

(a)    Subject to Section 9(c), the Company shall be dissolved, and its affairs shall be wound up upon the first to occur of the following: (i) the termination of the legal existence of the last remaining member of the Company or the occurrence of any other event which terminates the continued membership of the last remaining member of the Company in the Company unless the Company is continued without dissolution in a manner permitted by this Agreement or the Act or (ii) the entry of a decree of judicial dissolution under Section 18-802 of the Act. Upon the occurrence of any event that causes the last remaining member of the Company to cease to be a member of the Company or that causes the Member to cease to be a member of the Company (other than (i) upon an assignment by the Member of all of its limited liability company interest in the Company and the admission of the transferee pursuant to Sections 21 and 23, or (ii) the resignation of the Member and the admission of an additional member of the Company pursuant to Sections 22 and 23), to the fullest extent permitted by law, the personal representative of such member is hereby authorized to, and shall, within 90 days after the occurrence of the event that terminated the continued membership of such member in the Company, agree in writing (i) to continue the Company and (ii) to the admission of the personal representative or its nominee or designee, as the case may be, as a substitute member of the Company, effective as of the occurrence of the event that terminated the continued membership of the last remaining member of the Company or the Member in the Company.

(b)    Notwithstanding any other provision of this Agreement, the Bankruptcy of the Member or the Special Member shall not cause the Member or the Special Member, respectively, to cease to be a member of the Company and upon the occurrence of such an event, the Company shall continue without dissolution.

(c)    Notwithstanding any other provision of this Agreement, each of the Member and the Special Member waives any right it might have to agree in writing to dissolve the Company upon the Bankruptcy of the Member or the Special Member, or the occurrence of an event that causes the Member or the Special Member to cease to be a member of the Company.

(d)    In the event of dissolution, the Company shall conduct only such activities as are necessary to wind up its affairs (including the sale of the assets of the Company in an orderly manner), and the assets of the Company shall be applied in the manner, and in the order of priority, set forth in Section 18-804 of the Act.

(e)    The Company shall terminate when (i) all of the assets of the Company, after payment of or due provision for all debts, liabilities and obligations of the Company shall have

DEL-FS1\148687v01                                10

Section 30.   Governing Law.

This Agreement shall be governed by and construed under the laws of the State of Delaware (without regard to conflict of laws principles), all rights and remedies being governed by said laws.

Section 31.   Amendments.

Subject to Section 9(c), this Agreement may be modified, altered, supplemented or amended pursuant to a written agreement executed and delivered by the Member.

Section 32.   Counterparts.

This Agreement may be executed in any number of counterparts, each of which shall be deemed an original of this Agreement and all of which together shall constitute one and the same instrument.

Section 33.   Notices.

Any notices required to be delivered hereunder shall be in writing and personally delivered, mailed or sent by telecopy, electronic mail or other similar form of rapid transmission, and shall be deemed to have been duly given upon receipt (a) in the case of the Company, to the Company at its address in Section 2, (b) in the case of the Member, to the Member at its address as listed on Schedule B attached hereto and (c) in the case of either of the foregoing, at such other address as may be designated by written notice to the other party.

Section 34.   Effectiveness.

Pursuant to Section 18-201(d) of the Act, this Agreement shall be effective as of the time of the filing of the Certificate of Formation with the Office of the Secretary of State of the State of Delaware on September 14, 2005.

Section 35.   Certificated Limited Liability Company Interests.

(a)      Each limited liability company interest in the Company shall constitute a "security" within the meaning of, and be governed by, (i) Article 8 of the Uniform Commercial Code (including Section 8-102(a)(15) thereof) as in effect from time to time in the State of Delaware, and (ii) Article 8 of the Uniform Commercial Code of any other applicable jurisdiction that now or hereafter substantially includes the 1994 revisions to Article 8 thereof as adopted by the American Law Institute and the National Conference of Commissioners on Uniform State Laws and approved by the American Bar Association on February 14, 1995 and the Company hereby "opts-in" to such provisions for the purpose of the Uniform Commercial Code.

(b)      The Company shall maintain books for the purpose of registering the transfer of limited liability company interests of the Company. Notwithstanding anything in this Agreement to the contrary, the transfer of any limited liability company interest in the Company requires delivery of an endorsed Certificate and any transfer of limited liability company interests in the

IN WITNESS WHEREOF, the undersigned, intending to be legally bound hereby, has duly executed this Limited Liability Company Agreement as of the 21st day of September 2005.

MEMBERS:

246 Spring Street Holdings II, LLC

By: _____
Name:
Title:


INDEPENDENT MANAGER:

_____
Name:

SCHEDULE A

Definitions

A.     Definitions

When used in this Agreement, the following terms not otherwise defined herein have the following meanings:

"Act" has the meaning set forth in the preamble to this Agreement.

"Affiliate" means, with respect to any Person, any other Person directly or indirectly Controlling or Controlled by or under direct or indirect common Control with such Person.

"Agreement" means this Limited Liability Company Agreement of the Company, together with the schedules attached hereto, as amended, restated or supplemented or otherwise modified from time to time.

"Bankruptcy" means, with respect to any Person, if such Person (i) makes an assignment for the benefit of creditors, (ii) files a voluntary petition in bankruptcy, (iii) is adjudged a bankrupt or insolvent, or has entered against it an order for relief, in any bankruptcy or insolvency proceedings, (iv) files a petition or answer seeking for itself any reorganization, arrangement, composition, readjustment, liquidation or similar relief under any statute, law or regulation, (v) files an answer or other pleading admitting or failing to contest the material allegations of a petition filed against it in any proceeding of this nature, (vi) seeks, consents to or acquiesces in the appointment of a trustee, receiver or liquidator of the Person or of all or any substantial part of its properties, or (vii) if 120 days after the commencement of any proceeding against the Person seeking reorganization, arrangement, composition, readjustment, liquidation or similar relief under any statute, law or regulation, if the proceeding has not been dismissed, or if within 90 days after the appointment without such Person's consent or acquiescence of a trustee, receiver or liquidator of such Person or of all or any substantial part of its properties, the appointment is not vacated or stayed, or within 90 days after the expiration of any such stay, the appointment is not vacated. The foregoing definition of "Bankruptcy" is intended to replace and shall supersede and replace the definition of "Bankruptcy" set forth in Sections 18-101(l) and 18-304 of the Act.

"Basic Documents" means any and all documents necessary for the financing and acquisition of that certain real property known as 246 Spring Street and 132 Varick Street, New York, New York and all documents and certificates contemplated thereby or delivered in connection therewith.

"Certificate of Formation" means the Certificate of Formation of the Company filed with the Secretary of State of the State of Delaware on September 14, 2005, as amended or amended and restated from time to time.

"Company" means Bayrock/ZAR Spring LLC, a Delaware limited liability company.

trust, unincorporated organization, or other organization, whether or not a legal entity, and any governmental authority.

"Rating Agency" has the meaning assigned to that term in the Basic Documents.

"Rating Agency Condition" means (i) with respect to any action taken at any time before the loan evidenced and secured by the Basic Documents has been sold or assigned to a securitization trust, that the lender thereunder has consented in writing to such action, and (ii) with respect to any action taken at any time after such loan has been sold or assigned to a securitization trust, that each Rating Agency shall have been given ten (10) days prior notice thereof and that each of the Rating Agencies shall have notified the Company in writing that such action will not result in a reduction or withdrawal of the then current rating by such Rating Agency of any of securities issued by such securitization trust.

"Special Member" means, upon such person's admission to the Company as a member of the Company pursuant to Section 5(c), a person acting as Independent Manager, in such person's capacity as a member of the Company. A Special Member shall only have the rights and duties expressly set forth in this Agreement.

B.     Rules of Construction

Definitions in this Agreement apply equally to both the singular and plural forms of the defined terms. The words "include" and "including" shall be deemed to be followed by the phrase "without limitation." The terms "herein," "hereof" and "hereunder" and other words of similar import refer to this Agreement as a whole and not to any particular Section, paragraph or subdivision. The Section titles appear as a matter of convenience only and shall not affect the interpretation of this Agreement. All Section, paragraph, clause, Exhibit or Schedule references not attributed to a particular document shall be references to such parts of this Agreement.

<u>SCHEDULE C</u>

<u>Management Agreement</u>

September 2l, 2005

Re:   <u>Management Agreement –Bayrock/ZAR Spring LLC</u>

Ladies and Gentlemen:

For good and valuable consideration, the undersigned Persons, who has been designated as Independent Manager of Bayrock/ZAR Spring LLC, a Delaware limited liability company (the "<u>Company</u>"), in accordance with the Limited Liability Company Agreement of the Company, dated as of September 2l, 2005, as it may be amended or restated from time to time (the "<u>LLC Agreement</u>"), hereby agree as follows:

1.      The undersigned accepts such Person's rights and authority as an Independent Manager under the LLC Agreement and agrees to perform and discharge such Person's duties and obligations as an Independent Manager under the LLC Agreement, and further agrees that such rights, authorities, duties and obligations under the LLC Agreement shall continue until such Person's successor as an Independent Manager is designated or until such Person's resignation or removal as an Independent Manager in accordance with the LLC Agreement. Each of the undersigned agrees and acknowledges that it has been designated as a "manager" of the Company within the meaning of the Delaware Limited Liability Company Act.

2.      So long as any Obligation is outstanding, the undersigned agrees, solely in its capacity as a creditor of the Company on account of any indemnification or other payment owing to the undersigned by the Company, not to acquiesce, petition or otherwise invoke or cause the Company to invoke the process of any court or governmental authority for the purpose of commencing or sustaining a case against the Company under any federal or state bankruptcy, insolvency or similar law or appointing a receiver, liquidator, assignee, trustee, custodian, sequestrator or other similar official of the Company or any substantial part of the property of the Company, or ordering the winding up or liquidation of the affairs of the Company.

3.      THIS MANAGEMENT AGREEMENT SHALL BE GOVERNED BY AND CONSTRUED IN ACCORDANCE WITH THE LAWS OF THE STATE OF DELAWARE, AND ALL RIGHTS AND REMEDIES SHALL BE GOVERNED BY SUCH LAWS WITHOUT REGARD TO PRINCIPLES OF CONFLICTS OF LAWS.

Initially capitalized terms used and not otherwise defined herein have the meanings set forth in the LLC Agreement.

IN WITNESS WHEREOF, the undersigned has executed this Management Agreement as of the day and year first above written.

*James Young*

JAMES M. YOUNG
ASSISTANT VICE PRESIDENT

IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

JODY KRISS, for himself and derivatively on behalf of the Delaware )
limited liability companies Bayrock Spring Street, LLC, and Bayrock )
Whitestone LLC, the Arizona limited liability company Bayrock )
Camelback LLC, the Florida limited liability companies Bayrock )
Merrimac LLC, and Bayrock Ocean Club LLC, and the New York limited )
liability company Bayrock Group, LLC, )
                                    Plaintiff, )
  )
            v. )
  )
BAYROCK GROUP LLC; RIF INTERNATIONAL GROUP, INC.; )
TEVFIK ARIF; JULIUS SCHWARZ; MEL DOGAN; DOGAN & )
ASSOCIATES; 2027 EMMONS AVE LLC; FELIX SATTER (aka )
FELIX SATER); VICTORIA SATER; ALEX SALOMON; ALEX )
SALMON & CO., PC; JOSEPH BENCIVENGA; BUENA VISTA )
ALARGA LLC; BAYROCK SPRING STREET LLC; BAYROCK )
WHITESTONE LLC; BAYROCK HOLDINGS LLC; BAYROCK ) C.A. No.:
NATURAL STONE LLC; BAYROCK SAPIR ORGANIZATION LLC; ) 4154-VCS
246 SPRING STREET HOLDINGS II LLC; BAYROCK/SAPIR )
ORGANIZATION HOLDINGS LLC; BAYROCK/SAPIR )
ORGANIZATION REALTY LLC; 151-45 SIXTH ROAD )
WHITESTONE PARTNERS LLC; CAMELBACK DEVELOPMENT )
PARTNERS LLC; STILLMAN BAYROCK MERRIMAC LLC; SB )
HOTEL ASSOCIATES LLC, 550 SEABREEZE DEVELOPMENT LLC, )
  )
                             True Defendants, )
  )
                    And )
  )
BAYROCK GROUP LLC; BAYROCK WHITESTONE LLC; )
BAYROCK CAMELBACK, LLC; BAYROCK MERRIMAC LLC; )
BAYROCK OCEAN CLUB, LLC; BAYROCK SPRING STREET LLC, )
  )
                       Nominal Defendants. )

## VERIFIED ANSWER

The Bayrock Defendants,[1] by and through its undersigned counsel, as and for their

Answer and Affirmative Defenses to plaintiffs' Verified Complaint, respectfully states as

follows:

---

[1]       The Bayrock Defendants are Bayrock Group LLC, RIF International Group, Inc., Tevfik Arif,
Julius Schwarz, Mel Dogan, Dogan & Associates, 2027 Emmons Ave LLC, Felix Satter, Victoria

DB02:8055496.1
DB02:8207357.1
            068228.1001
            068228.1001

## ANSWER

1.     Denied, except admitted that plaintiff provided services to Bayrock Group LLC.

By way of further explanation, the Bayrock Defendants lack sufficient information to admit or

deny the remaining allegations pertaining and therefore denies those allegations.

2.     Denied, except the nature of the Bayrock Defendants' businesses is real estate

development.

3.     Admitted.  Also admitted as to subparagraphs 3.1-3.19.

4.     Denied.

    4.1.     Denied, except that admitted Mr. Arif is a Turkis national and lives in

    New York.

    4.2.     Denied, except admitted the Mr. Satter lives in New York.

    4.3.     Denied, except admitted that Mr. Schwarz is a United States citizen, lives

    in New Jersey, and is a member of the bars of New York and Florida.

    4.4.     Denied, except admitted that it is a New York corporation of which Mr.

    Arif is the sole shareholder.

5.     Paragraph 5 required no response.

    5.1.     Denied, except admitted that Dogan & Associates is a law a law firm with

    its principal office in New York.

---

Sater, Buena Vista Alarga LLC, Bayrock Spring Street LLC, Bayrock Whitestone LLC, Bayrock
Holdings LLC, Bayrock Natural Stone LLC, Bayrock Sapir Organization LLC, 246 Spring Street
Holdings II LLC, Bayrock /Sapir Organization Holdings LLC, Bayrock/Sapir Organization
Realty LLC, 151-45 Sixth Road Whitestone Partners LLC, Camelback Development Partners
LLC, Stillman Bayrock Merrimac LLC, SB Hotel Associates LLC, and 550 Seabreeze
Development LLC.  Defendants do not waive any grounds for their pending dismissal motion by
submitting this Answer and preserve all grounds for dismissal set forth therein hereby.  All non-
resident Bayrock Defendants specifically reserve their right to challenge this Court's exercise of
personal jurisdiction over them in connection with this action.  All non-resident Bayrock

5.2.    Denied, except admitted that Mr. Dogan is an attorney licensed to practice in New York and is the sole proprietor of Dogan & Associates.

5.3.    Defendants lack sufficient information to admit or deny the allegations of paragraph 5.3.

5.4.    Defendants lack sufficient information to admit or deny the allegations of paragraph 5.4.

5.5.    Defendants lack sufficient information to admit or deny the allegations of paragraph 5.5.

5.6.    Denied, except admitted that Mrs. Sater is married to Mr. Satter.

6.    Denied, except that Mr. Kriss is the plaintiff in this action.

7.    Denied. By way of further explanation, the terms of any contract(s) speak for themselves.

8.    Denied. By way of further explanation, the terms of any contract(s) speak for themselves.

9.    Denied. By way of further explanation, the terms of any contract(s) speak for themselves.

10.    Denied. By way of further explanation, the terms of any contract(s) speak for themselves.

11.    Denied. By way of further explanation, the terms of any contract(s) speak for themselves.

---

Defendants join in this Answer only in the event that this Court denies their pending motion to dismiss.

068228.1001

**2003**

12.     Denied. By way of further explanation, the terms of any contract(s) speak for themselves.

13.     Denied. By way of further explanation, the terms of any contract(s) speak for themselves.

14.     Denied. By way of further explanation, the terms of any contract(s) speak for themselves.

15.     Denied, except that Mr. Kriss executed a contract on November 10, 2005. By way of further explanation, the terms of any contract(s) speak for themselves.

16.     Denied. By way of further explanation, the terms of any contract(s) speak for themselves.

17.     Denied. By way of further explanation, the terms of any contract(s) speak for themselves.

18.     Denied. By way of further explanation, the terms of any contract(s) speak for themselves.

19.     Denied. By way of further explanation, the terms of any contract(s) speak for themselves.

20.     Denied. By way of further explanation, the terms of any contract(s) speak for themselves.

21.     Denied. By way of further explanation, the terms of any contract(s) speak for themselves.

22.     Denied. By way of further explanation, the terms of any contract(s) speak for themselves.

23.    Denied.  By way of further explanation, the terms of any contract(s) speak for themselves.

24.    Denied.  By way of further explanation, the terms of any contract(s) speak for themselves.

25.    Denied.  By way of further explanation, the terms of any contract(s) speak for themselves.

26.    Denied.  By way of further explanation, the terms of any contract(s) speak for themselves.

27.    Denied.  By way of further explanation, the terms of any contract(s) speak for themselves.

28.    Denied.  By way of further explanation, the terms of any contract(s) speak for themselves.

29.    Denied.  By way of further explanation, the terms of any contract(s) speak for themselves.

30.    Denied.  By way of further explanation, the terms of any contract(s) speak for themselves.

31.    Denied.  By way of further explanation, the terms of any contract(s) speak for themselves.

32.    Denied.  By way of further explanation, the terms of any contract(s) speak for themselves.

33.    Denied.  By way of further explanation, the terms of any contract(s) speak for themselves.

34.    Denied.  By way of further explanation, the terms of any contract(s) speak for themselves.

35.    Denied.  By way of further explanation, the terms of any contract(s) speak for themselves.

36.    The allegations of paragraph 36 assert conclusions of law to which no response is required.

## CAUSES OF ACTION
## DECLARATORY JUDGMENT

37.    The Bayrock Defendants repeat and reallege the preceding paragraphs as if fully set forth herein.

38.    Denied, to the extent any response is required to the statement in paragraph 38.

39.    Denied, to the extent any response is required to the statements in paragraph 38.

## BREACH OF THE CONTRACTUAL COVENANT OF GOOD FAITH

40.    The Bayrock Defendants repeat and reallege the preceding paragraphs as if fully set forth herein.

41.    The allegations of paragraph 41 assert conclusions of law to which no response is required.

42.    Denied.  By way of further explanation, the Bayrock Defendants lack sufficient information to admit or deny the allegations pertaining to 42, and therefore deny the allegations.

43.    Denied.  By way of further explanation, the Bayrock Defendants lack sufficient information to admit or deny the allegations pertaining to 42, and therefore deny the allegations.

44.    The allegations of paragraph 44 assert conclusions of law to which no response is required.

45.     The allegations of paragraph 45 assert conclusions of law to which no response is required.

46.     Denied.

47.     The allegations of paragraph 47 assert conclusions of law to which no response is required.

48.     The allegations of paragraph 48 assert conclusions of law to which no response is required.


## BREACH OF THE CONTRACTUAL COVENANT OF GOOD FAITH

49.     The Bayrock Defendants repeat and reallege the preceding paragraphs as if fully set forth herein.

50.     The allegations of paragraph 50 assert conclusions of law to which no response is required.

51.     Denied.

52.     Denied.

53.     Denied, to the extent any response is required to the statements in paragraph 53.

## COMMON LAW FRAUD

54.     The Bayrock Defendants repeat and reallege the preceding paragraphs as if fully set forth herein.

55.     Denied.

56.     Denied.  By way of further explantion, the Bayrock Defendants refer to the November 10 Contract for a true and complete statement of its terms.

57.     Denied.

58.    Denied, to the extent a response to any allegations in paragraph 58 is warranted. By way of further explanation, the allegations of paragraph 59 assert conclusions of law to which no response is required.

59.    Denied.

60.    Defendants lack sufficient information to admit or deny the allegations pertaining to paragraph 60 and therefore deny the allegations.

61.    Defendants lack sufficient information to admit or deny the allegations pertaining to paragraph 61 and therefore deny the allegations.

62.    The allegations of paragraph 62 assert conclusions of law to which no response is required.

63.    The allegations of paragraph 62 assert conclusions of law to which no response is required.

64.    Denied.

65.    Denied.

66.    Denied, to the extent any response is required to the statements in paragraph 66.

## DELAWARE STATE SECURITIES FRAUD

67.    The Bayrock Defendants repeat and reallege the preceding paragraphs as if fully set forth herein.

68.    The statement in paragraph 68 requires no response.

69.    The allegations of paragraph 69 assert conclusions of law to which no response is required.

70.    The allegations of paragraph 70 assert conclusions of law to which no response is required.

71. Denied.

72. Denied.

73. Denied.

74. Denied.

75. Denied.

76. Denied.

77. Denied.

78. Denied.

79. Denied, to the extent any response is required to the statements in paragraph 79.

## FLORIDA STATE SECURITIES FRAUD

80. The Bayrock Defendants repeat and reallege the preceding paragraphs as if fully set forth herein.

81. The statement in paragraph 81 requires no response.

82. The allegations of paragraph 82 assert conclusions of law to which no response is required.

83. The allegations of paragraph 83 assert conclusions of law to which no response is required.

84. Denied.

85. Denied.

86. Denied.

87. Denied.

88. Denied.

89. Denied.

90.     Denied, to the extent any response is required to the statements in paragraph 90.

## ARIZONA STATE SECURITIES FRAUD

91.     The Bayrock Defendants repeat and reallege the preceding paragraphs as if fully set forth herein.

92.     The statement in paragraph 92 requires no response.

93.     The allegations of paragraph 93 assert conclusions of law to which no response is required.

94.     The allegations of paragraph 94 assert conclusions of law to which no response is required.

95.     Denied.

96.     Denied.

97.     Denied.

98.     Denied.

99.     Denied.

100.    The allegations of paragraph 100 assert conclusions of law to which no response is required.

101.    Denied, to the extent any response is required to the statements in paragraph 101.

## AIDING AND ABETTING SECURITIES FRAUD

102.    The Bayrock Defendants repeat and reallege the preceding paragraphs as if fully set forth herein.

103.    Denied, to the extent any response is required to the statements in paragraph 103.

## AIDING AND ABETTING COMMON LAW FRAUD

104.    The Bayrock Defendants repeat and reallege the preceding paragraphs as if fully

set forth herein.

105.    Denied, to the extent any response is required to the statements in paragraph 105.

## BREACH OF FIDUCIARY DUTY

106.    The Bayrock Defendants repeat and reallege the preceding paragraphs as if fully set forth herein.

107.    The statement in paragraph 107 requires no response:

108.    Denied.

109.    Denied.

110.    Denied.

111.    Denied.

112.    Denied.

113.    The statement in paragraph 113 requires no response:

114.    Denied.

115.    Denied.

116.    Denied.

117.    Denied.

118.    The allegations of paragraph 118 assert conclusions of law to which no response is required.

119.    The allegations of paragraph 119 assert conclusions of law to which no response is required.

120.    The statement in paragraph 120 requires no response.

121.    Denied, except admitted that Bayrock Group LLC was the sole member of Bayrock Spring Street LLC.  The remaining allegations of paragraph 121 assert conclusions of

law to which no response is required.

122.    Denied, except admitted that Bayrock Group LLC was a member f Bayrock Whitestone LLC. The remaining allegations of paragraph 122 assert conclusions of law to which no response is required.

123.    Denied, except admitted that Bayrock Group LLC was the sole member of Bayrock Camelback LLC. The remaining allegations of paragraph 123 assert conclusions of law to which no response is required.

124.    Denied, except admitted That Bayrock Group LLC was the sole member of Bayrock Merrimac, LLC. The remaining allegations of paragraph 124 assert conclusions of law to which no response is required.

125.    The statement in paragraph 120 requires no response.

126.    Denied.

127.    Denied, except admitted that Mr. Arif owns a majority interest in Bayrock Group LLC.

128.    Denied. The allegations of paragraph 119 assert conclusions of law to which no response is required.

129.    Denied, except admitted that Mr. Schwarz is currently Executive Vice-President of Bayrock Group LLC.

130.    The statement in paragraph 130 requires no response.

      130.1. Denied.

      130.2. Denied.

      130.3. Denied. The allegations of paragraph 130.3 assert conclusions of law to which no response is required.

130.4. The allegations of paragraph 130.4 assert conclusions of law to which no response is required.

130.5. Denied.

130.6. Denied.

130.7. Denied.

130.8. Denied.

130.9. Denied.

130.10. Denied, to the extent the statement in paragraph 130 requires a response.

131.   Denied.  The allegations of paragraph 131 assert conclusions of law to which no response is required.

132.   The statement in paragraph 132 requires no response.

133.   The statement in paragraph 133 requires no response.

133.1. Denied.

133.2. Denied.

133.3. Denied.

133.4. The allegations of paragraph 133.4 assert conclusions of law to which no response is required.

133.5. Denied.

133.6. Denied, to the extent a response is required.

133.7. Denied.

133.8. Denied.

134.   Denied.

135.   Denied, to the extent a response is required.

136.   Denied, to the extent a response is required.

## AIDING AND ABETTING BREACH OF FIDUCIARY DUTY

137.   The Bayrock Defendants repeat and reallege the preceding paragraphs as if fully set forth herein.

138.   Denied.

## PRAYER FOR RELIEF

139.   The statements in paragraph 139 require no response.

## AFFIRMATIVE DEFENSES

### First Affirmative Defense

Plaintiff's claims are barred for lack of subject matter jurisdiction.

### Second Affirmative Defense

Plaintiff's claims against the non-resident defendants fail for lack of service of process.

### Third Affirmative Defense

Plaintiff's claims against the non-resident defendants fail for lack of personal jurisdiction.

### Fourth Affirmative Defense

Plaintiff's claims fail because plaintiff cannot join necessary indispensable parties to this action.

### Fifth Affirmative Defense

Plaintiff fails to state a claim.

### Sixth Affirmative Defense

Plaintiff is barred from pursuing his claims under the doctrine of unclean hands.

### Seventh Affirmative Defense

Plaintiff has failed to plead his claims with particularity.

### Eighth Affirmative Defense

Plaintiff has failed to adequately plead demand futility.

### Ninth Affirmative Defense

Plaintiff lacks standing to bring derivative claims.

### Tenth Affirmative Defense

Plaintiff's claims are barred by the doctrine of laches.

### Eleventh Affirmative Defense

Plaintiff has failed to plead an actionable controversy.

### Twelfth Affirmative Defense

Plaintiff has breached the November 10 Contract, the implied covenant of good faith and

fair dealing therein, and fiduciary duties in connection therewith, and has committed acts of self-

dealing, bad faith, willful misconduct, and gross negligence.  Plaintiff has also committed acts of

fraud in connection with entering and performing his duties under the November 10 Contract.


                              YOUNG CONAWAY STARGATT
                              & TAYLOR, LLP


                              /s/ Kathaleen St. J. McCormick
                              Barry M. Willoughby (No. 1016)
                              Kathaleen St. J. McCormick (No. 4579)
                              The Brandywine Building
                              1000 West Street, 17th Floor
                              Wilmington, Delaware  19801
Dated: May 15, 2009           (302) 571-6600
                              *Attorneys for the Bayrock Defendants*

## CERTIFICATE OF SERVICE

I, Kathaleen St. J. McCormick, Esquire, hereby certify that on May 15, 2009, a copy of the foregoing document was served on the following counsel in the manner indicated below:

### BY LEXIS/NEXIS FILE & SERVE

David L. Finger, Esquire
FINGER, SLANINA &
   LIEBESMAN, LLC
One Commerce center
1201 N. Orange St., 7th Floor
Wilmington, DE  19801-1155

John A. Elzufon, Esquire
Andrea C. Rodgers, Esquire
ELZUFON AUSTIN REARDON,
   TARLOV &  MONDELL, P.A.
300 Delaware Avenue, Suite 1700
P.O. Box 1630
Wilmington, DE 19899-1630

/s/ Kathaleen St. J. McCormick
Kathaleen St. J. McCormick (# 4579)

## VERIFICATION

State of New York          :
                           :          ss:
County of New York         :

    I, Tevfik Arif, state under oath, on behalf of myself and as an authorized agent of the

Bayrock Defendants which are business entities, that I have read the foregoing Answer to

plaintiff's Verified Complaint, and that, to the best of my knowledge and belief, the facts stated

therein are true and correct.  I further state that by executing this verification, I have not waived

my right to challenge this Court's exercise of personal jurisdiction over me or the non-resident

defendants named in this action.

                                Tevfik Arif

SWORN TO AND SUBSCRIBED BEFORE ME
This 15th day of  May , 2009.

_____
Notary Public, My Commission Expires:_____ 2010 _____

NEIL PASMANIK
Notary Public State of New York
No 02PA6150795
Qualified in Kings County
Commission Expires Aug. 7, 20 10

IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

| | |
|---|---|
| JODY KRISS, for himself and derivatively on behalf of the Delaware limited liability companies Bayrock Spring Street, LLC, and Bayrock Whitestone LLC, the Arizona limited liability company Bayrock Camelback LLC, the Florida limited liability companies Bayrock Merrimac LLC, and Bayrock Ocean Club LLC, and the New York limited liability company Bayrock Group, LLC, | ) ) ) ) ) ) ) |
| Plaintiff, | ) ) |
| v. | ) ) ) |
| BAYROCK GROUP LLC; RIF INTERNATIONAL GROUP, INC.; TEVFIK ARIF; JULIUS SCHWARZ; MEL DOGAN; DOGAN & ASSOCIATES; 2027 EMMONS AVE LLC; FELIX SATTER (aka FELIX SATER); VICTORIA SATER; ALEX SALOMON; ALEX SALMON & CO., PC; JOSEPH BENCIVENGA; BUENA VISTA ALARGA LLC; BAYROCK SPRING STREET LLC; BAYROCK WHITESTONE LLC; BAYROCK HOLDINGS LLC; BAYROCK NATURAL STONE LLC; BAYROCK SAPIR ORGANIZATION LLC; 246 SPRING STREET HOLDINGS II LLC; BAYROCK/SAPIR ORGANIZATION HOLDINGS LLC; BAYROCK/SAPIR ORGANIZATION REALTY LLC; 151-45 SIXTH ROAD WHITESTONE PARTNERS LLC; CAMELBACK DEVELOPMENT PARTNERS LLC; STILLMAN BAYROCK MERRIMAC LLC; SB HOTEL ASSOCIATES LLC, 550 SEABREEZE DEVELOPMENT LLC, | ) ) ) ) ) ) ) ) ) C.A. No.: ) 4154-VCS ) ) ) ) ) ) ) ) |
| True Defendants, | ) ) |
| And | ) ) |
| BAYROCK GROUP LLC; BAYROCK WHITESTONE LLC; BAYROCK CAMELBACK, LLC; BAYROCK MERRIMAC LLC; BAYROCK OCEAN CLUB, LLC; BAYROCK SPRING STREET LLC, | ) ) ) ) |
| Nominal Defendants. | ) ) |

## OPENING BRIEF IN SUPPORT OF THE BAYROCK DEFENDANTS' MOTION TO DISMISS

Barry M. Willoughby (No. 1016)
Kathaleen St. J. McCormick (No. 4579)
**YOUNG CONAWAY STARGATT
   & TAYLOR, LLP**
The Brandywine Building
1000 West Street, 17th Floor
Wilmington, Delaware  19801
(302) 571-6600

Dated: May 13, 2009                    *Attorneys for the Bayrock Defendants*

**Table of Contents**

Page

PRELIMINARY STATEMENT ........................................................... 2

STATEMENT OF FACTS ................................................................. 3

ARGUMENT ..................................................................................... 9

    I.      PLAINTIFF'S CLAIMS ARE SUBJECT TO ARBITRATION AND SHOULD BE DISMISSED FOR LACK OF SUBJECT MATTER JURISDICTION .................................................................... 9

           A.      The Arbitration Clause Delegates the Question of Substantive Arbitrability to the Arbitrator .................................... 10

           B.      All Claims Brought Against the Company Entities Are Subject to Arbitration ............................................................. 14

           C.      All Claims Brought Against Non-Signatories to the November 10 Contract Are Also Subject to Arbitration .................................. 15

           D.      Plaintiff's Claims Fall Within the Scope of the Arbitration Provision of the November 10 Contract ..................................... 17

    II.     PLAINTIFF'S CLAIMS AGAINST THE NON-RESIDENT DEFENDANTS SHOULD BE DISMISSED FOR LACK OF PERSONAL JURISDICTION ................................................ 19

    III.    PLAINTIFF'S CLAIMS SHOULD BE DISMISSED FOR FAILURE TO PROPERLY JOIN INDISPENSABLE PARTIES ............................ 21

## Table of Authorities

**Cases**

*Apollo Computer, Inc. v. Berg,*
    886 F.2d 469 (1st Cir. 1989) ..................................................... 12

*Bapu Corp. v. Choice Hotels Int'l, Inc.,*
    2008 U.S. Dist. LEXIS 71252 (D.N.J. Sept. 8, 2008) ............................ 12

*Baypo Ltd. P'ship, v. Tech. JV, LP,*
    940 A.2d 20 (Del. Ch. 2007) .............................................. 12, 13

*Bollinger Shipyards Lockport LLC v. Northrop Grumman Ship Sys. Inc.,*
    2009 U.S. Dist. LEXIS 3725 (E.D. La. Jan. 12, 2009) .......................... 12

*Brandon, Jones, Sandall, Zeide, Kohn, Chalal & Musso, P.A. v. MedPartners, Inc.,*
    203 F.R.D. 677 (S.D. Fla. 2001)
    *aff'd on other grounds*, 312 F.3d 1349 (11th Cir. 2002) ...................... 12

*Canaday v. Superior Court in and for New Castle County,*
    119 A.2d 347 (Del. 1955) ..................................................... 22

*Carder v. Carl M. Freeman Communities, LLC,*
    2009 Del. Ch. LEXIS 2 (Del. Ch. Jan. 5, 2009) .......................... passim

*Choctaw Generation L.P. v. Am. Home Assur. Co.,*
    271 F.3d 403 (2d Cir. 2001) .................................................. 15

*Citigfinancial, Inc. v. Newton,*
    359 F. Supp. 2d 525 (S.D. Miss. 2005) ....................................... 12

*Collins & Aikman Prods. Co. v. Building Sys.,*
    58 F.3d 16 (2d. Cir. 1995) ............................................... 14, 17

*Contec Corp. v. Remote Solution Co. Ltd.,*
    398 F.3d 205 (2d Cir. 2005) ............................................. 12, 16

*Denney v. BDO Seidman, L.L.P.,*
    412 F.3d 58 (2d Cir. 2005) ................................................... 16

*Dresser Indus. v. Global Indus. Techs.,*
    1999 Del. Ch. LEXIS 118 (Del. Ch. June 9, 1999) .............................. 9

*Elster v. American Airlines, Inc.,*
    106 A.2d 202 (Del. Ch. 1954) ................................................. 22

*First Options of Chicago, Inc. v. Kaplan*,
    514 U.S. 938 (1995)..................................................................................... 10

*Fisk Ventures, LLC v. Segal*,
    2008 Del. Ch. LEXIS 158 (Del. Ch. May 7, 2008) .................................... 19

*FSC Securities Corp. v. Freel*,
    14 F.3d 1310 (8th Cir. 1994) ..................................................................... 12

*Global Detection and Reporting, Inc., v. Securetec Detektions-Systeme AG*, 2008 U.S.
    Dist. LEXIS 95038 (S.D.N.Y. 2008).......................................................... 22

*Global Discount Travel Services, LLC v. Trans World Airlines, Inc.*,
    960 F. Supp. 701 (S.D.N.Y. 1997) ............................................................ 22

*Graham v. State Farm Mutual Automobile Ins. Co.*,
    565 A.2d 908, 910 (Del. 1989) .................................................................... 9

*Grigson v. Creative Artists Agency, L.L.C.*,
    210 F.3d 524 (5th Cir. 2000) ..................................................................... 16

*HDS Inv. Holding, Inc. v. Home Depot, Inc.*,
    2008 Del. Ch. LEXIS 154 (Del. Ch. Oct. 17, 2008)........................... 9, 11

*Hoffman v. Finger Lakes Instrumentation, LLC*,
    789 N.Y.S.2d 410 (N.Y. Sup. Ct. 2005) .............................................. 12, 15

*Hovensa, L.L.C. v. Technip Italy S.p.A.*,
    2009 U.S. Dist. LEXIS 21191 (S.D.N.Y. Mar. 16, 2009) ........................ 22

*Hughes Tool Co. v. Fawcett Publ's, Inc.*,
    350 A.2d 341 (Del. 1975) .......................................................................... 21

*Imo Indus. v. Sierra Int'l, Inc.*,
    2001 Del. Ch. LEXIS 120 (Del. Ch. Oct. 1, 2001)..................................... 9

*In re Arrow Inv. Advisors, LLC* ......................................................................... 18

*In re Wheelabrator Techs., Inc. S'holders Litig.*,
    1992 Del. Ch. LEXIS 196 (Del. Ch. Sept. 1, 1992) ................................... 7

*IOTEX Communs., Inc. v. Defries*,
    1998 Del. Ch. LEXIS 236 (Del. Ch. Dec. 21, 1988) ................................ 18

*James & Jackson, LLC v. Willie Gary, LLC*,
    906 A.2d 76 (Del. 2006) ................................................................ 10, 12, 13

*Japan Petroleum Co. (Nigeria), Ltd. v. Ashland Oil Co.*,
    456 F. Supp. 831 (D. Del. 1978)................................................................ 22

*Kennett v. The Carlyle Johnson Machine Co.*,
   2002 Del. Ch. LEXIS 73 (Del. Ch. June 17, 2002) .................................................. 18

*Life Receivables Trust v. Goshawk Syndicate 102 at Lloyd's*,
   2008 N.Y. Misc. LEXIS 6032 (N.Y. Sup. Ct., Mar. 30, 2008) ......................................... 10, 12

*McBro Planning & Dev. Co. v. Triangle Elec. Constr. Co.*, Inc.,
   741 F.2d 342 (11th Cir.1984) .................................................. 18

*McLaughlin v. McCann*,
   942 A.2d 616 (Del. Ch. 2008) .................................................. passim

*McMahon v. New Castle Assocs.*,
   532 A.2d 601 (Del. Ch. 1987) .................................................. 9

*McPadden v. Sidhu*,
   2008 Del. Ch. LEXIS 123 (Del. Ch. Aug. 29, 2008).................................................. 7

*NAMA Holdings, LLC v. Related World Mkt. Ctr., LLC*,
   922 A.2d 417 (Del. Ch. 2007) .................................................. 23

*Orner v. Country Grove Inv. Group, LLC*,
   2007 Del. Ch. LEXIS 144 (Del. Ch. Oct. 12, 2007).................................................. 11

*Palmer v. Moffat*,
   2001 Del. Super. LEXIS 386 (Del. Super. Ct. Oct. 10, 2001).................................................. 12, 21

*R&R Capital LLC v. Buck & Doe Run Valley Farms, LLC*,
   2008 Del. Ch. LEXIS 115 (Del. Ch. Aug. 19, 2008).................................................. 7

*Ross v. Am. Express Co.*,
   547 F.3d 137 (2d Cir. 2008) .................................................. 16

*Ryan v. Volpone Stamp Co., Inc.*,
   107 F. Supp. 2d 369 (S.D.N.Y. 2000) .................................................. 22

*SBC Interactive, Inc. v. Corporate Media Partners*,
   714 A.2d 758 (Del. 1998) .................................................. 9

*Schuss v. Penfield Partners, L.P.*,
   2008 Del. Ch. LEXIS 73 (Del. Ch. June 13, 2008) .................................................. 7

*Smith Barney, Harris Upham & Co. v. Luckie*,
   647 N.E.2d 1308 (N.Y. 1995).................................................. 9

*Sprint Nextel Corp. v. iPCS, Inc.*,
   2008 Del. Ch. LEXIS 90 (Del. Ch. July 14, 2008).................................................. 20

*Terminix Int'l Co., L.P. v. Palmer Ranch L.P.*,
    432 F.2d 1327 (11th Cir. 2005) ....................................................................... 12

*Travelers Indem. Co. v. Household Int'l, Inc.*,
    775 F. Supp. 518 (D.Conn. 1991) .................................................................. 22

*United Steelworkers of Am. v. Warrior & Gulf Navigation Co.*,
    363 U.S. 574 (1960) ........................................................................................ 9

*Worthy v. Payne*,
    1998 Del. Ch. LEXIS 13 (Del. Ch. Feb. 12, 1998) ........................................ 9

**Statutes**

10 *Del. C.* § 3104 ............................................................................................... 20

**Rules**

American Arbitration Association Employment Mediation Rule 7(a) ................................. 11, 15

Ct. Ch. Rule 12(b)(1) ............................................................................................. 3

Ct. Ch. Rule 12(b)(2) .................................................................................... 3, 19, 20

Ct. Ch. Rule 12(b)(7) ........................................................................................ 3, 22

Ct. Ch. Rule 19(a) ........................................................................................... 22, 23

Ct. Ch. Rule 19(b) ..................................................................................... 22, 23, 24

Ct. Ch.. Rule 19 .............................................................................................. 22, 24

## **NATURE AND STAGE OF THE PROCEEDINGS**

Plaintiff commenced this action by filing a Verified Complaint in this Court on November 4, 2008.  Plaintiff took no action to serve the Complaint for approximately four (4) months.

On March 24, this Court granted the parties' stipulated order for defendants to answer or otherwise move on or before April 30, 2009.  A second extension until May 15, 2009, for filing an answer or otherwise pleading was approved by the Court.

On May 12, 2009, defendants moved to dismiss plaintiff's Complaint in its entirety.

This is the Opening Brief in Support of Defendants' Motion to Dismiss.

## PRELIMINARY STATEMENT

This case arises from an employment contract executed on November 10, 2005 (the "November 10 Contract"), between plaintiff, Jody Kriss and a real estate company, Bayrock Group LLC ("Bayrock Group"), its founder, Tevfik Arif, and its subsidiaries.  The November 10 Contract provided that Mr. Kriss would receive profit interests in certain subsidiaries in consideration for serving as Director of Finance of Bayrock Group.  Notably, Mr. Kriss does not include any allegation in his complaint that he has not been paid monies owed to him under the November 10 Contract.  Instead, he appears to be seeking declaratory relief for alleged inchoate rights under the November 10 Contract.

This case should be dismissed for three reasons:

First, the November 10 Contract contains a binding arbitration clause that should be enforced.

Second, this Court does not have personal jurisdiction over 20 of the 29 defendants in this action.

Third, and finally, this Court does not have personal jurisdiction over indispensable parties to this action.

For all of these reasons, as set forth more fully below, this case should be dismissed.

## STATEMENT OF FACTS[1]

**The Parties**

### *Bayrock Group LLC and Tevfik Arif*

Defendant Bayrock Group LLC ("Bayrock Group") is a New York limited liability engaged in real estate development.  Compl. ¶ 2.  Mr. Arif is the managing member of Bayrock Group.  The Affidavit of Tevfik Arif  ("Arif Aff.") ¶ 1.   Mr. Arif is a Turkish citizen and resides in New York.  Compl. ¶ 4.1; Arif Aff. ¶ 1.  Aside from the formation of certain Delaware entities, neither Bayrock Group LLC nor Mr. Arif have any contacts with Delaware, and the formation of these Delaware entities is not at issue in this lawsuit.  Arif Aff. ¶ 3.

### *Plaintiff*

Plaintiff, Jody Kriss, was hired by Bayrock Group as its Director of Finance through an Employment Agreement executed on November 10, 2005 (the "November 10 Contract" or "Nov. 10 Contract," attached to the Arif Affidavit as Exhibit A).

### *The Company Entities*

In consideration for his employment with Bayrock Group, the November 10 Contract gave Mr. Kriss a right to profit interests in certain "affiliates, subsidiaries and related entities of [Bayrock Group LLC] and/or Tevfik Arik doing business under the 'Bayrock' name."  Nov. 10 Contract ¶ 4.C.  The business entities in which Mr. Kriss was given profit interests are defined as the "Company Entities" in the November 10 Contract.   Aside from Bayrock Group, all of the entities named as defendants to this lawsuit (except for Dogan & Associates, Alex Salmon &

---

[1]     The "Facts" recited herein are drawn from plaintiff's Complaint (cited herein as "Compl. at ¶ __") and from documents referenced in the Complaint and other documents that settled precedent permit the Court to consider in connection with a motion to dismiss pursuant to Rules 12(b)(1), (2), and (7).  Defendants do not concede, and largely dispute, the accuracy of the facts alleged in the Complaint for any purpose beyond the resolution of defendants' motion to dismiss.

Co., PC, and RIF International Group, Inc.) have been so named by virtue of plaintiff's claim that these defendants are Company Entities under November 10 Contract.  Of the eighteen purported Company Entities identified by plaintiff, nine were incorporated in Delaware (the "Delaware entities") and nine were incorporated in other states (the "non-Delaware entities").  Compl. ¶¶ 2-3.  The parent entity – Bayrock Group – is not incorporated in Delaware.  Compl. ¶ 3.1.  Neither Bayrock Group nor any of the Company Entities are head-quartered in Delaware.  *Id*.  Bayrock Group is not engaged in one real estate development project in Delaware.  Arif Aff. ¶ 3.  Neither Bayrock Group nor its subsidiaries engage in business with any Delaware-based developers.  *Id*.  In short, none of the non-Delaware entities have any contact with Delaware.  *Id*.

### *Other Named Defendants*

Plaintiff has also named the following persons and entities as defendants to this action: Julius Schwarz, Bayrock Group's Executive Vice President and former General Counsel and a member of Bayrock Group and certain Company Entities (Arif Aff. ¶ 4)**;** Felix Satter, a former employee of Bayrock Group (*id.*);  Mr. Satter's wife, Victoria Sater, whose only connection with the defendants is that she's married to one of its former employees (*id.*); Alex Salomon, Bayrock Group's accountant (*id.*);  Mr. Salomon's accounting firm, Alex Salomon & Co., PC, and a former employee of Mr. Salomon, Joseph Bencivenga (*id.*).  All of these persons have purportedly aided in the various conspiracies alleged by plaintiff, though the Complaint offers no specifics with respect to the purported wrongful acts any of these individuals.

Mr. Mel Dogan, Mr. Arif's personal counsel, has also been named as an individual defendant to this action, as has his sole proprietorship, Dogan & Associates.  As set forth more fully in his affidavit filed herewith, Mr. Dogan has no personal or business contacts with Delaware.  *See, generally,* The Affidavit of Mel Dogan ("Dogan Aff.").  Mr. Dogan does not

have an office in Delaware, nor does he conduct business in the State of Delaware. Dogan Aff. ¶ 6. He does not advertise his services in the State of Delaware or intentionally direct his services to a Delaware market. *Id.* None of his clients are Delaware residents. *Id.* He typically renders his services to Mr. Arif in New York City, and has never rendered any services to Mr. Arif when he has been in Delaware or when Mr. Arif has been in Delaware. *Id.* All advice rendered by Mr. Dogan in connection with the November 10 Contract was rendered in New York City. *Id.* And Mr. Dogan was not involved in the formation of any of the Delaware Company Entities. Dogan Aff. ¶ 5.

A New York corporation, RIF International Group, Inc. ("RIF"), was also named as a defendant, though plaintiff does not claim that RIF committed any wrongs. In fact, plaintiff acknowledge that he does not know exactly what RIF does. *See* Compl. ¶ 4.4 (noting that RIF is of "unknown purpose").

**The Terms of the November 10 Contract**

The November 10 Contract was entered into by and between Bayrock Group, Mr. Arif, the Company Entities, and Jody Kriss. Compl. ¶ 35; Nov. 10 Contract p. 1. It was effective as of February 1, 2003 (though executed on November 10, 2005) through December 31, 2008, and could be terminated by Bayrock Group for cause (Nov. 10 Contract § 8(a)) or by agreement of the parties (*id.* § 10(b)). The negotiations of this contract took place entirely in New York City. Dogan Aff. ¶ 4.

Section 4 of the November 10 Contract governed the terms of Mr. Kriss's profit interests in Bayrock Group and the Company Entities. Specifically, Section 4 of the Contract gave Mr. Kriss an "Executive Membership Interest," defined as a 10% non-voting profit interests in Bayrock Group and the Company Entities. *Id.* § 4.G. The November 10 Contract gave Mr.

Kriss the immediate right to seek advancements, in an amount not to exceed $10,000 per month,

against any future distributions Mr. Kriss might receive as a result of his profit interests.  *Id.* §

4(g).  It also gave Mr. Kriss an immediate right to "audit the books and records of the Company

Entities."

      Unlike the right to seek advancements and inspect the books and records, Mr. Kriss's

rights to future distributions from his profit interests were subject to certain conditions.  First,

Mr. Kriss's profit interests did not immediately vest; rather, they were subject to a staggered

vesting schedule:  Until Mr. Arif received in distributions an amount equal to his total capital

contributions to Bayrock Group and the Company Entities, Mr. Kriss's interest would vest only

periodically and only in a partial amounts (which varied under certain circumstances).  *Id.* § 5.

Even after the interests fully vested, the amount of money advanced to Mr. Kriss per the

November 10 Contract was to be deducted from any amount he was due in distributions.

Further, Mr. Kriss was only permitted distributions if and *after* Mr. Arif received distributions in

the amount of 10% of the total principal company contribution made by Mr. Arif to Bayrock

Group and/or the Company Entities.  *Id.* §§ 4.G and 4.K.

      To effectuate the portion of the November 10 Contract giving Mr. Kriss various rights to

profit interests, the November 10 Contract "amended and modified" the operating agreements of

the various Company Entities.  The contract stipulates that Mr. Arif was a signatory to the

contract for this purpose.  In Section 4, it is made clear that "individually, Tevfik Arif shall sign

solely in his capacity as a managing member and/or majority member of [Bayrock Group] and

each Company Entity, and shall incur no personal liability under this Agreement as a result of

said execution . . . ."  *Id.* § 4(d).  This language is consistent with the operating agreements of

Bayrock Group and the Company Entities, which exculpate Mr. Arif from personal liability for

actions taken on behalf of the Bayrock Group or the Company Entities. *See, e.g.,* Operating

Agreement of Bayrock Group LLC § 6.2, Arif Aff. Exh. B.[2]

      Importantly, the November 10 Contract contains an arbitration provision that sets forth

binding procedure for resolving "[a]ll claims and disputes (a "Dispute") between the parties

arising out of or relating to [the November 10 Contract]."  The arbitration clause provides that

"the Parties shall submit the Dispute to binding arbitration in accordance with the applicable

rules of the American Arbitration Association ('AAA') currently in effect, unless the parties

mutually agree otherwise."  Nov. 10 Contract at 9.  The rules of the American Arbitration

Association currently in effect state with respect to jurisdiction that "the arbitrator shall have the

power to rule on his or her own jurisdiction, including any objections with respect to the

existence, scope or validity of the arbitration agreement."[3]

      Also notable, the November 10 Contract contains a choice of law provision, requiring

that the contract "be governed and construed in accordance with the domestic laws of the State of

New York."  *Id.* § 18.

**The Claims**

      Plaintiff Kriss does not contend that he has been denied any specific rights under the

November 10 Contract.  No where does he contend that he has not received any monies that he

was due under the contract.  Instead, he seeks, in the first instance, a declaration that the

---

[2]     Operating Agreements and exculpatory provisions are appropriate for this Court's consideration on motion to dismiss. *See., e.g., Schuss v. Penfield Partners, L.P.,* 2008 Del. Ch. LEXIS 73, at *10-11 (Del. Ch. June 13, 2008) (taking judicial notice of content of a limited partnership agreement on motion to dismiss); *R&R Capital LLC v. Buck & Doe Run Valley Farms, LLC,* 2008 Del. Ch. LEXIS 115, at *5-6 (Del. Ch. Aug. 19, 2008) (same); *McPadden v. Sidhu,* 2008 Del. Ch. LEXIS 123, at *33 n.28 (Del. Ch. Aug. 29, 2008) (taking judicial notice of documents containing exculpatory provisions); *In re Wheelabrator Techs., Inc. S'holders Litig.,* 1992 Del. Ch. LEXIS 196, at *38 (Del. Ch. Sept. 1, 1992).

[3]     American Arbitration Association Mediation Rule 7(a) is included at Tab 1 in the compendium of Unreported Authorities filed herewith.

November 10 Contract did not create profit interests for him in the Company Entities.  Compl. ¶¶ 37-39.  He also brings two putative counts for breach of the covenant of good faith (Compl. ¶¶ 40-53), four putative counts of fraud ("common law fraud," and then securities fraud under Delaware, Florida and Arizona law) (Compl. ¶¶ 54-101), two putative counts for aiding and abetting in the alleged frauds (Compl. ¶¶ 102-105), one putative count for breach of fiduciary duties (Compl. ¶¶ 106-136), and one putative count for aiding and abetting in the breach of fiduciary duties (Compl. ¶¶ 137-138).

As set forth more fully herein, plaintiff's claims should be dismissed because they are subject to a binding arbitration provision in the November 10 Contract, and because this Court does not have personal jurisdiction over indispensible parties.

## <u>ARGUMENT</u>

I.   **PLAINTIFF'S CLAIMS ARE SUBJECT TO ARBITRATION AND SHOULD BE DISMISSED FOR LACK OF SUBJECT MATTER JURISDICTION**

On a motion to dismiss for lack of subject matter jurisdiction under Rule 12(b)(1), this Court assesses the "nature of the wrong alleged and the remedy available in order to determine whether a legal, as opposed to an equitable remedy, is available and fully adequate."[4]  Delaware Courts dismiss claims for lack of subject matter jurisdiction where such claims are contractually subject to arbitration because "arbitration is an adequate legal remedy."[5]  Delaware policy favors arbitration.[6]  Thus, "unless 'it may be said with positive assurance that the arbitration clause is not susceptible of an interpretation that covers the asserted dispute,'" a presumption will arise in favor of arbitration.[7]

The November 10 Contract contains a provision requiring the arbitration of "[a]ll claims and disputes . . . arising out of or relating to this Agreement or the breach thereof."[8]  The claims in plaintiff's Complaint arise out of and relate to the November 10 Contract.  The arbitration

---

[4]   *Imo Indus. v. Sierra Int'l, Inc.*, 2001 Del. Ch. LEXIS 120, at *4-5 (Del. Ch. Oct. 1, 2001) (citing *McMahon v. New Castle Assocs.*, 532 A.2d 601, 603 (Del. Ch. 1987) ("if a realistic evaluation leads to the conclusion that an adequate legal remedy is available," this court will not exercise jurisdiction)).

[5]   *Dresser Indus. v. Global Indus. Techs.*, 1999 Del. Ch. LEXIS 118, at *12 (Del. Ch. June 9, 1999).

[6]   *See Graham v. State Farm Mutual Automobile Ins. Co.*, 565 A.2d 908, 910 (Del. 1989).  *See also*, *HDS Inv. Holding, Inc. v. Home Depot, Inc.*, 2008 Del. Ch. LEXIS 154, at *14-15 (Del. Ch. Oct. 17, 2008) ("Delaware's policy of enforcing arbitration agreements is substantially similar to the policies under the FAA and New York law." (citing *Smith Barney, Harris Upham & Co. v. Luckie,* 647 N.E.2d 1308, 1315 (N.Y. 1995)).

[7]   *Worthy v. Payne*, 1998 Del. Ch. LEXIS 13, at *2 (Del. Ch. Feb. 12, 1998) (quoting *United Steelworkers of Am. v. Warrior & Gulf Navigation Co.*, 363 U.S. 574, 582-83 (1960)); *SBC Interactive, Inc. v. Corporate Media Partners*, 714 A.2d 758, 761 (Del. 1998) ("[a]ny doubt as to arbitrability is to be resolved in favor of arbitration").

[8]   Nov. 10 Contract ¶ 15.

clause therein, therefore, deprives this Court of subject matter jurisdiction over this action, insofar as it provides an adequate legal remedy for the resolution of this dispute.  When the issue of arbitration is raised in litigation, this Court has noted that two threshold questions arise:  (a) whether the dispute "should be resolved in arbitration (the issue of arbitrability)" and (b) "whether the issue of arbitrability should be decided by the court or the arbitrator (the issue of substantive arbitrability)."[9]  The Court need not reach the issue of arbitrability in the case at hand, because, as set forth more fully below, the issue of substantive arbitrability resolves in favor of arbitration.  This is true with respect to claims brought against all alleged parties to the November 10 Contract, including the Company Entities.  In addition, because the claims brought against the non-signatories to the November 10 Contract are sufficiently intertwined with the claims brought against the parties to the November 10 Contract, the non-signatories to the contract may also force plaintiff to arbitrate the issue of arbitrability with respect to those claims brought against them.  In any event, the issue of arbitrability also resolves in favor of arbitration, as plaintiff's claims fall with the scope of the arbitration clause at issue.

> **A.     The Arbitration Clause Delegates the Question of Substantive Arbitrability to the Arbitrator**

Generally, a court will presume that the "parties intended courts to decide issues of substantive arbitrability."[10]  Such a presumption will not be applied, however, where the arbitration clause at issue contains "clear and unmistakable" language to the contrary effect.[11]

---

[9]     *McLaughlin v. McCann*, 942 A.2d 616, 621 (Del. Ch. 2008) (citing *First Options of Chicago, Inc. v. Kaplan*, 514 U.S. 938, 942 (1995)).

[10]    *James & Jackson, LLC v. Willie Gary, LLC*, 906 A.2d 76, 79 (Del. 2006). *Accord Life Receivables Trust v. Goshawk Syndicate 102 at Lloyd's*, 2008 N.Y. Misc. LEXIS 6032, at *6 (N.Y. Sup. Ct., Mar. 30, 2008); *First Options of Chicago, Inc. v. Kaplan*, 514 U.S. 938, 944 (1995).

[11]    *See, e.g., Willie Gary*, 906 A.2d at 79.

Here, the arbitration clause contains "clear and unmistakable" language that the parties intended to submit the question of substantive arbitrability to the arbitrator.

The arbitration clause of the November 10 Contract provides that "the Parties shall submit the Dispute to binding arbitration in accordance with the applicable rules of the American Arbitration Association ('AAA') currently in effect, unless the parties mutually agree otherwise."  Nov. 10 Contract at 9.  Rule 7 of the AAA Commercial Arbitration Rules ("AAA Rule 7") states with respect to jurisdiction that "the arbitrator shall have the power to rule on his or her own jurisdiction, including any objections with respect to the existence, scope or validity of the arbitration agreement."[12]  Thus, AAA Rule 7 operates to delegate the question or substantive arbitrability to the arbitrator.

When interpreting an arbitration clause in a contract that contains a choice of law selection provision, this Court will enforce the arbitration clause applying the parties' chosen law.[13]  Because the November 10 Contract contains a New York choice of law provision, this Court must apply New York law when enforcing the arbitration clause at issue.

New York state courts, applying the majority view of Federal courts, have held that where, as here, the parties have invoked the rules of the AAA in the context of an arbitration clause, the parties have evinced the requisite "clear and unmistakable" intent to delegate the

---

[12]     AAA Rule 7(a).

[13]     *See, e.g., HDS Inv. Holding, Inc. v. Home Depot, Inc.*, 2008 Del. Ch. LEXIS 154, at *12 (Del. Ch., Oct. 17, 2008) ("Because the Agreement contains a choice of law provision selecting New York law, this Court must apply New York law to determine which disputes the parties agreed to arbitrate." (citations omitted)); *Orner v. Country Grove Inv. Group, LLC*, 2007 Del. Ch. LEXIS 144, at *18-20 & n.14 (Del. Ch. Oct. 12, 2007) (noting that a Maryland choice of law provision in a Subscription Agreement arguably required application of Maryland law in the interpreting of the arbitration clause in the Subscription Agreement); *see also*, *First Options*, 514 U.S. at 944 ("When deciding whether the parties agreed to arbitrate a certain matter (including arbitrability), courts generally . . . should apply ordinary state-law principles that govern the formation of contracts.").

issue of substantive arbitrability to be the arbitrator (the "majority view").[14]  The majority view

has the "primary advantage" of judicial efficiency.[15]  That is, "once it has been determined that

an arbitration clause references the rules of an arbitral body that authorize the arbitrator to decide

the issue of arbitrability, the trial court is not required to delve into the scope of the arbitration

clause and the details of the contract pending lawsuit – that is the job of the arbitrator."[16]

Because the parties referenced the AAA Rules, under New York law, the analysis stops

here: The majority view should be applied and the substantive arbitrability of this dispute should

be determined by the arbitrator.

To the extent plaintiff argues that the law of the forum applies, the same conclusion is

reached under Delaware law, though Delaware courts apply a slightly different analysis.

Delaware courts have also adopted the majority view.[17]  Delaware courts, however, will not

necessarily apply the majority view where the arbitration clause in question carves-out certain

---

[14]  *See, e.g., Life Receivables Trust,* 2008 N.Y. Misc. LEXIS 6032, at *6; *Contec Corp. v. Remote Solution Co. Ltd.*, 398 F.3d 205, 208 n.1 (2d Cir. 2005) (applying majority view, interpreting and agreement governed by New York law); *Bollinger Shipyards Lockport LLC v. Northrop Grumman Ship Sys. Inc.*, 2009 U.S. Dist. LEXIS 3725, at *14 (E.D. La. Jan. 12, 2009) (articulating the majority view, noting that all Federal courts that have considered this issue have adopted the majority view); *Apollo Computer, Inc. v. Berg,* 886 F.2d 469 (1st Cir. 1989) (applying majority view); *FSC Securities Corp. v. Freel*, 14 F.3d 1310 (8th Cir. 1994) (applying majority view); *Terminix Int'l Co., L.P. v. Palmer Ranch L.P.*, 432 F.2d 1327 (11th Cir. 2005) (same); *Bapu Corp. v. Choice Hotels Int'l, Inc.*, 2008 U.S. Dist. LEXIS 71252, at *9-11 (D.N.J. Sept. 8, 2008) (same); *Citigfinancial, Inc. v. Newton*, 359 F. Supp. 2d 525 (S.D. Miss. 2005) (same); *Brandon, Jones, Sandall, Zeide, Kohn, Chalal & Musso, P.A. v. MedPartners, Inc.*, 203 F.R.D. 677, 685 (S.D. Fla. 2001) (same), *aff'd on other grounds*, 312 F.3d 1349 (11th Cir. 2002). *See also*, *Hoffman v. Finger Lakes Instrumentation, LLC*, 789 N.Y.S.2d 410, 415 (N.Y. Sup. Ct. 2005) (interpreting New York state law consistent with Federal case law on the basis of the New York Court of Appeals' well-established policy of promoting "nationwide uniformity" in federal and state arbitration laws).

[15]  *McLaughlin*, 942 A.2d at 623.

[16]  *Id.*

[17]  *Willie Gary, LLC*, 906 A.2d at, 80; *accord, Carder v. Carl M. Freeman Communities, LLC,* 2009 Del. Ch. LEXIS 2, at *12-14 (Del. Ch. Jan. 5, 2009); *McLaughlin*, 942 A.2d 616; *Baypo Ltd. P'ship*, *v. Tech. JV, LP*, 940 A.2d 20 (Del. Ch. 2007).

aspects of the dispute to be arbitrated.[18]  For example, in *Willie v. Gary*, the case which

established Delaware's rule on this issue, the Delaware Supreme Court did not interpret a

reference to the AAA Rules as evincing a "clear and unmistakable" intent to arbitrate the issue of

arbitrability, because the clause at issue also reserved a litigant's ability to obtain injunctive

relief and specific performance in the courts.[19]

     The *Willie Gary* decision made clear, however, that where the language at issue contains

no carve-outs (like those present in *Willie Gary*), and instead the arbitration clause in question

"generally provides for arbitration of all disputes" in addition to invoking the AAA rules,

Delaware courts will apply the majority view and defer the question of substantive arbitrability

to the arbitrator.[20]

     Furthermore, this Court, applying the rule of *Willie Gary,* has held that where AAA Rules

are present in the language at issue, Delaware courts will apply a presumption in favor of

arbitrating the issue of substantive arbitrability.[21]  The purpose of the majority view – increased

judicial efficiency – motivates this presumption.[22]

     The arbitration clause at issue here provides this Court with no reason to depart from the

majority rule.  Unlike *Willie Gary*, the November 10 Contract contains no carve-outs to the

arbitration clause.  Not only are there no carve-outs in the arbitration clause at issue, but the

arbitration clause is expansive in scope.  The language used here compares favorably with the

---

[18]    *Willie Gary*, 906 A.2d at 80.

[19]    *Id.* at 81.

[20]    *See, e.g., Carder*, 2009 Del. Ch. LEXIS 2, at *12-14 (applying majority view where the arbitration clause invoking the AAA rules contained no carve-outs); *McLaughlin* 942 A.2d at 626 (same); *Baypo*, 940 A.2d at 25 (same).

[21]    *McLaughlin*, 942 A.2d at 625

[22]    *Id.*

language interpreted in *Carder* and *McLaughlin*, in each case the Court ruled that the issue of substantive arbitrability is for the arbitrator.  The pertinent language in *Carder* and *McLaughlin*, respectively, committed to arbitration "all disputes arising in any way under the Agreement," and disputes "aris[ing] under th[e] agreement."[23]  Here, the parties chose a "broader locution" of the relevant language, surrendering to arbitration "*[a]ll* claims and disputes . . . between the parties *arising out of or relating to* [the November 10 Contract]."[24]  If the plaintiffs in *Carder* and *McLaughlin* could not avoid arbitrating the issue of arbitrability under their comparatively narrow arbitration clauses, then certainly plaintiff cannot do so here.

**B.   All Claims Brought Against the Company Entities Are Subject to Arbitration**

A review of the Complaint shows that plaintiff affirmatively alleges that the Company Entities are **parties** to the November 10 Contract, along with Bayrock Group.  Compl. ¶ 35.  That paragraph specifically alleges that: "The November 10 contract was executed by the parties (i) Arif; (ii) [Bayrock Group]; **each Company Entity**; and (iv) Kriss."  Likewise, plaintiff asserts in Paragraph 134, that all of the Company Entities are under the control of Bayrock Group.  Accordingly, based on the allegations of the Complaint, this dispute "arises out of or relates to" the November 10 Contract as provided in the arbitration provision because plaintiff has affirmatively alleged that the Company Entities are **parties** to the November 10 Contract.  An arbitrator appointed pursuant to Section 15 of the contract should therefore adjudicate whether the other Company Entities are parties as plaintiff alleges.  At a minimum, based on the

---

[23]   *Carder*, 2009 Del. Ch. LEXIS 2, at *13; *McLaughlin*, 942 A.2d at 618.

[24]   Nov. 10 Contract ¶ 14 (emphasis added); *Carder*, 2009 Del. Ch. LEXIS 2, at *17 (describing "arising out of or relating to" as a "broader locution" than the language at issue in *Carder*); *see also*, *Collins & Aikman Prods. Co. v. Building Sys.,* 58 F.3d 16, 20 (2d. Cir. 1995) (interpreting an arbitration clause, describing "relating to" as the paradigm of a broad clause).

allegations of plaintiff's Complaint, the arbitrator can effectively adjudicate the case because of the control the Bayrock Group allegedly wields over the other entities.

### C.   All Claims Brought Against Non-Signatories to the November 10 Contract Are Also Subject to Arbitration

All claims brought against non-signatories to the November 10 Contract are also subject to arbitration.[25]  Under the doctrine of estoppel, courts will prohibit "a signatory from avoiding arbitration with a nonsignatory when the issues the nonsignatory is seeking to resolve in arbitration are intertwined with the agreement that the estopped party has signed."[26]  The reason for this is that "although arbitration is a matter of contract and cannot, in general, be required for a matter involving an arbitration agreement non-signatory, a signatory to that agreement cannot . . . have it both ways, that is, he cannot, on the one hand, seek to hold the non-signatory liable pursuant to duties imposed by the agreement, which contains the arbitration provision, but, on the other hand, deny the arbitration clause's applicability because the defendant is a non-signatory."[27]

In evaluating whether the claims against a non-party are intertwined so as to implicate the arbitration clause, courts consider whether there is a "sufficient relationship [1] to [the

---

[25]   To the extent the issue of who constitutes signatories or parties to the November 10 Contract is disputed, this Court need not address it:  Who constitutes a party to the November 10 Contract is a question of substantive arbitrability to be determined by the arbitrator, insofar as it is a question regarding the "existence, scope or validity" of the agreement and is within the jurisdiction of the arbitrator pursuant to AAA Rule 7.  *Cf. Contec*, 398 F.3d at 210 (deeming the question of whether the right to compel arbitration was validly assigned to a non-signatory an issue within scope of the arbitrator's jurisdiction under AAA Rule 7).

[26]   *Choctaw Generation L.P. v. Am. Home Assur. Co.*, 271 F.3d 403, 406 (2d Cir. 2001); *see also Hoffman v. Finger Lakes Instrumentation, LLC*, 789 N.Y.S.2d 410, 415 (N.Y. Supr. 2005) (citing cases).

[27]   *Hoffman*, 789 N.Y.S.2d at 415 (quotations omitted) (citations omitted).

signatories] and [2] to the rights created under the agreement."[28]  Both of these considerations

weigh in favor of arbitration here.

First, with respect to the relationship to the signatories, having alleged that all non-

signatories acted in concert with the signatories to defraud plaintiff or aided and abetted in such

conduct, plaintiff would be hard-pressed to deny that the non-signatories are sufficiently related

for the purpose of arbitration.[29]  But other factors compel this conclusion as well.  In determining

whether non-signatories are sufficiently related for the purpose of compelling arbitration, courts

have considered, for example, whether the parties are "subsidiaries, affiliates, agents, and other

related business entities,"[30] and/or whether, though not parties to the contract, the non-signatories

were "explicitly named [in the contract] as having certain tasks to perform under that contract."[31]

Both of these factors weigh against plaintiff here.  To the extent plaintiff argues that the

Company Entities are not signatories to the November 10 Contract as a grounds for evading

arbitration, plaintiff must concede that, by the definition given to the term in the November 10

Contract, the Company Entities are "affiliates, subsidiaries and related entities of [Bayrock

Group, LLC] and/or Tevfik Arif . . . ."[32]  Furthermore, the non-signatories who are not Company

Entities were named as defendants specifically because of their purported agency relationship

with the other defendants.  The non-signatories therefore bear a relationship sufficiently

---

[28]      *Contec Corp.*, 398 F.3d at 209.

[29]      *See, e.g., Denney v. BDO Seidman, L.L.P.*, 412 F.3d 58, 70 (2d Cir. 2005) (citing *Grigson v. Creative Artists Agency, L.L.C.*, 210 F.3d 524, 527 (5th Cir. 2000) ("Application of equitable estoppel is warranted when the signatory to the contract containing an arbitration clause raises allegations of substantially interdependent and concerted misconduct by both the nonsignatory and one or more of the signatories to the contract.").

[30]      *Ross v. Am. Express Co.*, 547 F.3d 137, 144 (2d Cir. 2008) (citing cases).

[31]      *Ross*, 547 F.3d at 144 (citing cases).

[32]      Nov. 10 Contract § 4.C.

connected to the contracting parties to warrant estopping plaintiff from avoiding arbitration of claims brought with respect to the non-signatories.

Second, with respect to the relationship among the claims, all claims are intertwined in that they arise from a common nucleus of facts, namely, the execution of the November 10 Contract, the intent behind executing that contract and the contention that the parties' performance under that contract (or, allegedly, non-performance or inability to perform under that contract).

As a final matter, this Court has held that where, as here, the question of substantive arbitrability should be deferred to the arbitrator, unless plaintiff can show that the non-signatories' contention that the claims against them are subject to arbitration is "wholly groundless," the question of the scope of the arbitration remedy with respect to non-signatories must be deferred to the arbitrator.[33]

### D.     Plaintiff's Claims Fall Within the Scope of the Arbitration Provision of the November 10 Contract

Even aside from the issue of substantive arbitrability, plaintiff's claims fall within the scope of the arbitration provision of the November 10 Contract.  The parties to the November 10 Contract chose the broadest locution of arbitration clauses possible, catching in its scope "[a]ll claims and disputes (a "Dispute") . . . arising out of or relating to [the November 10 Contract]."[34] And this Court has held that in the context of arbitration clauses, the phrase "'related to' . . .

---

[33]     *McLaughlin*, 942 A.2d at 626-627 ("[A]bsent a clear showing that the party desiring arbitration has essential no non-frivolous argument about substantive arbitrability to make before the arbitrator, the court should require the signatory to address its arguments against arbitrability to the arbitrator.  Otherwise, the efficiency gains contemplated by *Willie Gary* will be greatly undermined.").

[34]     Nov. 10 Contract § 14 (emphasis added); *Carder*, 2009 Del. Ch. LEXIS 2, at *17 (describing "arising out of or relating to" as a "broader locution" than the language at issue in *Carder*); *see*

explicitly extends beyond the four corners of the contract."[35]  Certainly, declarations relating to

the validity of the contract relate to the contract.[36]  Claims for breach of a contract's implied

covenant arise from and relate to the contract.  Claims of breach of fiduciary duties in connection

with alternative entities have been found to be within the scope of an arbitration provision in

contracts creating that fiduciary relationship.[37]  Claims of fraud in connection with the November

10 Contract also fall within its broad scope,[38] – just as this Court will not permit plaintiffs to

bootstrap a fraud claim into a breach of contract merely by adding the words "fraudulently

induced," [39] it is also "well established that a party may not avoid broad language in an

arbitration clause by attempting to cast its complaint in tort rather than contract."[40]

*        *        *

For the reasons set forth above, this Court should therefore dismiss this case based on the

binding arbitration clause in the November 10 Contract.

---

*also*, *Collins & Aikman Prods. Co. v. Building Sys.,* 58 F.3d 16 (2d. Cir. 1995) (interpreting an arbitration clause, describing "relating to" as the paradigm of a broad clause).

[35]   *Carder*, 2009 Del. Ch. LEXIS 2, at *17.

[36]   *C.f. Kennett v. The Carlyle Johnson Machine Co.*, 2002 Del. Ch. LEXIS 73, at *8-9 (Del. Ch. June 17, 2002) ("[Plaintiff] sought to amend his Complaint by abandoning the request that the transfer of the membership interests be rescinded and by asking, instead, that the Court declare that [certain defendants] could not transfer the interests. . . . [R]egardless of how one tries to define the relief sought, the question, in substance, nonetheless remains . . . .").

[37]   *See, e.g., In re Arrow Inv. Advisors, LLC*, 2009 Del. Ch. LEXIS 66, at *23 (Del. Ch. Apr. 23, 2009).

[38]   *See, e.g., Carder*, 2009 Del. Ch. LEXIS 2, at *15-16 (holding that claims of fraud brought in connection with an agreement fell within the scope of a similarly broadly worded arbitration clause).

[39]   *IOTEX Communs., Inc. v. Defries,* 1998 Del. Ch. LEXIS 236, at *17 (Del. Ch. Dec. 21, 1988).

[40]   *McBro Planning & Dev. Co. v. Triangle Elec. Constr. Co.*, Inc., 741 F.2d 342, 344 (11th Cir.1984) (citing cases).

## II.   PLAINTIFF'S CLAIMS AGAINST THE NON-RESIDENT DEFENDANTS SHOULD BE DISMISSED FOR LACK OF PERSONAL JURISDICTION

"Once a defendant moves to dismiss under Rule 12(b)(2), the burden rests on the plaintiff to demonstrate the two bedrock requirements for personal jurisdiction: (1) a statutory basis for service of process; and (2) the requisite 'minimum contacts' with the forum to satisfy constitutional due process."[41]   As the party invoking this Court's jurisdiction, "the plaintiff has the burden to show a basis for the Court's jurisdiction over the nonresident defendant."[42]   When assessing whether there is a statutory basis for service of process, Delaware courts have been careful not to "break[] the necessary connection between statutory words and common usage of the English language."[43]   On a motion to dismiss pursuant to Rule 12(b)(2), "[t]he court may consider the pleadings, affidavits, and any discovery of record."[44]

This Court does not have personal jurisdiction over Bayrock Group or Mr. Arif.  This Court does not have jurisdiction over the non-Delaware entities named as defendants herein. Nor does this Court have jurisdiction over defendants Dogan & Associates, Messrs. Schwarz, Dogan, or the Saters (collectively, with Bayrock Group, Mr. Arif, and the non-Delaware entities, the "non-resident defendants").  No allegations supporting any conclusion to the contrary have been made.

Plaintiff has attempted service of process on all non-Delaware defendants pursuant to Delaware's Long-Arm Statute, codified at 10 *Del. C.* § 3104.  Under Section 3104, a non-resident person or entity is deemed to submit to the jurisdiction of the Delaware courts by

---

[41]   *Fisk Ventures, LLC v. Segal*, 2008 Del. Ch. LEXIS 158, at *18-19 (Del. Ch. May 7, 2008).

[42]   *Sprint Nextel Corp. v. iPCS, Inc.*, 2008 Del. Ch. LEXIS 90, at *17 (Del. Ch. July 14, 2008) (citing cases).

[43]   *Fisk Ventures*, 2008 Del. Ch. LEXIS 158, at *18 (citation omitted).

committing any one of several acts.  10 *Del. C.* § 3104(b).  These acts are: (1) transacting any business or performing any character of work within the state; (2) contracting to supply services or things in Delaware; (3) causing tortious injury in Delaware through an act committed in Delaware; (4) causing tortious injury in Delaware through an act committed outside Delaware if the person solicits business in Delaware, engages in regular conduct in Delaware or derives substantial revenue from Delaware contacts; (5) having an interest in, using, or possessing real property in Delaware; or (6) contracting to act as a surety for a contract or other such obligation located, executed, or to be performed within Delaware at the time the contract is made.  *Id.* § 3104(c)(1)-(6).

With respect to the non-resident defendants, plaintiff's complaint does not allege a single act that would fall within any of these six categories.  Indeed, the only apparent Delaware connection to this action is the fact that nine of the 29 defendants are Delaware entities, and the contract plaintiff seeks to enforce purportedly conveys to plaintiff profit interests in these Delaware entities.  The November 10 Contract was not negotiated in Delaware.  It was not negotiated by Delaware residents or with the advice of Delaware counsel.  Nothing needed to be filed in Delaware in order for its terms to be effectuated.  The agreement did not require any action to occur in or be directed to Delaware.  Plaintiff has thus offered no grounds for bringing any of the non-resident defendants within the ambits of the long-arm statute, and it appears that there are none.[45]

Exercising personal jurisdiction over the non-resident defendants would also offend due process.  "The constitutional standard for determining whether a state may exercise judicial

---

[44]    *Sprint Nextel Corp.*, 2008 Del. Ch. LEXIS 90, at *17.

[45]    *See* The Affidavits of Messrs. Arif and Dogan, filed contemporaneously herewith, attesting to the lack of any contact the non-resident defendants have with Delaware.

power over a person is fairness and substantial justice. The critical question in making this determination is whether a reasonable person would have anticipated that his actions might result in the forum state asserting personal jurisdiction over him in order to adjudicate disputes arising from those actions."[46]  Given the dearth of any relevant Delaware contacts, no reasonable person would have anticipated being hailed into a Delaware court regarding a dispute arising from the November 10 Contract.  The non-Delaware Company Entities could not have expected that they would be required to defend a dispute under the November 10 Contract in Delaware.  As such, exercising personal jurisdiction with respect to the non-resident defendants would offend due process.

## III.   PLAINTIFF'S CLAIMS SHOULD BE DISMISSED FOR FAILURE TO PROPERLY JOIN INDISPENSABLE PARTIES

This Court may dismiss claims under Court of Chancery Rule 12(b)(7) where the non-movant has failed to join a necessary and indispensable party.  Rule 19 "categorizes those persons whose joinder should be required to accord complete adjudication of claims at issue."[47] Rule 19 outlines a two-part analysis for determining whether an action must be dismissed for failure to join a necessary and indispensable party.  First, Rule 19(a) identifies what parties are "necessary" for adjudication, and, second, 19(b) sets forth the analysis to be applied when joinder of those parties is not feasible.

Under Rule 19(a), it is "necessary" for a party to be joined when:

> (1) in the person's absence complete relief cannot be accorded among those already parties, or (2) the person claims an interest relating to the subject of the action and is so situated that the disposition of the action in the person's absence may (i) as a practical matter impair or impede that person's ability to protect

---

[46]   *Palmer v. Moffat*, 2001 Del. Super. LEXIS 386, at *11 (Del. Super. Ct. Oct. 10, 2001).

[47]   *Hughes Tool Co. v. Fawcett Publ's, Inc.*, 350 A.2d 341, 344 (Del. 1975).

> that interest or (ii) leave any of the persons already parties subject
> to a substantial risk of incurring double, multiple, or otherwise
> inconsistent obligations by reason of the claimed interest.[48]

Under Rule 19(b), when joinder of a "necessary" party is not feasible, the Court will determine

whether "in equity and good conscience" the party is "indispensable" and the action should be

dismissed.[49]  In determining whether the party is indispensable under Rule 19(b), the Court

considers the following four factors:

> First, to what extent a judgment rendered in the person's absence
> might be prejudicial to the person or those already parties; second,
> the extent to which, by protective provisions in the judgment, by
> the shaping of relief, or other measures, the prejudice can be
> lessened or avoided; third, whether a judgment rendered in the
> person's absence will be adequate; fourth, whether the plaintiff
> will have an adequate remedy is the action is dismissed for
> nonjoinder.[50]

As a general rule, "a contracting party is the paradigm of an indispensable party."[51]  The

reasons for this are manifest:  A contract implicates an interest for the purpose of Rule 19(a),

---

[48]     Ct. Ch. R. 19(a).

[49]     Ct. Ch. R. 19(b).

[50]     *Id.*

[51]     *Hovensa, L.L.C. v. Technip Italy S.P.A.*, 2009 U.S. Dist. LEXIS 21191, at *6 (S.D.N.Y. Mar. 16, 2009) (quoting *Travelers Indem. Co. v. Household Int'l, Inc.*, 775 F. Supp. 518, 527 (D. Conn. 1991)); *Ryan v. Volpone Stamp Co., Inc.*, 107 F. Supp. 2d 369, 387 (S.D.N.Y. 2000) ("It is well established that a party to a contract which is the subject of the litigation is considered a necessary party."); *Global Detection and Reporting, Inc, v. Securetec Detektions-Systeme AG,* 2008 U.S. Dist. LEXIS 95038, at *3-4 (S.D.N.Y. 2008) (same) (citing cases)*; Global Discount Travel Services, LLC v. Trans World Airlines, Inc.,* 960 F. Supp. 701, 707-08 (S.D.N.Y. 1997) ("As a direct party to the contract which is under dispute, Karabu is a necessary party to this litigation . . . ."); *Japan Petroleum Co. (Nigeria), Ltd. v. Ashland Oil Co.,* 456 F. Supp. 831, 836 n.7 (D. Del. 1978) ("In general, where rights sued upon arise from a contract, all parties to the contract must be joined."); *Cf. Elster v. American Airlines, Inc.,* 106 A.2d 202, 204 (Del. Ch. 1954) ("All parties to a contract sought to be cancelled are indispensable parties to the suit for cancellation unless it is obvious that one not joined has no interest whatever in the subject matter of the suit."). S*ee also, Canaday v. Superior Court in and for New Castle County*, 119 A.2d 347, 352 (Del. 1955) ("Decisions interpreting the Federal Rules of Civil Procedure are accorded great weight in interpreting parallel State Court rules.").  *Accord NAMA Holdings, LLC v. Related*

namely, the consideration, and it is inequitable for the purpose of Rule 19(b) to adjudicate the rights and obligations with respect to that consideration absent the parties having rights or potential obligations or liabilities with respect to that interest.

According to plaintiff, the parties to the November 10 Contract are: "(i) Arif; (ii) [Bayrock Group]; (iii) each Company Entity; and (iv) Kriss."  Compl. ¶ 34 (emphasis added). Mr. Arif, Bayrock Group and each Company Entity therefore are indispensable parties to the litigation in this Court.  Because this Court does not have personal jurisdiction over the majority of these contracting parties (Mr. Arif, Bayrock Group, or nine of the eighteen Company Entities), and because they cannot be joined for the purpose of Rule 19, plaintiff's complaint must be dismissed.

The non-Delaware defendants are also indispensable parties for reasons extrinsic to their function as contracting parties.  For example, Bayrock Group and the Company Entities have an interest in the distribution of their profit interests and the identity of their members, or any liability arising therefrom.[52]  Mr. Arif, on the other hand, has an interest in assuring that the exculpatory language of the November 10 Contract,[53] as well as the exculpatory language of the operating agreements that the November 10 Contract amends,[54] is enforced.  Furthermore, the

---

*World Mkt. Ctr., LLC*, 922 A.2d 417, 436 (Del. Ch. 2007) (deeming the parties to the disputed contract indispensable under Rule 19).

[52]   *See, e.g., Kennett v. The Carlyle Johnson Machine Co.*, 2002 Del. Ch. LEXIS 73, at *9-10 (Del. Ch. June 17, 2002) (parties contracting with respect to membership interests in limited liability companies are indispensable parties with respect to such a contract).

[53]   *See* Nov.  10 Contract § 4(d) ("[I]ndividually, Tevfik Arif shall sign solely in his capacity as a managing member and/or majority member of [Bayrock Group] and each Company Entity, and shall incur no personal liability under this Agreement as a result of said execution . . . .").

[54]   *See, e.g.,* Arif Aff. Exh. B § 6.2.

23

possibility of future litigation to enforce the November 10 Contract against the non-resident defendants gives rise to the real potential of inconsistent and multiple obligations.

One final Rule 19(b) factor weighs in favor of dismissal here – were this Court to dismiss this case, plaintiff would have an adequate remedy through arbitration.

## CONCLUSION

For the foregoing reasons, defendants respectfully request that this Court enter an order dismissing plaintiff's complaint with prejudice.

Respectfully submitted,

**YOUNG CONAWAY STARGATT
  & TAYLOR, LLP**

*/s/ Barry M. Willoughby*
Barry M. Willoughby (No. 1016)
Kathaleen St. J. McCormick (No. 4579)
The Brandywine Building
1000 West Street, 17th Floor
Wilmington, Delaware  19801
(302) 571-6600
  *Attorneys for the Bayrock Defendants*

Dated: May 13, 2009

IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

JODY KRISS, for himself and derivatively on behalf of the
Delaware limited liability companies Bayrock Spring Street, LLC,
and Bayrock Whitesone LLC, the Arizona limited liability company
Bayrock Camelback LLC, the Florida limited liability companies
Bayrock Merrimac LLC, and Bayrock Ocean Club LLC, and the
New York limited liability company Bayrock Group, LLC,

Plaintiff,

v.

BAYROCK GROUP LLC; RIF INTERNATIONAL GROUP, INC.;
TEVFIK ARIF; JULIUS SCHWARZ; MEL DOGAN; DOGAN &
ASSOCIATES; 2027 EMMONS AVE LLC; FELIX SATTER (aka
FELIX SATER); VICTORIA SATER; ALEX SALOMON, ALEX
SALOMON & CO., PC; JOSEPH BENCIVENGA; BUENA VISTA
ALARGA LLC; BAYROCK SPRING STREET LLC; BAYROCK
WHITESTONE LLC; BAYROCK HOLDINGS LLC; BAYROCK
NATURAL STONE LLC; BAYROCK SAPIR ORGANIZATION
LLC; 246 SPRING STREET HOLDINGS II LLC;
BAYROCK/SAPIR ORGANIZATION HOLDINGS LLC;
BAYROCK/SAPIR ORGANIZATION REALTY LLC; 151-45
SIXTH ROAD WHITESTONE PARTNERS LLC; CAMELBACK
DEVELOPMENT PARTNERS LLC; STILLMAN BAYROCK
MERRIMAC LLC; SB HOTEL ASSOCIATES LLC, 550
SEABREEZE DEVELOPMENT LLC,

True Defendants,

And

BAYROCK GROUP LLC; BAYROCK WHITESTONE LLC;
BAYROCK CAMELBACK, LLC; BAYROCK MERRIMAC LLC;
BAYROCK OCEAN CLUB, LLC; BAYROCK SPRING STREET
LLC,

Nominal Defendants.

CA #: 4154-VCS

State of New York      :
                       :      ss
County of New York  :

Melih ("Mel") Dogan, being duly sworn, hereby depose and state as follows:

1

1.      I am an attorney admitted to the bar of the State of New York and a named individual defendant in the above-captioned action. My law office, Dogan & Associates, a sole proprietorship, has also been named a defendant to this action. I submit this affidavit in support of the Bayrock Defendants' Motion to Dismiss and Opening Brief in support thereof.

2.      I am personal counsel to co-defendant Tevfik Arif, the principal of Bayrock Group LLC, a New York limited liability company with its principal place of business in New York City. As noted in the November 10 Contract, Dogan & Associates represented Mr. Arif as independent counsel (*see* Nov. 10 Contract § 19 (g)) in negotiations with plaintiff regarding the November 10 Contract.

3.      The November 10 Contract and provisions thereof was negotiated by the plaintiff on behalf of himself.

4.      All negotiations regarding the November 10 Contract took place in New York City.

5.      Neither I nor Dogan & Associates were involved in the formation of any of the entities listed as defendants to this action, or any of the "Company Entities" as that term is defined in the November 10 Contract except for Co-Defendants Bayrock Group LLC which is a New York limited liability company and Rif International Group, Inc., which is a New York corporation.

6.      I do not have an office in Delaware, nor do I conduct business in the State of Delaware. I do not advertise my services in the State of Delaware or intentionally direct my services to a Delaware market. To my knowledge, none of my clients are Delaware residents. I typically render my services to Mr. Arif in New York City. I have never rendered any services

2

to Mr. Arif when he has been in Delaware or when I have been in Delaware.  As stated above, all

advice rendered in connection with the November 10 Contract was done so in New York City.

Melih ("Mel") Dogan

SWORN TO AND SUBSCRIBED before me this _13_ day of ___May___, 2009.

Notary Public

My commission expires:  _12 · 30 · 2010_

SAROJINIE BUDHRAM
NOTARY PUBLIC, STATE OF NEW YORK
QUALIFIED IN QUEENS COUNTY
REG. NO. 01BU6066596
MY COMMISSION EXPIRES Dec. 30, 2010

3

## CERTIFICATE OF SERVICE

I, Kathaleen St. J. McCormick, Esquire, hereby certify that on May 13, 2009, a copy of the foregoing document was served on the following counsel in the manner indicated below:

**BY LEXIS/NEXIS FILE & SERVE**

David L. Finger, Esquire
FINGER, SLANINA &
   LIEBESMAN, LLC
One Commerce center
1201 N. Orange St., 7th Floor
Wilmington, DE  19801-1155

John A. Elzufon, Esquire
Andrea C. Rodgers, Esquire
ELZUFON AUSTIN REARDON,
   TARLOV &  MONDELL, P.A.
300 Delaware Avenue, Suite 1700
P.O. Box 1630
Wilmington, DE 19899-1630


*/s/ Kathaleen St. J. McCormick*
Kathaleen St. J. McCormick (# 4579)

IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

| | |
|---|---|
| JODY KRISS, for himself and derivatively on behalf of the Delaware limited liability companies Bayrock Spring Street, LLC, and Bayrock Whitesone LLC, the Arizona limited liability company Bayrock Camelback LLC, the Florida limited liability companies Bayrock Merrimac LLC, and Bayrock Ocean Club LLC, and the New York limited liability company Bayrock Group, LLC, | ) ) ) ) ) ) ) |
| Plaintiff, | ) ) |
| v. | ) ) ) |
| BAYROCK GROUP LLC; RIF INTERNATIONAL GROUP, INC.; TEVFIK ARIF; JULIUS SCHWARZ; MEL DOGAN; DOGAN & ASSOCIATES; 2027 EMMONS AVE LLC; FELIX SATTER (aka FELIX SATER); VICTORIA SATER; ALEX SALOMON, ALEX SALOMON & CO., PC; JOSEPH BENCIVENGA; BUENA VISTA ALARGA LLC; BAYROCK SPRING STREET LLC; BAYROCK WHITESTONE LLC; BAYROCK HOLDINGS LLC; BAYROCK NATURAL STONE LLC; BAYROCK SAPIR ORGANIZATION LLC; 246 SPRING STREET HOLDINGS II LLC; BAYROCK/SAPIR ORGANIZATION HOLDINGS LLC; BAYROCK/SAPIR ORGANIZATION REALTY LLC; 151-45 SIXTH ROAD WHITESTONE PARTNERS LLC; CAMELBACK DEVELOPMENT PARTNERS LLC; STILLMAN BAYROCK MERRIMAC LLC; SB HOTEL ASSOCIATES LLC, 550 SEABREEZE DEVELOPMENT LLC, | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) CA #: 4154-VCS |
| True Defendants, | ) ) |
| And | ) ) |
| BAYROCK GROUP LLC; BAYROCK WHITESTONE LLC; BAYROCK CAMELBACK, LLC; BAYROCK MERRIMAC LLC; BAYROCK OCEAN CLUB, LLC; BAYROCK SPRING STREET LLC, | ) ) ) ) ) |
| Nominal Defendants. | ) |

State of New York     :
                      :          ss
County of New York  :

Tevfik Arif, being duly sworn, hereby deposes and states as follows:

1

1.      I am the managing member of Bayrock Group LLC ("Bayrock Group"), a New York limited liability company engaged in real estate development. I am a Turkish citizen and reside in New York. I also founded Bayrock Group.

2.      On November 10, 2005, I executed a contract with plaintiff to the above-captioned action, Jody Kriss. This contract provided that Mr. Kriss would receive profit interests in certain subsidiaries and affiliates of Bayrock Group in consideration for serving as Director of Finance of Bayrock Group. I executed this contract on behalf of Bayrock Group and the certain subsidiaries (defined as the "Company Entities" in the November 10 Contract) in which the November 10 Contract gave Mr. Kriss profit interests. A true and correct copy of the November 10 Contract is attached hereto as Exhibit A.                                    · · · ·

3.      Some of the Company Entities were formed under Delaware law. Aside from the formation of these entities, neither Bayrock Group nor I have any contacts with Delaware, and the formation of these Delaware entities is not at issue in this lawsuit, nor were these entities formed as a result of the November 10 Contract. Bayrock Group is not engaged in any real estate development projects in Delaware. Neither Bayrock Group nor any of its subsidiaries engage in business with any Delaware-based developers. In short, none of the non-Delaware entities named as defendants to the above-captioned lawsuit have any contact with Delaware. The November 10 Contract was not negotiated in Delaware, nor was I advised by Delaware lawyers in connection with these negotiations.

4.      I have been named an individual defendant in the above-captioned lawsuit, though the November 10 Contract exculpates me from personal liability. Section 4 of the November 10 Contract makes clear that "individually, Tevfik Arif shall sign solely in his capacity as a managing member and/or majority member of [Bayrock Group] and each Company Entity, and

2

shall incur no personal liability under this Agreement as a result of said execution . . . ." Nov. 10

Contract § 4(d).  This language is consistent with the operating agreements of Bayrock Group

and the Company Entities, which exculpate me from personal liability for actions taken on behalf

of the Bayrock Group or the Company Entities.  By way of example, a true and correct copy of

the Operating Agreement of Bayrock Group LLC is attached as Exhibit B.  Section 6.2 of this

Operating Agreement contains the relevant exculpatory language.

(X) _____
Tevfik Arif

SWORN TO AND SUBSCRIBED before me this 13 day of _M A y_____, 2009.

_____

Notary Public

NEIL PASMANIK
Notary Public State of New York
No. 02PA6150796
Qualified in Kings County
Commission Expires Aug. 7, 20 1 C

My commission expires: _____20 1 C_____

3

## CERTIFICATE OF SERVICE

I, Kathaleen St. J. McCormick, Esquire, hereby certify that on May 13, 2009, a copy of the foregoing document was served on the following counsel in the manner indicated below:

## BY LEXIS/NEXIS FILE & SERVE

David L. Finger, Esquire
FINGER, SLANINA &
   LIEBESMAN, LLC
One Commerce center
1201 N. Orange St., 7th Floor
Wilmington, DE  19801-1155

John A. Elzufon, Esquire
Andrea C. Rodgers, Esquire
ELZUFON AUSTIN REARDON,
   TARLOV &  MONDELL, P.A.
300 Delaware Avenue, Suite 1700
P.O. Box 1630
Wilmington, DE 19899-1630


*/s/ Kathaleen St. J. McCormick*
Kathaleen St. J. McCormick (# 4579)