1  UNITED STATES DISTRICT COURT
2  SOUTHERN DISTRICT OF NEW YORK

3  **13-CV-3905**
4  **CLASS ACTION COMPLAINT**
5  **JURY DEMANDED**

6  **J. Kriss** and **M. Ejekam**, alone and for
7  **Bayrock Merrimac LLC, Bayrock Group LLC,**
8  **Bayrock Spring Street LLC, Bayrock Whitestone LLC,**
9  **Bayrock Camelback LLC;** and **E/O Ernest Gottdiener,**
10 **E/O Judit Gottdiener, Ervin Tausky,** and **Suan Investments**

11      Plaintiffs

12      v.

13 **Bayrock Group LLC, Tevfik Arif, Julius Schwarz,**
14 **Felix Sater, Brian Halberg, Salvatore Lauria, Alex Salomon,**
15 **Jerry Weinrich, Salomon & Co. PC, Akerman Senterfitt LLP,**
16 **Martin Domb, Craig Brown, Duval & Stachenfeld LLP,**
17 **Bruce Stachenfeld, David Granin, Nixon Peabody LLP,**
18 **Adam Gilbert, Roberts & Holland LLP, Elliott Pisem,**
19 **Michael Samuel, Mel Dogan, Bayrock Spring Street LLC,**
20 **John Does 1-100, Bayrock Whitestone LLC,**
21 **Bayrock Camelback LLC, Bayrock Merrimac LLC,**
22 **Bayrock Group Inc., Tamir Sapir; Alex Sapir, "Sapir Does" 1-100,**
23 **Walter Saurack, Satterlee Stephens Burke & Burke LLP,**
24 **Kelly Moore; Morgan Lewis & Bockius LLP,**
25 **Nader Mobargha, Michael Beys, Beys Stein & Mobargha LLP,**
26 **Istar Financial, "Lender Investor Does" 1-100, and**
27 **National Union Fire Insurance Co. of Pittsburgh, PA.,**

28      Defendants,

29 Frederick M. Oberlander          Richard E. Lerner
30 THE LAW OFFICE OF                THE LAW OFFICE OF
31 FREDERICK M. OBERLANDER          RICHARD E. LERNER
32 28 Sycamore Lane (Box 1870)      501 5th Avenue, Ste 300
33 Montauk, New York 11954          New York, NY 10017
34 (212) 826-0357                   (917) 584-4864
35 (212) 202-7624 fax               (347) 824-2006 fax
36 fred55@aol.com                   richardlerner@msn.com
37 Counsel for Plaintiffs           Co-counsel

38

**SUMMARY**

1.     Proximately harmed by the concealment of Felix Sater's conviction despite the fact that it was in open court and the government and court were required to inform them of it, the Gottdieners, Tausky, and Suan sue all responsible defendants for their conspiracy in a scheme to defraud them of both their property in the form of a cause of action to seek restitution and their knowledge thereof as well as in the form of the alleatory value of the order of restitution to which they were entitled.

2.     As noted further below, defendants Akerman Senterfitt and Martin Domb are the subject of no claims; until dismissed they must remain in the caption pursuant to FRCP 10 but no inference of any kind whatsoever is to be made by their presence there or by any claims stated herein.

3.     In addition, these plaintiffs demand declaratory judgment that they are crime victims of Sater's.

4.     These plaintiffs include among all these liable defendants all persons natural and juridical who participated in any way, direct or indirect, in the concealment not only of Sater's conviction in connection with his sentencing but in the secretion of his assets through his use of Bayrock as a money laundering device in a scheme of fraudulent transfers to evade them.

5.     This includes, without limitation, to the fullest extent of vicarious liability through mediate causation (Pinkerton liability) all those law firms

and others who facilitated tens of millions of dollars of tax fraud at Bay-
rock, insofar as that fraud went to line the pockets of Sater et al., proceeds
of which were also secreted.

6.     In addition, these plaintiffs demand an injunction compelling the
government to provide them all CVRA rights, starting with the right of
conference and ending as they, these plaintiffs, see fit, ***including demand
for the resentencing of Felix Sater in public before all his victims***.

7.     In addition, these plaintiffs demand the same on behalf of all per-
sons similarly situated, a class estimated at approximately 1,000 persons
whose claims amount to, in sum, approximately $360,000,000.

8.     Derivative plaintiffs Kriss and Ejekam assert in behalf of those com-
panies of which they are members liability in contribution and indemnifi-
cation against all other responsible defendants for all losses and liabilities
cause by the above, though they expect to present these claims in another
forum and through another nominal plaintiff such as receiver or litigation
trustee insofar as this court may determine it lacks jurisdiction.

9.     Individual plaintiffs Kriss and Ejekam make no claims pursuant to
their forthcoming FRCP 41 voluntary dismissals.

# JURISDICTION

10.　This action comes before the court by removal from New York state court on federal officer grounds, §1442(a).

11.　Nevertheless, the degree to which this court has Article III jurisdiction to hear all of the state law claims is suspect, since the applicable rules of Article III standing are more restrictive than the rules in New York, and so Plaintiffs decline to stipulate to such jurisdiction and expect motion practice to ensure. This could not have been prevented since it is a natural consequence of allowing removal before any claims have been pleaded and thus before anyone can tell who is claiming what and whether this court has the subject matter jurisdiction to hear them.

# VENUE

12.　While reserving all rights to object to venue, to whatever degree it exists it does so by reason of the aforementioned removal.

# PROCEDURAL NOTES

13.    This complaint is filed per this court's order of April 17th, 2014, and as this case came to this court by removal from a state action which had never had a complaint, and there's no provision in the rules to handle proceedings in an action where there's never been a pleading, as the rules make clear the only way to initiate an action is by filing a complaint and hardly anyone ever removes cases from state courts without pleadings already in existence. Without authority for guidance, we file the complaint as is but will immediately follow it with motion practice to make clear who the actual plaintiffs and defendants will be, as that would be the only way we know to avoid existential morass of whether one can file motions if they are not actually a party to a pleading that has ever been filed with the court.

14.    We can't even know what the caption should be, as we removed some defendants by voluntary discontinuance CPLR §3217 without prejudice before the case was removed from state court so they shouldn't be in the caption as they never got here, yet they are.

15.    And, while it's clear this isn't a class action for most purposes until certified such, it's not clear whether this is a derivative action as it was filed as direct and derivative but that's not controlling or dispositive after removal; without a pleading there's no way to tell.

16.    All this matters, as one example, because we've reached a tolling agreement with one defendant, Akerman Senterfitt LLP, in contemplation of settlement pursuant to which no claims shall be made against them in

the tenor of such agreement, but it isn't clear if that can be done by simply excluding them from this complaint or by stipulated FRCP 41 motion or whether FRCP 23.1 requires leave of court because it's deemed a partial discontinuance of a derivative action. **To be clear to the extent we may do so without leave pursuant to FRCP 41 stipulations, notwithstanding they are at least for now in the caption we omit from this document any claims by any person against either Akerman Senterfitt or Martin Domb or in the alternative confirm that any such claims we are required to make before asking for leave and so are deemed made herein are expected to be immediately discontinued without prejudice upon filing and acceptance of such discontinuance.**

17.    *Similarly, Mr. Kriss and Mr. Ejekam, notwithstanding they remain captioned as nominal plaintiffs, see next, either make no claims in their personal capacities or else if deemed to have made them for formal compliance with this court's order shall as of right voluntarily discontinue personally per FRCP 41, but we do not know if that is possible without leave as to their derivative claims so we assert those pending court advisement and motion practice.*

18.    *And FRCP 10 says complaints list all plaintiffs and defendants, which makes it impossible to remove anyone even if they shouldn't be there, e.g. Akerman, Domb, and, personally, Kriss and Ejekam.*

19.    In short we have done our best and in an abundance of caution are styling plaintiffs and defendants as "nominal, *pro nunc*" until this is resolved, presumably before service.

# PARTIES

## NOMINAL DEFENDANTS *PRO NUNC*

20.    **Bayrock Group LLC**, is, and was at all times relevant, a duly organized and existing New York limited liability company. Its principal place of business is New York.

21.    **Bayrock Spring Street, LLC** is, and was at all times relevant, a duly organized and existing Delaware limited liability company. It is the holding company for Bayrock insider interests in the Trump SoHo hotel condominium project in New York.

22.    **Bayrock Camelback, LLC** is, and was at all times relevant, a duly organized and existing Arizona limited liability company. It is the holding company for Bayrock insider interests the Trump Camelback hotel condominium project in Phoenix.

23.    **Bayrock Merrimac, LLC** is, and was at all times relevant, a duly organized and existing Florida limited liability company. It is the holding company for Bayrock insider interests in the Trump International hotel condominium project in Fort Lauderdale.

24.    **Bayrock Whitestone LLC** is, and was at all times relevant, a duly organized and existing Delaware limited liability company. It is the holding company for Bayrock insider interests in the Waterpointe project in New York City.

25.    **Bayrock Ocean Club LLC** is, and was at all times relevant, a duly organized and existing Florida limited liability company. It is the holding company

for Bayrock insider interests in the Trump Ocean Club hotel condominium project in Fort Lauderdale.

26.     **Tevfik Arif** is a natural person whereabouts unknown but believed to be residing in London.

27.     **Felix Satter** aka Sater, is a natural person residing in New York.

28.     **Julius Schwarz** is a natural person residing in New Jersey.

29.     **Brian Halberg** is a natural person residing in New York.

30.     **Salomon & Company, PC** is, and was at all times relevant, a duly organized New York professional corporation.

31.     **Alex Salomon** is a natural person residing in New York.

32.     **Jerry Weinrich** is a natural person residing in New York.

33.     **Roberts & Holland, LLP** is, and was at all times relevant, a duly organized New York limited liability partnership.

34.     **Elliot Pisem** is a natural person residing in New York.

35.     **Duval & Stachenfeld, LLP** is, and was at all times relevant, a duly organized New York limited liability partnership.

36.     **Bruce Stachenfeld** is a natural person residing in New York.

37.     **Craig Brown** is a natural person residing in New York.

38.     **David Granin** is a natural person residing in New York.

39.   **Mel Dogan** is a natural person, residing and in New York.

40.   **Nixon Peabody, LLP** is, and was at all times relevant, a duly organized New York limited liability partnership.

41.   **Adam Gilbert** is a natural person residing in New York.

42.   **Bayrock Group, Inc.** is, and was at all times relevant, a duly organized Delaware corporation.

43.   **Michael Samuel** is a natural person residing in New York and Florida.

44.   **Salvatore Lauria** is a natural person residing in Connecticut.

45.   **National Union Fire Insurance Co. of Pittsburgh, PA.** is, and was at all times relevant, a duly organized Pennsylvania corporation.

46.   **Investor Does 1-100** are natural or juridical persons unknown who provided capital to Bayrock in some form, typically as a partner.

47.   **Alex Sapir** is a natural person residing in New York**.**

48.   **Tamir Sapir** is a natural person residing in New York**.**

49.   **Istar Financial** is a publicly traded real estate lender included for declaratory relief.

50.   **Sapir Does 1-100** are natural or juridical persons unknown associated in any relevant way with the Sapirs.

51.   **National Union** is an insurer included for declaratory relief**.**

52.     **Michael Beys** is a natural person, an attorney representing Felix Sater and Salvatore Lauria and residing or working in New York.

53.     **Nader Mobargha** is a natural person, an attorney representing Felix Sater and Salvatore Lauria and residing or working in New York.

54.     **Beys Stein & Mobargha LLP** is a law firm doing business in New York of which Beys and Mobargha are partners.

## Nominal Plaintiffs *Pro Nunc*

55.     **Jody Kriss** ("Kriss") is a natural person residing in New York.

56.     **Michael Chudi Ejekam** ("Ejekam") is a natural person and United States citizen.

# RULE 23.1 STATEMENT

**DERIVATIVE PLAINTIFF KRISS:**

57.     The undersigned verifying this complaint attests that Kriss is now and has been a member of, owning membership interests in, derivative Plaintiffs Bayrock Group LLC, Bayrock Spring Street LLC, Bayrock Whitestone LLC, Bayrock Camelback LLC, and Bayrock Merrimac LLC, continuously from the earliest relevant date herein and at all times thereafter, including without limitation at the time of each and every transaction I complain of in the derivative claims.

**DERIVATIVE PLAINTIFF EJEKAM:**

58.     The underlying verifying this complaint attests that Ejekam is and has been a member of, owning membership interests in, derivative Plaintiffs Bayrock Spring Street LLC, and Bayrock Whitestone LLC continuously from the earliest relevant date herein and at all times thereafter, including without limitation at the time of each and every transaction I complain of in the derivative claims.

**DERIVATIVE PLAINTIFFS KRISS AND EJEKAM:**

59.     This action is not a collusive one to confer jurisdiction the court would otherwise lack. Moreover, demand would be futile. This is stated this with the following particularity: Albeit almost surely illegally (in other words, it is highly likely that no one lawfully controls the firm), one or more (for this section, "their" as in "their control" referring to that "one or more" of defendants Arif, Satter, and Schwarz control Bayrock Group LLC, and have controlled it each alone, and together in combination, since no later than 2002 in the case of Arif, 2003 in the case of Arif and Satter, and 2005 in the case of Arif, Satter, and Schwarz.

60.     During those periods, they have not only controlled it, but dominated it to the extent they are and have been the sole persons having de jure or de facto control over it. There are no other persons in the nature of independent managers or directors who could contest or overrule them. In particular, throughout these times Defendant Arif has been the only member of Bayrock Group LLC, which is member managed, whose membership interests have voting rights.

61.     (Notwithstanding the above it is not clear nor does this complaint make any allegations that are to be interpreted as conclusively asserting as to whether Sater standing alone ever had sufficient interest in or dominion and control over any Bayrock entity or entities such that as a result his mens rea or scienter or other mental state or interest would be imputed to them and this complaint makes no allegations as to the same insofar as whether and to what degree any action by Sater could have triggered *in pari delicto* insofar as his position, ownership, or control would be relevant.)

62.     Through their control of Bayrock Group LLC they exercise either or both *de jure* and *de facto* control over all other Bayrock entities relevant to this action, including without limitation Spring Street and Whitestone, of which Bayrock Group LLC is the sole manager.

63.     This Complaint in general and the derivative causes of action in particular are predicated on the continued, wrongful operation of these three derivative Plaintiffs for the personal benefit of (i) Arif, Satter, and Schwarz, as to Bayrock Group LLC; and (ii) Bayrock Group LLC, Arif, Satter, and Schwarz, as to Bayrock Spring Street LLC and Bayrock Whitestone LLC.

64.     The acts complained of include not just civil wrongs but criminal acts of money laundering, tax evasion, perjury, obstruction of justice, mail fraud, wire fraud, bribery, honest services fraud, extortion, and embezzlement of a degree and nature and in respect of amounts so large that federal sentencing guidelines for a comparable criminal action would be in the decades.

65.     None of Arif, Satter, or Schwarz can be expected to adequately pursue civil action against themselves which could result in such possible subsequent criminal liability, particularly where liability would depend on their own culpable mental state (mens rea or scienter).

66.     Moreover, the acts complained of, for example tax evasion, were acts whereby these Defendants used derivative Plaintiffs as mediating agents to commit crimes and wrongs predominantly by engaging in transactions with third parties, many conspiracy Defendants in this action, in which they stood on both sides of the transaction, either directly, for example in the FL transactions whereby they stripped tens of millions of dollars of assets from Bayrock subsidiaries, including Spring Street and Whitestone, in order to gain access to $50,000,000 cash for the direct benefit of Bayrock Group and themselves personally, or constructively, because of conspiracy with the "other side", so are self-interested.

67.     Moreover, no reasonable persons controlling these entities would, in the exercise of proper business judgment, commit these crimes and related civil wrongs, let alone on such terms. Finally, Kriss has made attempts to gain access to the books and records of Bayrock Group LLC, Spring Street, and Whitestone by proper demand and has been refused, and there is no reason to believe demand for action would meet with any different result other than refusal.

# SATER'S SECRET CONVICTION

68. Felix Sater has a long history of defrauding investors in his business ventures. In 1998, he pled guilty to participating in a "pump-and-dump" stock-trading scheme that bilked investors out of more than $40 million. That plea should have signaled the end of his business career and the possibility of restitution for the victims of his crimes.

69. Not so. His entire criminal docket was "sealed," leaving past victims and third parties unaware of his conviction.

70. Sater wasted little time in resuming his old tricks and defrauding new victims. By 2002 he infiltrated and influenced Bayrock, a real estate venture with ties to organized crime. Sater used that company to launder millions of dollars, skim millions more in cash, and once again defraud his prior victims and his new investors and business partners.

71. In 2010, while plaintiffs Kriss and Ejekam were preparing a RICO complaint against Sater and others, a whistleblower, a former Bayrock employee, gave their team, unsolicited, a package of documents he had obtained, in or after late 2007, while at the firm that provided extensive information about Sater's earlier crimes.

72. The documents included a 2004 presentence report ("PSR") from the 1998 case in which Sater acknowledged that he was hiding his previous guilty plea from his partners in Bayrock, an obviously "material" omission, and in which he told the probation officer that he had no salary from Bayrock even though he was, and had been for years, skimming nearly

$1,000,000 a year in cash and was using Bayrock to pay his personal expenses, such as his rent on a Sands Point mansion and his downpayment on another mansion he purchased soon after.

73.    And they included a 1998 cooperation agreement that put Sater on notice that at sentencing he faced up to $60,000,000 of mandatory restitution and in which he promised at all times to disclose his assets to the government and turn over all his assets to satisfy that restitution.

74.    But, Sater never intended to keep his word, so besides his skims, disguised as sham loans, *ab initio* he hid his Bayrock holdings, themselves often disguised as sham options, in companies in his wife's name.

75.    In May 2010, Kriss and Ejekam filed the RICO complaint on behalf of Doe's victims in S.D.N.Y, with excerpts from some of the documents, which of course had the effect exposing Sater's frauds; one needn't read the complaint to suspect, just based on the allegations of the preceding page, for example, that where a real estate developer is sufficiently owned and controlled by a mobster with convictions for assault with a deadly weapon and racketeering predicated on securities fraud and money laundering, and that's been kept secret, there's probably a very big problem with the hundreds and hundreds of millions of dollars of loans and partner contributions it procured, and the millions of dollars of condominium sales it sponsored, because failure to disclose that inconvenient truth would be a half dozen felonies – an inconvenient truth Sater himself has admitted he knew was so; in fact, he's even confirmed that his own law

1   firm, Morgan Lewis, knew this was so (nevertheless they helped him do it
2   anyway).

3   76.   Instead of taking steps to help Sater's victims recover for their mas-
4   sive losses, the responsible United States Attorneys and two district courts
5   quickly swung into action to squelch any public reference to the earlier
6   criminal proceedings and to punish Plaintiffs' team for disclosing evidence
7   of Sater's crimes.

8   77.   The S.D.N.Y. court sealed the civil RICO complaint without public
9   notice and hearings four days after it was filed, though there is a First
10  Amendment right of access to civil complaints. And the E.D.N.Y. court in
11  which Sater was secretly prosecuted and convicted issued a temporary re-
12  straining order barring Plaintiffs from disseminating the PSR and other
13  documents to "protect" the dignity of its sealing —even though they were
14  not a party to that 1998 criminal case, and even though the court could not
15  identify any actual sealing or other order ever put in writing or ever dock-
16  eted that would have applied to them, rather instead admitting no such
17  order ever existed in the first place.

18  78.   (The court subsequently converted the PSR TRO into a permanent
19  injunction, and the Second Circuit affirmed. The U.S. Supreme Court sub-
20  sequently granted Plaintiffs' motion to be allowed to disclose the portions
21  of the PSR they had wanted to.)

22  79.   Yet throughout all this asserted need for secrecy the government
23  never revealed that it itself had made Sater's conviction public in 2000

through a worldwide press release, and had made his cooperation public then and thereafter through various public court filings. All that was found by Plaintiffs team, and of course along with that and the Supreme Court's motion approval the concealment eventually fell apart.

80.   Perhaps not surprisingly, the E.D.N.Y. court and the government have recently admitted, as they must and, one supposes, better late than never, that half of those documents were never sealed to begin with because they had never been filed with the court in the first place and further admitted that, contrary to all the claims of actual and necessary constant secrecy, Sater had been sentenced in 2009 *in open court*.

81.   All this is important here because of the (purported) reason given for all that secrecy and the proximate harm it caused Plaintiffs and others similarly situated.

# THE PURPORTED NEED FOR SECRECY

82.   For a decade, from the 1970s through the 1980s, in the *Richmond* cases the U.S. Supreme Court held that the First Amendment ensures a public right of access to most proceedings in criminal cases, the common law a right of access to the rest. And this First Amendment right may not be infringed without notice, hearings, and record findings capable of appellate review based on clear and convincing evidence that closure was the least restrictive means necessary to guard against a near certain imminence of lawfully cognizable grave and imminent danger.

83.   And during and since that time, lower courts, especially the Second Circuit, have held that this First Amendment right of access includes not only access to proceedings such as sentencings but also includes access to transcripts of such proceedings and to docket sheets.

84.   Yet the Second Circuit did something else as well. Twenty years ago, in *U.S. v. Doe* it held that a district court could conceal part or all of a criminal case, hide it from the public forever, not on particularized findings of a "risk" to the defendant, but on the judge's gut sense – if the defendant was a cooperator and the case involved organized crime.

85.   **Absence of evidence is not evidence of absence**. Not only did the Second Circuit purport to exempt every judge from the *Richmond* line, it went so far as to note in *Doe* that not only was evidence of actual threat not necessary, but evidence of no threat could be convoluted into evidence that all the secrecy worked, which might be funny if a Manhattan novelty store sold cans of elephant repellent and answered questions whether it

worked with, "Well, you don't see any elephants around here, do you?" but isn't so very funny when the public and certain special subsets of the public we'll mention later, including Plaintiffs, are defrauded by all the secrecy.

86. Predictably enough, the ensuing years have seen a cottage industry of cooperator case secrecy, and predictably enough the courts have managed to get so used to it they often do not even go through the motions of hearings and actual sealing orders, rather "it just happens."

87. Per *Doe*, he Second Circuit's reasoning would be that this is justified by the fact that dead cooperators aren't washing up on the shores of the East River, Hudson, and Gowanus. Others might say no, decades of such non-occurrences isn't proof that secrecy works, it's proof that something else is going on with this secrecy and risk is only a badly disguised pretext.

88. The justification for secrecy here was a disgrace, with the government's assertions that if anyone knew of Sater's conviction he'd be dead – retracted when Plaintiffs proved the government had made his conviction public in a press release a decade earlier – assertions that they'd never publicly acknowledged his cooperation or, yes, he'd have been dead – which they now acknowledge weren't true either, as Plaintiffs proved the government had made it public in filings in *U.S. v. Coppa*, the case he cooperated in; assertions culminating with a fraud on the court by Mobargha and Beys, in which they fabricated a threat against Sater and Lauria and caused falsified reports of it to be propagated through filings in New York Supreme Court, the Second Circuit, and the Supreme Court as pretextual justification for the concealments.

# THE CONSEQUENCES OF THE SECRECY

89.   The most important general consequence (as opposed to conse-quences of particularly parochial interests to Plaintiffs) came in 2013 when the United States Solicitor General publicly conceded in filings before the United States Supreme Court the truth of Plaintiffs' allegations that the E.D.N.Y. operated a covert, dual justice system of hidden criminal cases and illegal sentences intended, *inter alia*, to allow cooperators to keep the proceeds of their past crimes and the proceeds of their ongoing crimes, at least to the extent committed by dint of the concealment of their cases.

90.   As noted, the secrecy surrounding revelations of all Sater's crimes before and during his conviction (he was convicted in 1998 when he pleaded guilty, but not sentenced until 2009), the same period as before and during his tenure at Bayrock, was febrile. It hit its nadir in early 2011 when the Second Circuit issued orders prohibiting Plaintiffs even from telling Congress what they knew and requiring Plaintiffs to keep any filings at the Supreme Court under seal.

91.   Accordingly, in May 2012 Plaintiffs dutifully filed a petition for writ of certiorari with the Supreme Court with a motion asking it be filed under seal pursuant to that order of the Second Circuit.

92.   But as of right Plaintiffs also filed with the Court a motion asking the Supreme Court to override the Second Circuit by allowing them to publicly file their petition and to include in it many parts of the PSR and other documents so the public could see the fraud they revealed.

93.     On June 25, 2012, by order of the Supreme Court granting the mo-
tion, Plaintiffs won. But more importantly, so did the public. The public
won because a few months later the Court further called for a response of
the Solicitor General, a "request" that the government file papers explain-
ing why the petition for certiorari should not be granted, if they so felt.

94.     The petition, almost all public, alleges and describes in great detail
how the secret justice system works, how cases are illegally hidden, how
the criminal defendants take advantage of that to commit further crime
with the knowledge of the courts and the government, and how as part of
this scheme they're often rewarded with illegal sentences.

95.     As noted, but for a few redactions the petition is public, and has been
for nearly two years now, and widely available online. And so is the Solicitor
General's opposition, important not for what it says, but for what it
doesn't, like the dog that didn't bark, as nowhere anywhere does it deny a
single allegation in the petition as to the maintenance of a secret dual jus-
tice system and the illegal sentences in the petition.

96.     And according to Supreme Court rules, that's a deemed admission
of the truth of all of them. True, that's only for purposes of the cert pro-
ceeding, but contemplate for a long time what it means that the United
States Solicitor General, with the countersignature of the Assistant Attor-
ney General, Criminal Division, have admitted before the United States
Supreme Court that all those allegations are true.

## PLAINTIFFS' CAUSAL INJURIES
## AND THE RELIEF REQUESTED

97.    Of course, everyone is harmed when the justice system corrupts itself, but this complaint now focuses on the harm caused Plaintiffs and those similarly situated and those they represent.

### THE GRAVAMEN I

98.    The standards governing restitution make clear that the "primary and overarching purpose of the law (the Mandatory Victims Restitution Act, "MVRA") is to make victims of crime whole, to compensate these victims for their losses and to restore these victims to their original state of well-being." In addition to compensating victims, restitution is also designed to serve the traditional purpose of forming a part of the defendant's punishment. The MVRA *requires* a sentencing court to impose restitution in "the full amount of each victim's losses as determined by the court and without consideration of the economic circumstances of the defendant."

99.    For purposes of restitution, "the term 'victim' means a person directly and proximately harmed as a result of the commission of an offense for which restitution may be ordered including, ***in the case of an offense that involves as an element a scheme, conspiracy, or pattern of criminal activity, any person directly harmed by the defendant's criminal conduct in the course of the scheme, conspiracy, or pattern.***"

100. "The requirement that the victim be 'directly and proximately harmed' encompasses the traditional 'but for' and proximate cause analyses," while the "conspiracy" portion of this provision "provide[s] for restitution payable by all convicted co-conspirators in respect of damage suffered by all victims of a conspiracy, regardless of the facts underlying counts of conviction in individual prosecutions."

101. The term "loss" is defined by the restitution statute as "the amount of the loss sustained by each victim as a result of the offense." The statute provides that "[t]he defendant must 'pay an amount equal to…the greater of…the value of the property' on the date of the loss or on the date of sentencing, less 'the value (as of the date the property is returned) of any part of the property that is returned.'"

102. Reaffirming these principles in 2011, the Second Circuit affirmed a restitution award that sought "to restore a [fraud] victim, to the extent money can do so, to the position he occupied before sustaining injury" by including pre-judgment interest, reasoning that because "sentencing courts are required to compensate victims for 'the full amount of each victim's losses,' there is no reason to exclude losses that result from the deprivation of the victim's ability to put its money to productive use."

103. Indeed, in holding that "the MVRA allows a sentencing court to award prejudgment interest in a criminal restitution order to ensure compensation 'in the full amount of each victim's losses,'" the Circuit expressly refused to place on the victims "the burden of showing how they would have used the lost funds."

104.  And, significantly, subsequent legislation, the Crime Victims Rights Act ("CVRA"), requires the government, inter alia, to contact every victim and notify them of all open court proceedings, and all sentencings, and in particular to invite them to participate in the sentencings.

105.  But even more important, in addition to confirming the MVRA's requirement that the courts award restitution, the CVRA for the first time gives crime victims the standing to sue, to petition the sentencing judge if they do not like her order of restitution and if that fails to mandamus the court of appeals, which must take up the matter within 72 hours.

106.  And as Justice Scalia has told us in his 9-0 opinion in *Lexmark*, when Congress creates a statutory cause of action, federal courts are devoid of "prudential" ability to decide not to hear the case, but rather have an "unflagging duty" to do so whether they agree with Congress or not.

107.  Similarly, over 100 years ago another 9-0 Supreme Court held that when a federal court refuses to sentence according to Congressional mandate, it acts illegally and *ultra vires*.

108.  The Gottdieners, Tausky, and Suan are crime victims of Saters, to begin with from his stock fraud days. To be clear, they were brokerage customers of one Al Palagonia at D. H. Blair, but he was part of a racketeering enterprise in which Sater himself participated in the operation and management and so their entitlement to restitution runs to Sater as well as to Palagonia – as is true of everyone else injured by Palagonia and everyone else injured by that scheme, cf. U.S. v. Coppa – and that's a big number.

109. This is absolutely beside the question whether the Gottdieners et al. ever had any civil causes of action against Sater or anyone else.

110. Consequently, assuming the $60,000,000 figure in Sater's cooperation is reasonable as a loss estimate of Coppa victims aka Sater victims, at 9% interest over 18 years or so that amounts to about $360,000,000 in restitution they didn't get from Sater.

111. Or more precisely, that's the size of the restitution order they had a *right* to get or, if they didn't get it, the size of the order they had a *right* to petition the sentencing judge to get and if he said no, the size of the order they had a *right* to mandamus the Second Circuit to get.

112. But they didn't get that order (or any money) because Felix Sater's sentencing was unlawful for two reasons:

113. First, because – as the government now publicly admits, most recently in a related submission to the Second Circuit, as does the sentencing judge, in an attempted secret (but obviously failed) document transmitted to the Supreme Court and the Second Circuit – Sater was sentenced in open court. And what happens in open court is public property. Yet neither these plaintiffs nor any other victim was ever told of the sentencing.

114. (It bears mention that Lauria's sentencing transcript reveals a detailed colloquy with the same sentencing judge and AUSA in which he, and his counsel, brag that he settled with "15 or 20" victims (but less than full value) of his and Sater's own brokerage they operated as part of the scheme, so there can be no excuse that the government didn't know there

were victims and who they were and how to find them even if they only looked for victims of that brokerage; moreover, the *Coppa* indictment charges Sater as an unindicted co-conspirator in *Coppa*, which by definition means there was and remains probable cause to believe its allegations, including that Sater and Palagonia were part of the same RICO enterprise, so no excuse there, either.)

115.  Second, because no award of restitution was made, nor any finding that an exception applied (though again such finding would be open to victim attack in court, per the CVRA, which, however, **only works if the victims know about it**).

116.  So, these plaintiffs – and all other victims similarly situated – were deprived of their property through a scheme of fraudulent concealment, and again to be clear, that property is not simply the cash they should have got, but (and absolutely certainly in this circuit, which has long held so) that property also includes their right of action to sue for restitution and their knowledge of that right as well.

117.  Now, no one is suing the United States here, or any employee thereof.

118.  Instead, these plaintiffs intend by this action to establish the civil liability to them of all those private persons, especially including the defense attorneys who participated in this scheme – as in Kelly Moore, who stood up for Sater at that sentencing and who is a partner at Morgan Lewis, and so by *respondeat superior* the firm itself – for their collusion and participation.

119.  Or put simply, let's see them argue that they shared sovereign immunity to participate in a fraudulent scheme of illegal sentencing which wouldn't' have been legal if the government did it alone and so can't have been the subject of any lawful order to them to violate every known ethical rule of conduct and go along with this.

## THE GRAVAMEN II

120.  We don't stop there. Recall the prior allegations that Sater used Bayrock as a money laundering device to siphon assets out of the firm, and through the firm, to avoid having them used for restitution (one presumes at the time he was not yet sure he'd get away with not having an illegal sentence of no restitution, although he'll be free to testify in deposition that no, he was secreting assets, but not to evade restitution because he had been told all along that the fix was in. We doubt that will happen.

121.  Well, one colleague of Sater's from "the day," a certain Roy Ageloff, is as far as we know still residing in a federal penitentiary, but not on charges of securities fraud or racketeering (he was involved in the same or similar acts as Sater et al.), rather on charges of money laundering, because when he was arrested for his stock frauds, like Sater in 1998, and learned he would be subject to a mandatory restitution order, in his case $80,000,000, he and his brother secreted away some $9,000,000 of the proceeds of his stock fraud to keep it out of the reach of the victims.

122.  And where did they hide the proceeds of that illegal activity? In dummy companies and trusts for the benefit of, yes, his wife and children, just as Sater did from the beginning at Bayrock.

123.  (Kelly Moore has admitted helping Sater hide a million or two in a trust for his wife and children in 2008, which he did by transferring his membership interests in Bayrock – interests she allowed him on June 21, 2010 in Courtroom 8B, E.D.N.Y, at about 2.00pm, to testify indirectly that he couldn't have owned because, he said,  he wasn't a member (that's sub-ornation and obstruction for her, perjury and obstruction for him), then having the trust immediately flip the interests back to Bayrock for cash.)

124.  (To be fair, Ms. Moore only admitted that she helped explain this to the probation officer preparing his updated, 2009 PSR, so the degree of facilitation she provided awaits deposition.)

125.  (And whether or not this money laundering – and it is, for one thing the money is the proceeds of crime, not securities fraud in this example, but rather crimes found predominantly in Title 26, not Title 18, it's still good old fashioned fraudulent transfer and fraudulent conveyance.)

126.  So, the group of responsible defendants must include all who facili-tated these fraudulent transfers, even if they didn't know everyone being defrauded, for example whether it was, or was only, crime victims.

134. (And yes, actions taken that are themselves predicate crimes but which are taken to conceal evidence of an existing or prior racketeering enterprise are deemed related thereto and thus part of it).

135. We refer, most especially, to the submission, directly or indirectly by Mobargha and Beys into courts in the E.D.N.Y, the S.D.N.Y, the Second Circuit, and the U.S. Supreme Court of manufactured evidence and related documents accusing various persons including Kriss of being responsible for death threats on Lauria and Sater by one Daniel Persico, insisting that these persons, including Kriss, did so by passing secret messages to Persico (who they say never before this knew who cooperated against him in *Coppa*) through Gerry Shargell to arrange Sater's murder to scare defendants into settling, when all the time they knew that Persico had been told over a decade earlier that Sater and Lauria had cooperated against him and indeed Lauria is quoted on his sentencing transcript explaining to the sentencing judge back in 2004 that he and the FBI were already aware that Persico knew and had even threatened him back then.

136. And then there's their most recent bout of witness tampering, itself a felony as well as a RICO predicate, in their conspiracy with Sater and Lauria in threatening Kriss and Ejekam (in writing yet) with ruin if they didn't drop this action.

137. Finally, derivative plaintiffs Kriss and Ejekam assert in behalf of the Bayrock companies of which they are members that all other liable defendants fully indemnify those companies.

138.  Otherwise, for their own protection, as crime victims per §136 they assert no individual claims in this complaint, awaiting disposition of forth-coming motions to ensure as of right their protection by this court, know-ing that until such disposition their abstention means at least that, *inter alia*, a common fund for the benefit of all the victims including the Holocaust survivors like the Gottdieners may be made maximum.

139.  Last, the plaintiff victims will demand injunctive relief and declara-tory relief that they and all others whom they represent, the class of all Coppa victims including all Sater and Lauria (White Rock) victims and all Baron and Blair victims, are crime victims of Sater and compelling the government perform its CVRA duties to all of them.

140.  This may include, in their discretion, the demand that Sater be resen-tenced in public again, but this time before all his victims.

141.  Accordingly, these plaintiffs assert that all requirements of FRCP 23 have been or will be satisfied, especially as to each and every one of (b)(1), (b)(2), and (b)(3) class requirements, as will be expanded further on certi-fication motion and amendment of this complaint.

142.  The following allegations in the First Amended Complaint in *Kriss I*, 10-CV-3959 (SDNY) (LGS) are incorporated herein as if set forth herein, again with the understanding that this complaint makes no claims against Akerman Senterfitt or Martin Domb, see herein ¶16: those in FAC ¶¶363 through 426; 428 through 519, 520 through 552, and 600 through 766.

*****

# VERIFICATION

143.  The undersigned, thoroughly familiar with the facts of this case including by years of involvement and document review, declare that they have personal knowledge of the facts contained in this complaint and declare same to be true and correct to the best of their knowledge, information, and belief, declaring again under penalty of perjury pursuant to 28 U.S.C. §1746 that the foregoing is true and correct.

Counsels signature:


Frederick M. Oberlander          Richard E. Lerner
THE LAW OFFICE OF                THE LAW OFFICE OF
FREDERICK M. OBERLANDER          RICHARD E. LERNER
28 Sycamore Lane (Box 1870)      501 5th Avenue, Ste 300
Montauk, New York 11954          New York, NY 10017
(212) 826-0357                   (917) 584-4864
(212) 202-7624 fax               (347) 824-2006 fax
fred55@aol.com                   richardlerner@msn.com
Counsel for Plaintiffs           Co-counsel